IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

ANTHONY HENRY,

    Plaintiff,

vs.

MUNICIPALITY OF ANCHORAGE and
MARK MEW,

    Defendants.

Case No. 3:15-cv-00187-RRB

**FIRST ORDER RE: DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
(Docket 503)**

    Defendants have moved for summary judgment as to almost all remaining counts.[1] Separately, Plaintiff has moved for Summary Judgment as to Count IX.[2] Although also addressed in this motion practice, Count IX will be addressed in a separate order.

## I.  STANDARD OF REVIEW

    Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.[3] The moving party bears the initial burden of proof for showing that no fact is in dispute.[4] If the moving party meets that burden, then it falls upon the non-moving party to refute with facts that

---

[1] Docket 503.
[2] Docket 472.
[3] Fed. R. Civ. P. 56(c).
[4] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

would indicate a genuine issue of fact for trial.[5] Summary judgment is appropriate if the facts and allegations presented by a party are merely colorable, or are not significantly probative.[6]

## II. BACKGROUND

The facts surrounding this highly contentious lawsuit have been discussed at length in prior briefing, as well as in various orders by this Court.[7] The parties have significantly expanded upon the factual summary in recent briefing, but the Court is well aware of the facts hereof—both disputed and otherwise.

## III. DISCUSSION

### A. Count I—Retaliation

**Count I** alleges retaliatory discharge under Alaska law against the Municipality of Anchorage ("MOA") and Chief Mew.[8] Title VII of the Civil Rights Act of 1964 protects individuals against employment discrimination on the bases of race, color, religion, sex, or national origin.[9] The anti-retaliation provision of Title VII forbids employers from discriminating against employees because they "opposed any practice made unlawful by Title VII" or "made a charge, testified, assisted or participated in a Title VII proceeding or investigation."[10] To prove a *prima facie* case of retaliation, Plaintiff must show that (1) he was engaging in a protected activity; (2) he suffered a materially adverse action or decision; and (3) a causal link exists between the protected activity and the materially adverse action or decision.[11] If a plaintiff asserts a *prima facie* retaliation claim, the burden shifts to the defendant to articulate a legitimate nondiscriminatory

---

[5] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).
[6] *Id.; see also In re Lewis*, 97 F.3d 1182, 1187 (9th Cir. 1996); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1995).
[7] *See* Docket 194.
[8] Docket 197 at 8.
[9] 42 U.S.C. §§ 2000e-2(b).
[10] 42 U.S.C. § 2000e-3(a).
[11] *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000).

*Henry v. Municipality of Anchorage, et al.*     Case No. 3:15-cv-00187-RRB
Order re Motion for Summary Judgment     Page 2
Case 3:15-cv-00187-RRB   Document 671   Filed 10/25/17   Page 2 of 17

reason for its decision. If the defendant articulates such a reason, the plaintiff, again, bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive.[12]

Plaintiff alleges that in 2012 he learned that another officer under his command had a degenerative medical condition. Plaintiff determined that the officer's medical condition was irrelevant to his job performance. However, his superiors transferred the officer to a different position. Plaintiff felt that the actions taken against the officer violated the Americans with Disabilities Act and APD policies, and Plaintiff complained of retaliation against that officer to his superiors. Plaintiff complains that, as a result of complaining about ADA violations against another officer, the APD proceeded to retaliate directly against *him*, ultimately resulting in Plaintiff's termination.[13]

Defendants argue that Henry's retaliation claims must be dismissed because his activity was not protected, he cannot meet the causation requirement, and he was discharged for legitimate, non-retaliatory reasons.[14] But Plaintiff argues that the facts of this case establish a "continuous train of retaliatory conduct, ultimately concluding in Lt. Henry's termination."[15] He details a series of events from 2011 through 2014, arguing that "during the spring of 2014, Lt. Vandegriff and Chief Mew brainstormed a way to get rid of Lt. Henry."[16]

Assuming, without concluding, that Plaintiff can make a *prima facie* case of retaliation,[17] the Court has considered Defendants' position that Lt. Henry was discharged for

---

[12] *Id.*
[13] Docket 192.
[14] Docket 503 at 34–45.
[15] Docket 607 at 7.
[16] *Id.* at 14.
[17] The Court doubts that causation could be shown here, but will give Plaintiff the benefit of the doubt in order to address the issue of pretext.

legitimate, non-retaliatory reasons. Specifically, they argue that Henry's termination was based on an independent third-party investigation by Lt. Colonel (Retired) John R. "Rick" Brown ("the Brown report"), which determined that Henry violated Anchorage Police Department ("APD") policy by his contacts with General Katkus, and then lied about those events during Brown's investigation.[18] MOA's Employee Relations Director, Nancy Usera, reviewed the Brown report, and then recommended to the Municipal Manager, George Vakalis, that Henry be terminated on the basis of that report. Henry thereafter was terminated effective April 1, 2015. In short, Henry was terminated by the Municipal Manager because an independent investigator concluded that Henry had engaged in "significant misconduct, including lying during the investigation."[19] He was not terminated by Chief Mew or Lt. Vandegriff, whom Henry seems to view as his primary antagonists. In fact, Chief Mew himself was the subject of some criticism in the Brown report.

However, Plaintiff argues that the Brown report was merely a pretext, and that the MOA's claim that it relied in good faith on Brown's findings that Lt. Henry "lied" is debatable. Plaintiff suggests that there are genuine issues of material fact regarding the pretextual nature of the MOA's termination decision.[20] Plaintiff claims that none of the decision-makers even read the Brown report in its entirety.

Although there may be many disputed facts, what is not disputed is the content of the Brown report, which the Court has read in its entirety and which is clear on its face. Ultimately, the report concluded that, at a minimum, Lt. Henry failed to "promptly report to a supervisor his unauthorized disclosure" of sensitive information on two occasions, thus negatively impacting at least one assault victim, as well as APD operations.[21] Brown recommended the "initiation of

---

[18] Docket 503 at 39.
[19] *Id.* at 40.
[20] Docket 607 at 29.
[21] Docket 506-2 at 20.

formal disciplinary, or other corrective, action" against Plaintiff for two "sustained" violations of department policy, and also recommended disciplinary action against another APD employee in his report.[22]

But Plaintiff argues that Brown's report was generated merely to create a buffer between Plaintiff's protected activity and what otherwise obviously would be retaliatory conduct. Plaintiff provides an exhibit that shows in the spring and summer of 2014 Chief Mew tried to interest the city in hiring a consultant with "special expertise in ridding police organizations of corrosive commanders." Chief Mew suggested that this consultant used "unusual means, one which the city has never to my knowledge undertaken, and one which parries a retaliation claim."[23] Plaintiff seems to suggest that Chief Mew was suggesting getting rid of him via some nefarious means. However, Chief Mew's cryptic email to Brown, sent during Brown's investigation, was not acted upon and only indicated that Chief Mew had strategized how best to handle a difficult situation. In fact, the Brown report ultimately was critical of Chief Mew as well as Henry, and contained recommendations for the APD in general. To the extent Plaintiff suggests that Brown himself had his own agenda, the Court is unpersuaded. The Court has thoroughly reviewed the Brown report, as well as Lt. Col. Brown's background available on the website for his LLC, Transparency Matters, which is listed in his report. Lt. Col. Brown, a former Pennsylvania State Police officer, launched Transparency Matters, a Pennsylvania-based LLC, after 29 years of service. He specializes in consulting with police agencies to provide "recommendations on how to develop quality internal affairs processes that enhance public trust."[24] Absolutely nothing in the record suggests that Brown—coming from Pennsylvania—would have any agenda or bias in

---

[22] *Id.*
[23] *See* Dockets 607 at 14; 238-3 at 1.
[24] http://www.transparencymattersllc.com/index.php (last visited July 27, 2017).

this Alaska matter. Performing investigations such as this, as an impartial third party, is the crux of his work. Plaintiff has failed to provide the Court with evidence of any motive that Brown would have to be disingenuous in his findings.[25]

While the Supreme Court did not go so far as to declare that an independent investigation does not automatically preclude litigation in these circumstances,[26] Brown's 98-page report with 123 attachments was produced after interviewing numerous witnesses—not just those witnesses who may have had an ax to grind with Lt. Henry. Nevertheless, "Title VII may still be violated where the ultimate decisionmaker, lacking individual discriminatory intent, takes an adverse employment action in reliance on factors affected by another decisionmaker's discriminatory animus."[27] However, if an employer's independent investigation "results in an adverse action for reasons unrelated to the supervisor's original biased action," then the employer will not be liable.[28] Here, there is little, if any, evidence that any of Plaintiff's supervisors were motivated by a discriminatory animus toward Henry. Moreover, there is no evidence that the Brown report was motivated by bias or that the MOA was wrong to rely upon it.

The Court is not persuaded that the Brown report was part of an elaborate plan to create a pretext for firing Plaintiff in retaliation for protected activities. There simply is no evidence in the record to establish that the decision by the MOA to terminate Henry was pretextual.

---

[25] Subsequent to the briefing on this issue, the Court considered whether to order the production of a number of documents that Plaintiff sought in discovery. After extensive briefing and a review of the materials *in camera*, the Court concluded that those materials did not render the Brown report unreliable. Docket 669.

[26] *See Straub*, 562 U.S. at 421.

[27] *Galdamez v. Potter*, 415 F.3d 1015, 1026 n.9 (9th Cir. 2005) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 232–35, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989)).

[28] *Anderson v. City & Cty. of San Francisco*, 169 F. Supp. 3d 995, 1019 (N.D. Cal. 2016) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011)).

The Court previously declined to grant summary judgment as to Count I.[29] However, in light of the foregoing, **Count I is now dismissed**.[30]

B.   **Count II—State Statute of Limitations**

Defendants next seek to limit **Count II** (Wrongful Termination) on statute of limitations grounds. Defendants argue that because Plaintiff contends that his claim for wrongful termination is a tort, it is subject to the two-year statute of limitations under Alaska Stat. § 09.10.070. Based on the dates of filing various complaints, Defendants argue that Henry is therefore barred from recovery under this theory for any incidents prior to May 6, 2013, two years before the original complaint was filed.[31]

Plaintiff conflates the federal and state arguments, arguing that *National Railroad Passenger Corp. v. Morgan*,[32] does not apply to state claims,[33] while failing to address the applicability of Alaska Stat. § 09.10.070. Although the parties disagree as to whether *Morgan* applies, "Henry does not dispute the applicability of AS 09.10.070, or explain why Defendants' argument that Henry's state law claims are measured back two years from May 6, 2015, the date he filed his lawsuit in Superior Court."[34] The Court finds that **according to the plain language of Alaska Stat. § 09.10.070, Henry's remaining state law claim is limited to events occurring on or after May 6, 2013**. The Court notes that Lt. Henry was not terminated until April of 2015.

---

[29] Docket 194 at 7.
[30] Alternatively, Defendants seek to dispose of Count I based on a two-year statute of limitations. Docket 503 at 33. Based on the dates of filing various complaints, Defendants allege that Henry cannot recover under this count against the MOA for any incidents occurring prior to May 6, 2013, or against Mew prior to September 21, 2013. *Id.* at 34. For the reasons discussed in section B of this order, Count I—were it not dismissed on the grounds discussed above—would be limited in time to events occurring after these relevant dates.
[31] Docket 503 at 34.
[32] 536 U.S. 101 (2002).
[33] Docket 607 at 42–43.
[34] Docket 644 at 7.

*Henry v. Municipality of Anchorage, et al.*  Case No. 3:15-cv-00187-RRB
Order re Motion for Summary Judgment  Page 7
Case 3:15-cv-00187-RRB   Document 671   Filed 10/25/17   Page 7 of 17

Accordingly, the statute of limitations does not appear to affect his wrongful termination claim, with the exception of the admissibility of background information, discussed below in Section C.

C. **Counts VI and VII—Federal Statute of Limitations**

**Count VI** (Violation of Title V – ADA Retaliation)[35] and **Count VII** (Violation of Title VII - the Civil Rights Act) previously were dismissed against Mark Mew.[36] Defendants now seek to further limit Henry's claims against the MOA under these two counts to events on or after February 3, 2013.[37] Defendants' rationale is that Henry's second EEOC claim was filed on August 2, 2013, and "claims filed directly with the EEOC must be filed within 180 days of the discriminatory act."[38]

Plaintiff argues that equitable tolling is permitted and that there is no bar to using prior acts as background evidence to support timely claims.[39]

**1. Equitable tolling**

Although Plaintiff raises the concept of equitable tolling, he fails to make any arguments to support that equitable tolling should be applied, nor does he argue that the statutes of limitation are not applicable to his Federal claims. However, he does argue that, because the two EEOC complaints were "inextricably intertwined," the relevant time period should be calculated based on the filing of the *first* EEOC complaint on January 28, 2013.[40]

In response, Defendants note that Henry's Federal claims are expressly based on his ***second*** EEOC claim, which was filed August 2, 2013. The Court agrees that Henry's Federal

---

[35] The Court also dismissed the portion of Count VI alleging a violation of Title I of the ADA. Docket 194.
[36] *Id.*
[37] Docket 503 at 23.
[38] *Id.* at 33 citing *Mun v. Univ. of Alaska at Anchorage*, 378 F. Supp. 2d 1149, 1155 (D. Alaska 2005).
[39] Docket 607 at 41.
[40] *Id.* at 42.

*Henry v. Municipality of Anchorage, et al.*     Case No. 3:15-cv-00187-RRB
Order re Motion for Summary Judgment     Page 8
Case 3:15-cv-00187-RRB   Document 671   Filed 10/25/17   Page 8 of 17

claims are restricted by the statute of limitations to events that occurred 180 days prior to that filing, or February 3, 2013.

### 2. Background evidence

Plaintiff next argues that an employee can use any act, even one that is untimely, as *background evidence* in support of a timely claim.[41] Defendants agree that background evidence may be admissible, but "still must be relevant to determine 'the ultimate question: whether the defendant intentionally discriminated against the plaintiff.'"[42]

The Court concludes that, under Fed. R. Evid. 403, the Court will have to exercise discretion to determine whether such "background evidence" is more prejudicial than probative.

## D. Count III—Breach of Implied Covenant of Good Faith and Fair Dealing and Count IV—Breach of Contract

Plaintiff alleges breach of contract for failure to fulfill the terms of the EEOC settlement agreement (**Count IV**). Plaintiff also alleges breach of the implied covenant of good faith and fair dealing for breaching the EEOC settlement agreement (**Count III**). Count III also alleges a breach of the implied covenant associated with the termination of his employment contract.[43]

### 1. Termination of employment

Defendants allege that Henry failed to exhaust his administrative remedies as to Count III because arbitration was mandatory under Anchorage Municipal Code 3.30.102, but that, even if he had exhausted his administrative remedies, the claim should be dismissed on the merits because Henry cannot show a breach of either the objective or the subjective components of the

---

[41] *Id.* at 41.
[42] Docket 644 at 8, citing *Lyons v. England*, 307 F.3d 1092, 1110 (9th Cir. 2002).
[43] Docket 197 at 9–10.

covenant with respect to his termination.[44] Plaintiff argues that the exhaustion requirement does not apply to retaliation claims, the due process claim, or the claims related to the settlement agreement.[45] Defendants do not revisit the exhaustion issue in their reply.

Addressing his good faith and fair dealing claim on the merits, and relying on the theory that the Brown report was mere pretext to terminate him, Plaintiff argues that "Defendants cite to no admissible evidence to establish that they had a good faith basis in accepting Rick Brown's conclusions."[46] He argues that the MOA played a "heavy handed role," in directing Brown's "singular focus on Lt. Henry."[47] Although Plaintiff claims that Brown admitted that Lt. Henry was the target of his investigation, the Court has reviewed Brown's deposition and finds no such admission. Rather, Brown testified at his deposition that he was hired to *investigate* various allegations, not to *confirm* them.[48]

As discussed in section A, above, Plaintiff has not provided adequate evidence of pretext to question the Municipality's reliance on the Rick Brown report in determining to fire him. Accordingly, whether or not Plaintiff exhausted his administrative remedies, any claim that the MOA breached the covenant by relying on the Rick Brown report fails.

### 2. EEOC settlement agreement

"The parties apparently agree that disposition of the contract breach issues applies as well to the corresponding implied covenant [of good faith and fair dealing] claim."[49] Plaintiff suggests that, "[w]hile the parties appear to agree that a contract exists, there are disputed factual

---

[44] Docket 503 at 45–53.
[45] Docket 607 at 43.
[46] *Id.* at 35.
[47] *Id.* at 36.
[48] Docket 610-26 at 2 (emphasis added).
[49] Docket 644 at 22.

*Henry v. Municipality of Anchorage, et al.*                                    Case No. 3:15-cv-00187-RRB
Order re Motion for Summary Judgment                            Page 10
Case 3:15-cv-00187-RRB   Document 671   Filed 10/25/17   Page 10 of 17

questions about whether the MOA failed to perform as agreed, and the meaning of material terms."[50]

Plaintiff alleges that the MOA breached the June 4, 2013, EEOC settlement agreement by violating the following provisions of the agreement: (1) APD would not retaliate; (2) records would be purged from his personnel file; (3) APD would provide department-wide EEO training; (4) the January 2014 OEO report would be provided to Henry; and (5) Henry would be included in discussions about his assignments.[51] Defendants argue that none of these terms were violated, and summary judgment should be entered on this claim.[52] The Court has reviewed the settlement agreement[53] in detail, and addresses each argument below. The Court notes that nowhere in the agreement did the parties agree upon a timeframe within which several of the items had to be performed.

### (i) Retaliation

The Court finds that Plaintiff's claim of retaliation under the settlement agreement fails for the same reasons that Count I fails.[54]

### (ii) Purging of records

The settlement agreement states that the MOA would remove several specific documents from Henry's IA file.[55] Although the records were removed from the file, it is undisputed that the MOA provided those records to the Alaska Police Standards Council ("APSC"), which subsequently considered the documents in an administrative matter involving

---

[50] Docket 607 at 37–38.
[51] *See* Docket 506-5 (settlement agreement).
[52] Docket 503 at 53–54.
[53] Docket 506-5 at 45–47.
[54] *See* section A, above.
[55] Docket 506-5 at 46.

*Henry v. Municipality of Anchorage, et al.*     Case No. 3:15-cv-00187-RRB
Order re Motion for Summary Judgment     Page 11
Case 3:15-cv-00187-RRB    Document 671    Filed 10/25/17    Page 11 of 17

revoking Lt. Henry's police certificate.[56] Defendants argue that "nothing in that agreement prevented APD from maintaining these IA records elsewhere. Moreover, they argue, any contention that APD should hold back certain records from the APSC in a reportable matter because of a purging agreement is contrary to the public policy inherent in policing of police."[57] Defendants note that the APSC will disregard any agreement to purge a prior disciplinary record when determining if an officer has engaged in misconduct for license revocation purposes.[58] Indeed, the APSC has addressed this issue:

> That reference to the prior discharge has been purged from the Alaska State Troopers files does not mean that no discharge occurred. Rather, removing reference to the prior discharge means that for purposes of any future personnel action by the <u>employer</u>, the discharge will be treated as if it had never occurred. But the fact remains that the discharge <u>did</u> occur, and the absence of any reference to it in the employer's records does not mean that the council's own records of that discharge have been wiped clean. The arbitrator has authority under a collective bargaining agreement to bind the Alaska State Troopers to the arbitrator's decision, but lacks any authority to limit the council's disciplinary actions based on information in the council's records.[59]

Henry cites no authority to the contrary. While it appears that there may not have been a meeting of the minds as to the meaning of the words "Respondent will remove the following documentation documents (in its entirety) from Charging Party's IA File,"[60] that simply means the parties did not have a valid contract; it does not mean that Defendants breached the settlement agreement in this regard.

---

[56] Docket 607 at 39.
[57] Docket 644 at 23.
[58] Docket 644.
[59] *In re Bowen*, AOH No. 10-0327-POC, pp. 11–12 (May 16, 2011) (emphasis original).
[60] Docket 506-5 at 46.

### (iii) Training

The settlement agreement requires the MOA to provide EEO and ADA training department wide.[61] Defendants have provided a 64-page Power Point presentation as evidence that this requirement was fulfilled.[62] Plaintiff complains that this is not adequate evidence of compliance, but then complains that the log identifying officers who received the training received it after Henry filed this lawsuit.[63] But, again, the Court notes that no deadline was set in the settlement agreement. Plaintiff concedes that training was provided in 2015 and 2016. Although this was after he filed his lawsuit, the fact remains that, at this point, the training has been provided. This issue therefore is moot, as Henry has not suggested that he suffered any personal damages due to the delay in training.

### (iv) Copy of report

The settlement agreement required the MOA to provide Henry with a copy of the OEO investigative report "only after legal review by the City Attorney and/or a Court Order allowing the release of the investigative report."[64] Henry complains that Defendants hid the report during arbitration and the first *Kennedy/Feliciano* trial.[65] However, Defendants note that a court order was not provided until May 19, 2015. It is unclear whether the City Attorney could have unilaterally released the report.

The Court notes that the report was provided *in camera* to the state court judge in the *Kennedy/Feliciano* matter on February 25, 2015.[66] In his order, Judge Pfiffner noted that

---

[61] *Id.*
[62] Docket 505-1 at 29–92.
[63] Docket 607 at 40.
[64] Docket 506-5 at 46.
[65] Docket 607 at 40.
[66] *See* Docket 221-1.

failure to order production earlier was due to the *court's* oversight.  He considered all of the Municipality's arguments against disclosure and ordered production of a redacted version.

Again, Defendants have met the letter of the settlement agreement by waiting for a court order to disclose the OEO report.

### (v) Future assignments

The settlement agreement required the MOA to include Henry in discussions regarding his future assignments.[67]  Henry complains that not only was he not included in these discussions, but that the assignments he received, including working as the head of the School Resource Officers and then as head of the Special Victim's Unit, were humiliating.[68]  But, Defendants note that these complaints are belied by the record, including Henry's own testimony.[69]  Indeed, emails dated May 2014 reflect that Henry was included in "lengthy discussions" regarding his next assignment, prior to assigning him to SVU.  Henry did not dispute this statement in his responsive email.[70]  In Henry's August 2016 deposition, he testified that his assignment to homicide did not reflect a "loss of prestige," but that "a message" was being sent by assigning him to the schools, although he continued to receive his regular salary.[71]  He also stated that he "enjoy[ed] working wherever they tell me to work," and conceded that the work at the schools was important work for the community.[72]  He indicated that he enjoyed the SVU work for the short time he was there.[73]

---

[67] Docket 506-5 at 46.
[68] Docket 607 at 40.
[69] Docket 644 at 23.
[70] Docket 506-5 at 92.
[71] Docket 646-1 at 96.
[72] *Id*. at 96–97.
[73] *Id*.

*Henry v. Municipality of Anchorage, et al.*                                    Case No. 3:15-cv-00187-RRB
Order re Motion for Summary Judgment                                         Page 14
Case 3:15-cv-00187-RRB   Document 671   Filed 10/25/17   Page 14 of 17

In light of the foregoing, no genuine issues of material fact remain as to Plaintiff's breach of contract claim regarding the settlement agreement, and the associated claim for breach of the implied covenant of good faith and fair dealing.  **Counts III and IV are DISMISSED**.[74]

E.   **Lost Wages**

In the case of wrongful discharge, damages consist of "the total amount of the agreed upon salary for the unexpired term of [plaintiff's] employment, less what he could earn by making diligent efforts to obtain similar employment."[75]  Defendants argue that Henry voluntarily agreed to not seek employment in Alaska as a police officer, and therefore "the doctrine of avoidable consequences precludes him from seeking lost wages based upon the fact that he's not earning Alaska police wages.  The defendants are therefore entitled to summary judgment cutting off damages as of no later than July 15, 2016."[76]

In response, Henry argues that his decision not to seek employment was based on an agreement with the APSC to stay the police certification revocations proceedings until this case is finished.  "Otherwise, Lt. Henry would have been forced to litigate the same issues in two forums."[77]  However, Defendants observe that regardless of the outcome of this litigation, the APSC still could revoke Henry's police certificate.  Defendants reason that Henry elected to complete this case before his license is revoked in order to preserve his ability to claim front pay or reinstatement.  Were his license revoked prior to this litigation, his eligibility for lost wages

---

[74] Count V remained in Plaintiff's Second Amended Complaint filed at Docket 197.  Nevertheless, Count V was dismissed at Docket 194.
[75] *Luedtke v. Nabors Alaska Drilling, Inc.*, 834 P.2d 1220, 1226 (Alaska 1992).
[76] Defendants argue that "[t]he doctrine of avoidable consequences is well enshrined in Alaska law.  *Johnson v. Alaska Dep't of Fish & Game*, 836 P.2d 896, 911 n.26 (Alaska 1991).  Federal law is the same.  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764 (1998)."  Docket 503 at 58, 61.
[77] Docket 607 at 47.

*Henry v. Municipality of Anchorage, et al.* Case No. 3:15-cv-00187-RRB
Order re Motion for Summary Judgment Page 15
Case 3:15-cv-00187-RRB   Document 671   Filed 10/25/17   Page 15 of 17

would be impacted. Defendants argue that choosing the strategy to voluntarily remove himself from police work caps his damages as of the date he elected to do so.[78]

The Ninth Circuit has held that "there is no right to have a jury determine the appropriate amount of back pay under Title VII . . . . Instead, back pay remains an equitable remedy to be awarded by the district court in its discretion."[79] Accordingly, this is the proverbial bridge the Court can cross when it comes to it. The Court notes that if Henry made the strategic move to delay his APSC certification revocation proceedings until after this trial, part of that gamble involved giving up his right to work under his police certificate. Without the right to work under his police certificate, his right to back pay would be extinguished on that date. However, the parties have not addressed whether Henry would be entitled to lost wages at a different (lower) rate than that which he could earn under his police certificate, nor have the parties addressed any other type of mitigation, or lack thereof. The Court simply lacks adequate information to make a ruling on this issue.

F.  **Punitive Damages**

Plaintiff argues that MOA ordinances allow for an award of punitive damages for employees who report "matters of public concern," which includes any "violation of federal, state or municipal law, regulations or ordinance."[80] Plaintiff argues that if he prevails on his retaliation claim, he is entitled to punitive damages.[81] The Court notes that, having dismissed the retaliation claim, punitive damages are no longer available.

---

[78] Docket 644 at 23.
[79] *Lutz v. Glendale Union High Sch.*, 403 F.3d 1061, 1069 (9th Cir. 2005) (citing *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 415–16, 95 S. Ct. 2362, 45 L. Ed. 2d 280 (1975)).
[80] Docket 607 at 46, citing Anchorage Municipal Code 3.75.010–.020.
[81] Docket 607 at 46.

## IV. CONCLUSION

In light for the foregoing, it is hereby ordered that the Motion for Summary Judgment at Docket 503 is **GRANTED IN PART** as follows:

1. **Count I** is DISMISSED.

2. **Count II** is limited to events that occurred on or after May 6, 2013.

3. **Counts III and IV** are DISMISSED

4. **Counts VI and VII** are limited to events that occurred on or after February 3, 2013.

5. The Court defers the issue of **Lost Wages** until after resolution of the merits.

6. Plaintiff's claim for **Punitive Damages** is dismissed.

7. **Count IX** will be considered in a separate Order.

IT IS SO ORDERED this 25th day of October, 2017, at Anchorage, Alaska.

                                                       */s/ Ralph R. Beistline*
                                                       RALPH R. BEISTLINE
                                                  Senior United States District Judge

*Henry v. Municipality of Anchorage, et al.*                                            Case No. 3:15-cv-00187-RRB
Order re Motion for Summary Judgment                                                          Page 17
Case 3:15-cv-00187-RRB    Document 671    Filed 10/25/17    Page 17 of 17