## MUNICIPALITY OF ANCHORAGE, ANCHORAGE POLICE DEPARTMENT

## INTERNAL INVESTIGATION REPORT

Date of Report:  March 15, 2015          Report Number:  TMLLC 2014-3

Investigator:  Lieutenant Colonel (Retired) John R. "Rick" Brown
Transparency Matters, LLC
P.O. Box 6598
Harrisburg, PA 17112
Telephone: █████████
Email: █████████████████████
www.transparencymattersllc.com

## SUBJECT OF INVESTIGATION

Lieutenant Anthony C. Henry
Anchorage Police Department
4501 Elmore Road
Anchorage, Alaska 99507-1599
DSN Number 973

Chief Mark T. Mew
Anchorage Police Department
4501 Elmore Road
Anchorage, Alaska 99507-1599
DSN Number 662

## REASON FOR INVESTIGATION

On October 3, 2014, this investigator was retained by the Municipality of Anchorage (MOA), Alaska through its city manager, George Vakalis, to conduct an independent internal administrative investigation into the facts and circumstances surrounding two events:

1. The alleged release of confidential informant information by employees of the Anchorage Police Department (APD), relating to illegal drug dealing within the Alaska National Guard (AKNG), Army Guard Recruitment and Retention Unit, and the impact of any substantiated release of confidential information on the APD or other agency's ability to properly investigate the criminal activity.

2. The alleged release of confidential informant information by employees of the Anchorage Police Department (APD), relating to sexual assaults within the AKNG, and the impact of any substantiated release of confidential information on the APD's ability to properly investigate the criminal activity.

Case 3:15-cv-00187-RRB   Document 1003-1   Filed 10/18/18   Page 1 of 50
Case 3:15-cv-00187-RRB   Document 899-1 *SEALED*   Filed 09/14/18   Page 1 of 50
MOA 006587

## SYNOPSIS OF INVESTIGATION

On February 23, 2010, APD Special Assignment Unit (SAU) personnel, including Officer Seth McMillan, observed ⬛D.A.⬛ (The boyfriend of AKNG Recruiter ⬛E.J.⬛ ⬛E.J.⬛ ) conduct a hand-to-hand drug transaction in the Costco Debarr Parking Lot in Anchorage, Alaska. Subsequently, a traffic stop was initiated by APD Officer Charles Robertson. ⬛D.A.⬛ was detained by Officer Robertson and his vehicle was ultimately searched. APD officers seized fifty-six grams of cocaine and three hundred twenty grams of marijuana. ⬛D.A.⬛ was taken to the APD for further processing. No formal criminal charges were filed against ⬛D.A.⬛ as a result of the traffic stop

On February 24, 2010, APD investigators Officers Jack Carson, Eric Smith, and Alaska State Trooper (AST) Joseph Hazelaar met and debriefed ⬛D.A.⬛ who informed the investigators that he could purchase and receive illegal drugs from a person known to him as ⬛R.Z.⬛ ⬛D.A.⬛ related that he communicates with ⬛R.Z.⬛ through his source, who was identified as ⬛E.P.⬛ a member of the AKNG Recruitment and Retention Unit. According to ⬛D.A.⬛ ⬛E.P.⬛ paid ⬛R.Z.⬛ $3,000 for the drugs that were seized by the APD during the traffic stop and search on February 23, 2010. ⬛D.A.⬛ related that he informed ⬛E.P.⬛ of the traffic stop and seizure. ⬛D.A.⬛ related that ⬛E.P.⬛ expressed his willingness to help the APD in their drug investigation for consideration on ⬛D.A.⬛'s pending drug charges.

On February 25, 2010, SAU Officer Jack Carson and AST Hazelaar met with ⬛E.P.⬛ who initially denied dealing drugs, but eventually admitted to being the main contact for a larger Mexican drug ring operating in the Anchorage area. ⬛E.P.⬛ also admitted to transporting drugs on AKNG work time and in AKNG vehicles. ⬛E.P.⬛ identified his drug source as Anchorage resident ⬛R.Z.⬛ . During this meeting, ⬛E.P.⬛ requested officers not notify his employer, the AKNG. SAU Officer Carson and AST Hazelaar advised ⬛D.A.⬛ that they had no intention of notifying ⬛E.P.⬛'s employer and that notifying employers was not the SAU's common practice. (AST Hazelaar was assigned to the APD SAU at this time )

At the time of the investigation, Officer Carson's wife, Mia Carson, worked for the AKNG as an Air Guard recruiter. She worked next to the Army Guard recruiters. Through Mia Carson's observations, investigators suspected illegal drug dealing activity in the Army Guard Unit to be large-scale and pervasive. The Army Guard recruiters often bragged to Mia Carson that General Thomas H. Katkus, Commander of the AKNG, was in their pocket. SAU case officers Jack Carson, Seth McMillan, and AST Joseph Hazelaar interpreted and suspected that General Katkus was not directly involved in drug dealing activity, but rather the whole Army Guard Recruitment Unit was involved in the illegal drug activity and that General Katkus ignored and tolerated these illegal activities.

Additionally, on February 25, 2010, Officer Carson and AST Hazelaar informed APD SAU Lieutenant (LT) Anthony Henry of the investigative specifics, including the alleged illegal activity within AKNG. LT Henry was informed of the possible importance of the case, specifically statements from confidential informants ⬛D.A.⬛ and ⬛E.P.⬛ regarding the ability to obtain pounds of marijuana and large amounts of cocaine. LT Henry indicated his intent to notify General Katkus and establish a meeting. Officer Carson

related that he and AST Hazelaar both voiced their concerns to LT Henry that ███ E.P. ███ had been told by both investigators (Officer Carson and AST Hazelaar) that they would not contact ███ E.P. ███'s employer. LT Henry informed Officer Carson and AST Hazelaar that they had made a promise that they could not keep and that notification to General Katkus would occur. LT Henry set up the meeting with General Katkus at the AKNG for the very next day.

On February 26, 2010 a meeting was held at the AKNG and was attended by AKNG Commanders General Thomas Katkus and Lieutenant Colonel (LTC) Timothy DeHaas, and SAU personnel LT Henry, Officer Carson, and AST Hazelaar. LT Henry disclosed the ongoing SAU drug dealing investigation at the AKNG and directed Officer Carson and AST Hazelaar to disclose the particulars of the investigation. Officer Carson related that he and AST Hazelaar disclosed their belief that AKNG Recruiters ███ E.J. ███ ███ E.J. ███ ███ E.P. ███ ███ J.C. ███, and ███ J.N. ███ were all involved in, or possessed knowledge of, the drug trafficking in the AKNG. Officer Carson related that he and AST Hazelaar knew that ███ E.P. ███ was heavily involved in drug dealing and it was suspected that the rest of the Army Guard recruiters were also involved. General Katkus then informed the SAU officers in attendance that there were some suspicions within the Guard that ███████ J.N. ███████ had been returned from Afghanistan or Iraq because of suspected steroid use.

According to SAU Officers Carson and McMillan (Officer McMillian did not attend the February 26, 2010 meeting at the AKNG), the meeting with the AKNG command clearly compromised the SAU drug investigation into the Army Guard recruiters. The disclosures did not compromise the separate federal Safe Streets Task Force (SSTF) drug investigation into the Mexican drug cartels coming to Anchorage to establish drug houses.

Officer Carson related that within a few days of the meeting with leaders of the AKNG (between February 28, 2010 and approximately March 5, 2010), two of the suspected Army Guard recruiters, ███ E.P. ███ and ███ J.N. ███ entered his wife Mia Carson's office and conducted a search for information about his identify. ███ E.P. ███ and ███ J.N. ███ were particularly interested in photographs Ms. Carson had on her desk of her husband SAU Officer Carson. The actions of ███ E.P. ███ and ███ J.N. ███ threatened and intimidated Mia Carson. Mia Carson shared information about the Army recruiters intimidating her with her supervisor Air Guard Recruiter Beth Miller. Officer Carson notified his SAU Supervisor Sergeant (SGT) Darrel Redick of concerns regarding his wife's safety. Mia Carson's supervisor Beth Miller notified the second in command of the AKNG Colonel Keese, and she was moved to later shift hours to avoid contact with the Army Guard recruiters. Officer Carson related that both Mia Carson and Beth Miller were subsequently ordered to sign a gag order (not to discuss the actions of ███ E.P. ███ and ███ J.N. ███ with anyone) by AKNG command (who provided the gag order in particular from the AKNG is not clear). Officer Carson related that not long after the aforementioned incident occurred in his wife's office, ███ E.P. ███ stopped providing information on the illegal drug dealing activity allegedly occurring within the AKNG.

On March 12, 2010 the federal airport interdiction detail seizes thirty-three pounds of marijuana at the Anchorage International Airport. The seizure does not meet the federal minimum standards for prosecution and the case is referred to SAU for further

investigation.

On March 24, 2010 SAU is working with the SSTF linked several residences (also referred to as drug houses) in the Anchorage area with links to a drug ring out of California and Mexico with reported ties to the Mexican Drug Cartel La Familia. SAU and SSTF personnel believing this drug investigation was compromised executed search warrants on the known drug houses and seized five pounds of methamphetamine, one-half kilo of cocaine, and $181,000 in cash.

On March 29, 2010 AKNG ███████ S.T. ███████ makes an anonymous restricted report to the AKNG Sexual Assault Response Coordinator (SARC) and a forensic exam was completed by the Anchorage Sexual Assault Response Team.

On June 3, 2010, Officer McMillan was ordered by LT Henry to disclose the name of another confidential source of drug information within the AKNG. In addition, this confidential source was also providing Officer McMillan with information relating to alleged sexual assaults that were occurring within the AKNG. Officer McMillan disclosed the name of his confidential informant, AKNG ████ K.B. ████ ████ K.B. ████████ to LT Henry. LT Henry contacted General Katkus telephonically and, in the presence of Officer McMillan, notified General Katkus that ████ K.B. ████ was the source providing information to Officer McMillan relating to the illegal activities occurring within the AKNG. LT Henry then ordered Officers McMillan and Carson to cease investigation of all alleged illegal activities involving AKNG recruiters and General Katkus.

On June 4, 2010, a second meeting occurred at the office of General Katkus. Present for the meeting were LT Henry, SGT Darrel Redick, and Officer McMillan from the APD. The AKNG was represented by General Katkus and LTC DeHaas. During this meeting AKNG ████ K.B. ████ was directed to report and enter into the meeting. General Katkus had learned the night before from LT Henry that ████ K.B. ████ was assisting and knew the names of several female AKNG members who were victims of sexual assault allegedly occurring within the AKNG. General Katkus ordered K.B. ████ K.B. ████ to disclose the names of sexual assault victims who had come to him for assistance in reporting their sexual assaults to civilian law enforcement. ████ K.B. ████ refused to disclose the names of the sexual assault victims and was dismissed from the meeting.

Shortly after the meeting with AKNG command and APD personnel on June 4, 2010, ████ K.B. ████ informed the four AKNG sexual assault victims of the attempted disclosure of their names by AKNG command in the presence of APD personnel. K.B. ████ K.B. ████ also disclosed to the four victims that an Army AR 15-6 (AR 15-6 Defined: Army Procedure for Investigating Officers and Board Officers.) investigation was initiated against him by senior command. One AKNG sexual assault victim in particular, ████████ S.T. ████████, was deterred from reporting the sexual assault committed on her to the APD when she learned that AKNG command ordered ████ K.B. ████ to breach her confidentiality while APD personnel was in the room.

The disclosure of SAU AKNG confidential informants and illegal drug dealing specifics that occurred on February 26, 2010, and the disclosure of another confidential informant that occurred on June 3-4, 2010 were not reported to any supervisor in LT Henry's chain of command until October 2013.

On June 28, 2013 Officer Seth McMillan transported AKNG ████ J.N. ████ to the APD parking lot in furtherance of processing him for a Psychiatric Evaluation (Title 47). ████ J.N. ████ / ████ J.W. ████ this same date made indirect homicidal threats regarding AKNG ████ J.N. ████. When Officer McMillan arrived at the Providence Psych Unit with ████ in custody a suspicious extended cab Chevrolet SUV had pulled in behind him. The APD investigation revealed the driver of the vehicle was ████ ████ M.G. ████ a close friend of AKNG ████ S.2. ████ who is a close associate of ████ J.N. ████

In October 2013 APD Deputy Chief (DC) Steve Hebbe (now retired) was made aware for the first time by recently promoted SGT Jack Carson of the sexual assault and drug allegations involving the AKNG Army Recruitment and Retention Unit, and the disclosures of confidential informant information to potential subjects of an official APD drug investigation. On at least two occasions in October 2013, DC Hebbe encouraged APD Chief of Police Mark T. Mew to initiate an internal investigation to determine APD's role in these incidents.

On November 7, 2013, Chief Mew received an email that was referred to his office from the Anchorage Mayor's Office regarding a complaint by a former member of the AKNG named ████ about cover-ups by the APD. One specific allegation involved the alleged cover-up of ████ AKNG member ████ M.C. ████ alleged ████ M.C. ████ reported her fear ████ (feared the AKNG recruiters) to her superiors and then ████ According to ████ M.C. ████ was allegedly covered-up by General Katkus and ultimately APD. ████



████ M.C ████

Note: This investigator learned from the APD Special Victim's Unit (SVU) review of ████ ████ that ████ M.C. ████ was allegedly raped ████ SVU notified Army CID and an investigation was initiated to attempt to identify the perpetrator of the sexual assault on ████ M.C. ████ (Refer to LT McCoy's interview of December 19, 2014 in the Details section of this report)

Additionally, during the meeting with APD members on November 7, 2013 the attendees discussed in part the following information that was taken directly from Chief Mew's prepared timeline of events. Chief Mew's timeline was initiated and completed in September 2014. Chief Mew admits to confusion as to some of the specific details but the following is taken directly from his timeline:

- The local AKNG drug case was going well enough until APD officers tried to interview and roll (obtain his cooperation and enlist ██ E.P. ██ as a source of information to further the SAU investigation into the AKNG) ██ E.P. ██ The APD

informed General Katkus of what they (the APD investigators) were going to do. The investigation stalled in several ways immediately thereafter. (Note: The initial two drug informants, **D.A.** and **E.P.** stopped cooperating and their lack of further cooperation impeded any further investigation into the AKNG.)

- After the drug case stalled, AKNG personnel conducted counter-surveillance of SAU personnel.

- SGT Carson's wife and another woman, who were also AKNG recruiters but uninvolved in these controversies, became subjects of intimidation by the suspect recruiters.

- The SAU wanted to investigate General Katkus for possibly interfering (with the AKNG drug investigation) but LT Henry wouldn't let them. LT Henry also failed to notify his superiors about his unit's concerns regarding General Katkus and of his (LT Henry) decision not to investigate.

- At a follow-up meeting between SAU and AKNG, General Katkus seem peeved, and addressed Officer McMillan as a guardsman rather than as a police officer. Officer McMillan saw the writing on the wall and left the AKNG soon after.

DC Fanning recommended to Chief Mew at the meeting on November 7, 2013 that the APD should investigate the identified concerns to ascertain the APD's potential liability.

In late November into December 2013 CPT Bill Miller is notified that LT Henry directed SAU personnel to stop investigating the AKNG in general. CPT Miller recommended to Chief Mew that an internal investigation should be initiated into LT Henry's conduct.

On May 1, 2014, APD members DC Myron Fanning, (now retired) DC Steve Smith, CPT Bill Miller, LT Kenneth McCoy, and SGT John McKinnon met with Chief Mew to provide a briefing regarding negative media releases involving the APD. Specific allegations included LT Henry's illegal or unethical direction to disclose the name of **K.B.** to the AKNG command as a confidential informant who was providing information regarding drug dealing and possible sexual assaults occurring in the AKNG. DC Fanning, CPT Miller and LT McCoy advised Chief Mew to initiate an internal investigation into this matter.

Approximately an hour or so later, a second meeting occurred at Anchorage City Hall, which included SGT Jack Carson and Officer Seth McMillan, along with the APD members mentioned in the above paragraph. During this meeting, the same APD commanders once again requested that Chief Mew initiate an internal investigation into this matter. Despite repeated recommendations from APD mid-level and senior commanders, Chief Mew did not initiate an internal investigation into the allegations of misconduct brought to his attention.

## TIMELINE OF SIGNIFICANT EVENTS

- February 23, 2010 – APD SAU's initial encounter with drug suspect  D.A. ████

- February 24, 2010 – SAU confidential informant D.A. is debriefed by Officers Carson and Smith, and AST Hazelaar.

- February 25, 2010 – SAU confidential informant AKNG E.P. is debriefed by Officer Carson and AST Hazelaar.

- February 26, 2010 – SAU personnel meet with AKNG command. SAU confidential AKNG drug informants and investigation specifics are directed disclosed by LT Henry to AKNG command.

- February 28, 2010 through March 5, 2010 – AKNG drug suspects E.P. ████ and J.N. are caught in Mia Carson's office seeking information on her husband, SAU Officer Jack Carson. Ms. Carson feels threatened and intimidated by E.P. s and J.N. actions.

- March 12, 2010 – Federal drug enforcement interdiction detail at Anchorage International Airport seizes thirty-three pounds of marijuana.

- March 24, 2010 – Search warrants are executed at drug houses in the Anchorage area with links to a California and Mexico drug operation with reported ties to the Mexican Drug Cartel La Familia.

- March 29, 2010 – AKNG S.T. makes an anonymous restricted sexual assault report to the AKNG SARC.

- June 3, 2010 – Officer McMillan is ordered by LT Henry to disclose his source of AKNG sexual assault information. LT Henry notifies General Katkus, by telephone, that K.B. is the SAU source of AKNG information.

- June 4, 2010 – SAU meeting with AKNG command. AKNG command orders K.B. to breach the confidentiality of the sexual assault victims by providing their names. K.B. refuses.

- June 28, 2013 – M.G. an associate of the suspect AKNG recruiters conducts surveillance on Officer McMillan. Officer McMillan has J.N. in custody and is in the process of transporting him to the ████ for processing.

- October 2013 – DC Hebbe recommends to Chief Mew on at least two occasions an internal investigation should be initiated into LT Henry's conduct in relation to the AKNG.

- November 7, 2013 – Chief Mew is informed of LT Henry's conduct and an internal investigation is recommended by DC Fanning.

- November (late November) – December 2013 CPT Bill Miller learned of LT Henry's conduct and recommended to Chief Mew that an internal investigation should be initiated to determine APD's liability.

- May 1, 2014 – Two separate meetings with Chief Mew occurred and DC Fanning, CPT Miller, and LT McCoy recommended, at both meetings, an internal investigation should be initiated into LT Henry's conduct in relation to the AKNG.

## CONCLUSIONS

**1. The following conclusions are based upon a preponderance of the evidence standard, supported by authenticated interviews and related documentation obtained during this investigation. The following has been determined relating to the conduct of LT Anthony Henry:**

A. On February 26, 2010, LT Henry, while at a meeting with AKNG command staff at the AKNG headquarters, disclosed, and directed the disclosure by Officer Jack Carson and AST Joseph Hazelaar of the names of two SAU confidential informants named ██D.A.██ and AKNG member ██ ██E.P.██ In addition, the names of three additional AKNG suspects who were possibly active in illegal drug dealing activity within the AKNG were disclosed: Army Guard Recruiters ██J.C.██ ██J.N.██, and ██E.J.██ The meeting attendees were AKNG General Thomas Katkus and LTC Timothy DeHaas, SAU members LT Henry, Officer Jack Carson (now SGT) and AST Joseph Hazelaar. General Katkus and LTC DeHaas are non-law enforcement personnel and were not authorized to receive the APD confidential informant information at such an early stage of the investigation. The meeting between LT Henry, SGT Carson, AST Hazelaar, General Katkus. and LTC DeHaas occurred approximately seventy-two hours after a vehicle stop, drug seizure, and APD detention of ██D.A.██ During the same initial seventy-two hour time period, AKNG member ██E.P.██ was identified as being involved in illegal drug dealing activity and was debriefed by SAU personnel. Both ██D.A.██ and ██E.P.██ agreed to cooperate with the SAU investigation by providing information and arranging controlled drug purchases from a major drug supplier to the Anchorage region identified as ██████R.Z.██████.

B. APD informant registration documentation was processed for ██E.P.██ and was completed on February 26, 2010, the same day the disclosure of ██E.P.██ s information was made to non-law enforcement personnel at the

AKNG. ▇E.P.▇ was interviewed telephonically and related that he had been called into the office by General Katkus while he was actively working as a confidential drug informant for the APD and was informed by General Katkus that he knew about his ▇E.P.▇ involvement as drug informant for the APD.

C. As a result of the informant disclosures directed by LT Henry, AKNG members General Katkus and LTC DeHaas were provided with confidential APD information concerning APD's operations, APD activities and matters of law enforcement business. LT Henry gained the involved SAU informant and investigative information by virtue of his position within the APD. The disclosure of the identities of APD confidential informants, and identities of additional drug suspects, to non-law enforcement personnel should not occur unless approved by the appropriate APD command personnel after a determination that the investigation, safety of informants, and APD personnel will not be compromised. LT Henry never reported to his supervisors' information regarding his meetings with and disclosures to the AKNG on February 26, 2010 and June 3-4, 2010.

D. During his two administrative interviews, LT Henry continually connected the SAU AKNG drug investigation initiated on February 23, 2010 to a federal ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ case.

E. LT Henry provided a memorandum identifying a second meeting with General Katkus on March 11, 2010. LT Henry recalled AST Hazelaar was present but his notes say the FBI was in attendance. This investigator has no concern with the SSTF disclosures made to the AKNG on this date because these disclosures had nothing to do with the initial SAU drug investigation. At this time these investigations were running on two separate tracks. It wasn't until the airport interdiction on March 12, 2010 and subsequent follow-up that it was learned there was a Mexican drug cartel link between the targets of the federal ▇▇▇▇▇▇ investigation and the SAU investigation. As discussed above, the SAU investigation was compromised in the first seventy-two hours of its initiation. The APD command staff above LT Henry (including his supervising captain, the deputy chief of operations, and Chief Mew) did not authorize the release of this information to the AKNG which is troubling in such a significant illegal drug trafficking case.

AST Hazelaar (now retired) was telephonically interviewed and recorded on October 29, 2014 by LT Kevin Vandegriff, APD Internal Affairs Division. AST Hazelaar related that on February 23, 2010 he was assigned to the APD's SAU. He confirmed that the AKNG recruiter drug case did not involve any type of federal or ▇▇▇▇▇▇ participation as stated by LT Henry.

Officer Eric Smith was interviewed on November 14, 2014 and confirmed that the SAU drug investigation with connections to the AKNG was not a federal investigation at its initiation. Officer Smith related his role was merely that of assisting members of the SAU with the debriefing of both informants and facilitating any drug purchases that were arranged by ▇D.A.▇ and ▇E.P.▇ Officer Smith also confirmed that this case did not become a federal investigation until

the airport interdiction that occurred on March 12, 2010. The interdiction was not known to be related to the SAU drug investigation of the AKNG until it was learned that a significant drug seizure was linked to ██E.P.██ and ██D.A.██ s main drug source ███████R.Z.███████. The total marijuana seized during this interdiction was one hundred twenty-six pounds along with approximately $60,000 in cash.

In this investigator's opinion, t LT Henry's continual references to the federal ██████ case were attempts to evade his accountability for the disclosures to AKNG command staff of confidential informant identities and AKNG drug dealing issues under investigation.

F. On June 3, 2010, Officer Seth McMillan was ordered by LT Henry to disclose the name of his source of information within the AKNG who provided him with the name of ████J.N.████ as a potential source of drug information within the AKNG Recruitment and Retention Unit. Officer McMillan disclosed the name of his confidential informant, ██████K.B.██████ as the source that provided the information regarding ████J.N.████ ████K.B.████ also advised Officer McMillan that he had been contacted by several female AKNG members who had been sexually assaulted by male members of the AKNG Recruitment and Retention Unit, and that these victims wanted to report these incidents to the APD. Officer McMillan attempted to facilitate ████K.B.████'s request and recommended that ████K.B.████ contact the APD Special Victims Unit (SVU).

G. LT Henry denies having a discussion with Officer McMillan, on June 3, 2010, about disclosing the name of ████K.B.████ as the AKNG sexual assault informant. LT Henry also denies that there was a meeting with AKNG command staff the following day, on June 4, 2010, and that ████K.B.████ was ordered by AKNG General Katkus and Chief of Staff, LTC DeHaas, to disclose the names of female AKNG sexual assault victims.

H. LT Henry is adamant that he has no memory or notes regarding the meeting on June 4, 2010 with the AKNG command staff. The occurrence of this meeting is supported by recorded and certified interviews with SGT Redick, Officer McMillan, ████K.B.████, a summarized telephone interview with LTC Tim Dehaas, and a recorded telephone interview with General Katkus. General Katkus related that LT Henry came to his office with SGT Redick after he learned that one of his AKNG members, Seth McMillan, (also an APD member) had made contact with ████J.N.████ According to General Katkus. Officer McMillan was seeking to use ████J.N.████ as a source of information into the illegal activities occurring in the AKNG and was unaware that he was communicating also with a subject ████J.N.████ of criminal activity occurring within the AKNG. General Katkus related that he asked LT Henry to meet with him and that LT Henry brought SGT Redick and Officer McMillan to the requested meeting. General Katkus further related that the meeting attendees met with all the players ████K.B.████ ████J.N.████ and Officer McMillan) and attempted to obtain a clear picture of the events.

I. AKNG LTC Joseph Lawendowski provided a sworn statement, during an AKNG ▬▬▬▬▬ on June 28, 2010, that detailed his observations on June 4, 2010 in General Katkus' office. LTC Lawendowski related that he was directed to report to the general's office along with ▬▬ J.N. ▬▬ Once there LTC Lawendowski observed ▬▬ K.B. ▬▬ enter and exit the general's office. LTC Lawendowski related that ▬▬ J.N. ▬▬ also entered and exited General Katkus' office about fifteen minutes after ▬▬ K.B. ▬▬ departed. LTC Lawendowski related he then entered the general's office and observed (identified through investigation) General Katkus, LTC DeHaas, Officer McMillan, SGT Redick, and LT Henry. LT Henry's response when confronted with this information during his Garrity interview was that LTC Lawendowski's dates were wrong. General Katkus was interviewed telephonically and confirmed that the meeting in question occurred but asserted that he (General Katkus) was not trying to obtain the names of the AKNG sexual assault victims. General Katkus related that he was only trying to ensure the AKNG sexual assault victims were receiving the support services offered by the AKNG.

J. During employer compelled administrative interviews, employees are required to answer all questions truthfully, completely, and without evasion. LT Henry was interviewed administratively on two separate occasions and was provided with the APD Pre-Interview Admonition Form, also known as Garrity Warnings. LT Henry admitted that he was at a meeting on February 26, 2010 with General Katkus and Officer McMillan, but asserted that this meeting only involved an allegation by Officer McMillan that General Katkus could not be trusted. He further asserted that this was the only reason for the meeting.

K. LT Henry denied directing the disclosure of the names of the confidential informants being utilized by the SAU in its investigation into illegal drug dealing activities within the AKNG. Both AST Hazelaar and SGT Carson advised LT Henry not to disclose the names of the confidential informants or the identities of the additional AKNG targets of the investigation. SGT Carson and AST Hazelaar were with LT Henry at the meeting. Officer McMillan was not in attendance at the February 26, 2010 meeting with the AKNG command. LTC DeHaas related that he was present for the February 26, 2010 meeting and only remembers the disclosure of ▬ E.P. ▬s name by APD personnel (LTC DeHaas could not identify by name the SAU personnel present) and the disclosure that there was an ongoing investigation.

L. According to SAU Officers Carson, McMillan, AST Hazelaar, and FBI Special Agent (SA) Steve Payne the AKNG drug dealing investigation was exposed prematurely by LT Henry to AKNG command staff. LT Henry related that Officer McMillan made statements that General Katkus could not be trusted and that this was the genesis of the February 26, 2010 meeting with the AKNG command staff. General Katkus was interviewed and recorded telephonically. General Katkus was not specifically asked about this issue but did not mention anything about the statements that he was untrustworthy that were allegedly made by Officer McMillan. This

investigation revealed that this meeting was initiated to disclose information about the SAU confidential informants and specifics of the drug dealing investigation involving AKNG members.

M. The aforementioned informant disclosures jeopardized the ongoing SAU drug investigation into the illegal activities of the AKNG Recruitment and Retention Unit. Additionally, these disclosures put the safety and security of the confidential informants, the investigating officers, and the spouse of one of the SAU investigating officers at risk. The disclosures disrupted the APD as an organization by causing dissention in the ranks and negatively impacted the APD's credibility with the other law enforcement, specifically the FBI, and negatively impacted the department's image in the Anchorage community. LT Henry's assertion that this drug investigation was a SSTF ▮▮▮▮▮▮▮▮ case, not an APD SAU case, is irrelevant to this internal investigation because both units conduct illegal narcotics investigations. Both drug investigation units are charged with working with confidential informants and are responsible for maintaining their safety and security while protecting the integrity of their investigations. However, for the record, the drug investigation was an APD SAU drug investigation at the time of the disclosures. Even more troubling is the negative impact that the disclosures had on at least one identified victim of sexual assault that occurred within the AKNG.

LT Henry authored the Metro Drug Enforcement Management Review and under Confidential Informant Records, documented the following, "Informant records must be maintained by the department in a secure location. It is well understood that the identities of the persons who cooperate with the police do so at considerable risk to their own safety and keeping their identities protected is critical." Despite this well understood basic law enforcement safety concern, LT Henry disclosed the identities of confidential informants and targets to the non-law enforcement supervisors of potential targets. Additionally, there was a second disclosure on June 4, 2010 of an informant who was representing victims of sexual assaults and an additional potential drug information source within the AKNG.

N. On June 4, 2010, a second meeting occurred at the office of General Katkus. Present for the meeting were LT Henry, SGT Redick, and Officer McMillan from the APD. The AKNG was represented by General Katkus and LTC DeHaas. During this meeting AKNG ▮▮▮▮ K.B. ▮▮▮▮ was directed to and entered into the meeting. General Katkus had learned the night before from LT Henry that ▮▮▮ K.B. ▮▮▮ knew the names of several female AKNG members who were victims of sexual assault. General Katkus ordered ▮▮▮ K.B. ▮▮▮ to disclose the names of the sexual assault victims that had come to him for assistance in reporting their sexual assaults to civilian law enforcement. ▮▮▮ K.B. ▮▮▮ refused to disclose the names of the sexual assault victims and was dismissed from the meeting.

O. As a result of the disclosure by LT Henry of ▮▮▮ K.B. ▮▮▮ 's identity to AKNG command, ▮▮▮ K.B. ▮▮▮ was subjected to negative employment action by the

AKNG, an AR 15-6 investigation was started he and received a Letter of Reprimand effectively ending his career with the AKNG. Additionally, what occurred at the meeting on June 4, 2010 was presented by ▮K.B.▮ to the four women whom he attempted to assist. .One victim, ▮S.T.▮ ▮S.T.▮ was sexually assaulted in the early morning hours of March 29, 2010. The disclosure of ▮S.T.▮ s assault to AKNG command staff occurred between the informant disclosures made by LT Henry on February 26, 2010 and June 3 – 4, 2010. ▮S.T.▮ was interviewed and confirmed that when she learned that members of the APD were part of the meeting at the AKNG headquarters in which General Katkus and LTC DeHaas tried to obtain the names of sexual assault victims from ▮K.B.▮ it effectively prevented her from reporting her sexual assault to the APD. It is unknown at the time of this report how many additional AKNG victims of sexual assaults were prevented/dissuaded from making a report to civilian law enforcement due to the disclosure of ▮K.B.▮ as the source of confidential information and the attempt by AKNG command to breach the victims confidentiality. The disclosure of ▮K.B.▮ s name to the AKNG command staff as the source of information for the APD into sexual assaults allegedly occurring in the AKNG was not reported by LT Henry to any supervisor above him in his chain of command at APD.

**P.** Several of the AKNG recruiters, to include ▮J.N.▮ an AKNG senior enlisted member, were involved in alleged sexual misconduct with female members of the AKNG when the SAU drug investigation into their activities commenced. The compromising of the drug investigation provided AKNG suspects the opportunity to dispose of physical evidence, and to concoct stories and alibis. The AKNG suspects also engaged in acts of intimidation toward SAU investigator Officer Carson and his wife Mia Carson and they were suspected to be involved in conducting counter-surveillance at the APD involving Officer McMillan. APD AKNG informant ▮E.P.▮ was determined separately through the ▮▮▮ federal investigation, to have connections to the dangerous and violent La Familia Mexican Drug Trafficking Cartel. APD AKNG confidential informant ▮E.P.▮ eventually relocated to the state of ▮▮▮

Additionally, on June 28, 2013 ▮J.W.▮ who was assigned by the AKNG to investigate recruiter misconduct, was indirectly threatened by AKNG ▮J.N.▮ a potential drug and sexual assault suspect. ▮J.N.▮ was meeting with a mental health professional when he threatened to harm ▮▮▮ ▮J.W.▮ and needed to be treated immediately for homicidal thoughts. The counselor had a duty to report ▮J.N.▮ homicidal threat and notified ▮J.W.▮ appropriately. ▮J.W.▮ reported the threat to her safety to the APD ▮J.N.▮ s was served with a twenty day Stalking Order preventing ▮J.N.▮ from having contact with ▮J.W.▮

Note: ▮J.N.▮ had just been released from the Providence Hospital Psychiatric Emergency Unit. ▮J.N.▮ had previously been housed at an out-of-state facility for making homicidal and suicidal threats.

**Q.** The APD made a federal Touhy Request to obtain the cellular telephone records of AKNG General Katkus from July 10, 2009 through September 9, 2014. General Katkus AKNG cellular telephone number during the aforementioned time period was ███████████. This investigator reviewed the cellular telephone records that revealed no telephone calls from LT Henry to General Katkus at the time of the first SAU informant and investigation disclosures on or about February 26, 2010. However, General Katkus cellular telephone records revealed that LT Henry made three calls to General Katkus on June 3, 2010. LT Henry made two calls from his APD office telephone number █████████ totaling eight minutes and one call from his APD cellular telephone number █████████ for a total of six minutes. On June 4, 2014 LT Henry placed one call to General Katkus from his cellular telephone for a total of one minute. General Katkus' cellular telephone records support Officer McMillan's version of events from June 3, 2010. Officer McMillan related he was ordered by LT Henry to disclose ███K.B.███ as his confidential source of drug and sexual assault information from within the AKNG. Officer McMillan further related that he was present in LT Henry's office when LT Henry called and informed General Katkus of ███K.B.███ as his (Officer McMillan) AKNG source. LT Henry's cellular telephone call to General Katkus on June 4, 2010 at 10:44 am was sixteen minutes before the 11:00 am meeting with General Katkus and LTC DeHaas at the AKNG. The day and the time of the June 4, 2010 SAU meeting with the AKNG is supported by an AKNG ████Sworn Statement provided by LTC Joseph Lawendowski on June 28, 2010. The subject cellular telephone records obtained by APD and identified in this paragraph are further evidence of LT Henry's lack of honesty during his compelled administrative interviews.

**R.** The disclosure of confidential informant information by LT Henry to potential targets of the SAU AKNG drug investigation compromised the integrity of the SAU investigation and the safety of all involved, including the APD confidential informants, APD personnel, and their families. The APD has been exposed to potential criminal and/or civil liability and further diminished public trust. Additionally, one confirmed report of a sexual assault that occurred in the AKNG was suppressed, thereby violating the APD Regulations and Procedures Manual, Code of Conduct, Information Policy 1.02.015E, paragraphs I through IV enumerated below:

> I. Employees shall not communicate to any person who is not an employee of this department any information concerning operations, activities, or matters of law-enforcement business which would unduly disrupt the department's legitimate operations. The release of this information is prohibited by law and may have an adverse impact on the department image, operations, or administration.

> II. Employees shall communicate promptly to supervisor information regarding crimes or criminal activity or other relevant law-enforcement information which may come into their possession.

III. Employees shall not willfully use, nor permit the use of, any information gained by reason of their position, for anything other than official purposes. This information includes, but is not limited to verbal, written, electronic, and computer-generated sources.

IV. Employees will regard all information concerning the official business and policies of the department as confidential and will not release such information unless its release is specifically permitted.

**S.** LT Henry's versions of events proved not credible and evasive. LT Henry had an obligation to provide truthful, complete, and non-evasive answers to the inquiries made by this investigator during this administrative investigation as it relates to his official APD duties. The responses by LT Henry to the questions asked of him during both of his compelled administrative interviews were not credible, thereby violating the APD Regulations and Procedures Manual, Code of Conduct, Obedience to Laws 1.02.015B, paragraph III enumerated below:

III. Honesty; that requires APD personnel on any official matter whatsoever, all communications, documents, reports, or other statements submitted or caused to be submitted by an employee shall be accurate, factual, and complete when it is reasonable to expect that the information may be relied upon because of the employee's affiliation with the department.

**2. The following conclusions are based upon a preponderance of the evidence standard, supported by authenticated interviews and other related documentation obtained during this investigation. The following has been determined relating to the conduct of Chief Mark Mew:**

**A.** In October 2013 retired DC Steve Hebbe was made aware by SGT Carson of the sexual assault and drug allegations involving the AKNG Army Recruitment and Retention Unit, and of the disclosures by LT Henry of confidential informant information to potential subjects of an official APD undercover drug investigation. On at least two occasions, DC Hebbe encouraged Chief Mew to initiate an internal investigation to determine the APD's role in this incident. Chief Mew related to this investigator that DC Hebbe might have come to him with some allegations that he should look into, and maybe that happened, but he does not remember the briefings by DC Hebbe. Chief Mew related that he was just drawing a blank on the alleged briefings by DC Hebbe.

**B.** Toward the end of October 2013, DC Fanning read an online article posted by AKNG ▮▮▮▮▮ K.B. ▮▮▮▮▮ alleging illegal activities were occurring in the AKNG. DC Fanning was briefed by LT Henning, SGT Carson and Officer McMillan about the media reports, the connection to an old SAU investigation, and that the SAU should have notified the chain of command.

On November 7, 2013 during a meeting with Chief Mew, LT Henning, SGT Carson and Officer McMillan, DC Fanning recommended to Chief Mew that the

APD needed to investigate LT Henry's decision to stop the SAU drug investigation of the AKNG and any interference into the drug investigation by General Katkus.

C. Chief Mew related that he was reluctant to initiate an investigation into the conduct of LT Henry due to concerns about complaints of retaliation potentially being made by LT Henry stemming from his filing EEOC complaints in the past. Chief Mew related that he was advised in the past by the Municipal Attorney's Office and Employee Relations not to investigate or discipline LT Henry due to the appearance of retaliation. Chief Mew related, during both of his administrative interviews, that he assumed the answer would be the same with these new allegations; however, Chief Mew admitted he was not directed by the Municipal Attorney's Office not to initiate an investigation into this matter after briefing them on November 8, 2013. Chief Mew briefed Dennis Wheeler, George Vakalis, the City Manager, and the Mayor on the allegations that he received on November 7, 2013.

Chief Mew is the final authority and is responsible for discipline (adherence to laws and policies) within the ranks of the APD. Chief Mew on several occasions during his interviews attempted to abdicate his authority as the Chief Executive of the APD to the Municipal Attorney's Office and Employee Relations by asserting his attorneys would not allow him to initiate investigations on LT Henry.

D. On November 7, 2013 Chief Mew knew that LT Henry made the decision not to investigate General Katkus for interfering with the AKNG SAU drug investigation (referenced in his prepared timeline).

On November 8, 2013 Chief Mew contacted the FBI and requested an investigation of General Katkus for interfering with the SAU drug investigation. Chief Mew assumed if the FBI found any wrongdoing involving APD personnel during their investigation of General Katkus that he would be notified. This is another example of Chief Mew abdicating his authority by relying on the FBI to determine if APD personnel were involved in wrongdoing instead of initiating an internal investigation to determine if any department policies were violated in regards to allegations involving LT Henry (including whether he directed SAU not to investigate General Katkus and failed to notify his superiors of certain disclosures).

E. Late in the November to December 2013 timeframe, CPT Bill Miller learned that LT Henry had ordered the exposure of informants to the commander of the AKNG despite the fact that the commander was a potential target of the investigation. Additionally, CPT Miller learned that LT Henry gave direction to his subordinates to stop investigating the AKNG in general. CPT Miller's advice to Chief Mew was to investigate this matter to determine APD's liability

F. On or about May 1, 2014, APD DC Myron Fanning, DC Steve Smith (now retired) CPT Bill Miller, LT Kenneth McCoy, and SGT John McKinnon met with Chief Mew to brief him about media information regarding the disclosure of an

informant ███ K.B. ███ with information on drug dealing and possible sexual assaults in the AKNG and that this disclosure occurred at the direction of LT Henry. DC Fanning, CPT Miller, and LT McCoy requested an internal investigation be initiated to look into this matter. DC Smith recommended APD act with caution because LT Henry had previously filed lawsuits against the department and the initiation of such an investigation could be viewed as retaliation against LT Henry.

G. Approximately an hour or so later, a second meeting occurred at Anchorage City Hall, which included SGT Jack Carson and Officer Seth McMillan along with the APD members mentioned in paragraph G. above. During this meeting, the same APD commanders once again advised Chief Mew to initiate an internal investigation into this matter. Chief Mew related that he would take the APD commands' concerns under advisement and reach out to the FBI to discuss the issue.

H. On February 12, 2015 Chief Mew provided written correspondence to this investigator acknowledging that he was not prevented from investigating LT Henry in May 2014; however, Chief Mew related that he hoped the FBI or OCI investigations would provide a finding or referral to the department that would initiate an investigation into LT Henry's conduct. Chief Mew related his position has never been that LT Henry should not be investigated but that he was dealing with three conflicting interests between November 2013 and September 2014. Chief Mew indicated the conflicting interests were competing criminal investigations, OEO rules, and the Kennedy-Feliciano lawsuit. Chief Mew indicated that prior to September 2014 no one outside of the APD recommended (former DC Hebbe, DC Fanning, CPT Miller and LT McCoy, experienced and senior police commanders, internally recommended an investigation into LT Henry's conduct on several occasions) to him the APD should be investigating LT Henry's conduct that occurred in 2010. Chief Mew further related that for a ten-month (between November 2013 and October 2014) period he did not order an investigation into LT Henry's conduct to protect the APD and the taxpayer.

Chief Mew in his two administrative interviews indicated he did not think it was appropriate to initiate an investigation into what LT Henry did or did not do by failing to notify his supervisors of the AKNG disclosures that occurred three years in the past. Chief Mew initially related that he did not have a grasp of all the allegations surrounding LT Henry's conduct that were brought to his attention to initiate an investigation. Chief Mew in his February 12, 2015 correspondence details that he had valid managerial reasons not initiate an investigation into LT Henry's conduct. The managerial reasons provided by Chief Mew are in conflict with the decisions he detailed in the two aforementioned interviews. In contrast, once the MOA, Municipal Attorney's Office learned LT Henry disclosed confidential informants to the AKNG and terminated AKNG investigations without APD command knowledge this investigation was immediately requested and initiated. This conflict, in this investigator's opinion, is another attempt by Chief Mew to abdicate his authority to others.

Additionally on February 12, 2015, Chief Mew sent an email to this investigator stating that in late spring or early summer of 2014 he tried to interest the City of Anchorage into hiring a consultant with expertise in ridding police agencies of corrosive commanders. Chief Mew related that he was willing to use department funds to pay for the consultant's services.

Note: The APD Regulations and Procedures Manual, Definitions and Scope of Manual, Compliance 1.01.025 (Compliance with All Laws, Oaths, Regulations, and Procedures) Department Retains Authority Despite Other Dispositions enumerated below states:

Action taken or not taken by any other agency or person does not limit the APD's authority to enforce the material contained in this manual.

This provision of the APD Regulations and Procedures Manual gives the APD the authority to enforce department policies contained therein despite any action or inaction by any other agency. APD policy violations are enforceable by the APD and does not extend to any other agency.

The additional information in this section further illustrates that Chief Mew continues to abdicate his authority to attorneys, outside investigative agencies, and consultants instead of initiating an internal investigation and holding LT Henry accountable for his conduct. Contrary to Chief Mew's belief that he was protecting the APD and the public, his continued delays in holding LT Henry accountable for his conduct has exposed the APD to criminal and civil ramifications, has negatively impacted APD's reputation in the community, and has not mitigated any risk to APD. Chief Mew's decision to seek an outside consultant to deal with LT Henry's behavior instead of using the APD's available internal investigation and discipline processes at the expense of the APD and ultimately the public is troubling.

I. Based on the information provided in this section, Chief Mew missed a number of opportunities to investigate allegations brought forward. Chief Mew also disregarded the recommendations of several APD commanders who advised him that the circumstances surrounding these allegations should be investigated. Likewise, Chief Mew failed to initiate an investigation into LT Henry's failure to report his (LT Henry's) decisions involving the AKNG and General Katkus which negatively impacted a significant SAU AKNG drug investigation, prevented at least one confirmed AKNG sexual assault report, and further diminished the public's trust. Chief Mew's decision not to initiate investigative action regarding the complaints involving LT Henry was, therefore, unreasonable and not in accordance with the APD Internal Investigations and General Conduct Policy.

The decision by Chief Mew not to investigate serious allegations of misconduct made both publicly and internally against the APD and LT Henry, in particular, was unreasonable and a violation of APD Internal Investigations and General Conduct Policies for the following reasons:

- APD Internal Investigations Policy 2.04.005, which was in effect at the time of the confidential informant disclosures, indicates the department accepts complaints originating from any source, including other employees. It also states that employees should direct all complaints against the department or other employees to their supervisor or internal affairs for processing.

- The current internal investigations policy, 2.04.005, also dictates that the department shall accept, and fairly and impartially investigate, all complaints or allegations of misconduct to determine their validity.

Finally, this investigator finds Chief Mew's conduct in not initiating an internal investigation into serious misconduct allegations brought to his attention, internally and publicly, involving LT Henry and the APD's alleged conduct involving the AKNG was unreasonable and does not comport with the APD Internal Investigations Policy. Chief Mew's conduct violated the APD Regulations and Procedures Manual, Code of Conduct, General Conduct, 1.02.015B, paragraph III enumerated below:

> XI. Department employees will exercise discretionary judgment in a reasonable manner and remain within the limits of their authority as defined by law, judicial interpretation, and departmental procedures and regulations.

## RECOMMENDATIONS

### LT Anthony Henry:

The MOA should consider initiation of formal disciplinary, or other corrective, action against LT Henry for two "Sustained" violations of department policy. LT Henry did violate Section III. Honesty, of the APD Code of Conduct by providing false and evasive information during this administrative investigation. In addition, Lt. Henry violated Section IV. Information, of the APD Code of Conduct Policy, by failing to promptly report to a supervisor his unauthorized disclosures on February 26, 2010 and June 4, 2010. These disclosures of confidential APD information to unauthorized personnel negatively impacted at least one AKNG sexual assault victim, the public, APD operations, APD employees, and family members of APD employees.

### Chief Mark Mew:

The MOA should consider initiation of formal disciplinary, or other corrective, action against Chief Mew for "Sustained" violations of the APD General Conduct Policy as it relates to the separate APD Internal Investigations Policy. Chief Mew failed to initiate an internal investigation regarding allegations of serious misconduct brought to his attention by the public and senior APD command personnel on several occasions. The Chief of Police has the overall responsibility to administer the department's internal investigation and discipline mechanisms and is the final authority on such matters. A number of occasions, Chief Mew attempts to abdicate his authority to the Municipal Attorney's Office, Employee Relations, the AKNG

Office of Complex Investigations, an outside special consultant, and the FBI. Additionally, Chief Mew was provided copies of emails of the complaint made by former AKNG member ███████████ through the Mayor's Office who specifically made allegations that the APD was involved with reported abuse and cover-ups that were silenced by General Katkus and never pursued by the APD.

Due to the seriousness of the allegations and the intense media interest, it would have been a reasonable exercise of discretionary judgment by Chief Mew to initiate an APD internal investigation in order to ascertain any APD policy violations and determine the department's criminal and civil liabilities given the circumstances surrounding the illegal drug dealing and sexual assault events occurring in the AKNG.

## OTHER RECOMMEDATIONS

1.  The initial SAU AKNG drug investigation was impeded by the actions of LT Henry. As the initial investigation was clearly a state case, this matter should be referred to the Anchorage District Attorney, or appropriate authority, for a written prosecutorial determination regarding the SAU informant disclosures and failure to investigate the AKNG or General Katkus. Once the prosecutorial decision is received a determination (whether or not LT Henry is criminally charged) should be made by the MOA to ascertain if LT Henry committed an additional violation of the APD Regulations and Procedures Manual, Code of Conduct, Obedience to Laws 1.02.015B, paragraph I as enumerated below:

    > **I.** Authority: Employees shall obey all federal and state laws, and ordinances of Municipality of Anchorage or other municipality in which the employees may be present. Employees shall obey lawful orders, written or oral, issued to them by competent authority. The term "employees" includes both sworn and non-sworn personnel.

2.  The APD should consider a press event encouraging any current or former AKNG members that were victims of sexual assault in the AKNG to contact the APD SVU or District Attorney for appropriate criminal investigation and prosecutorial referral. The press release should include information that the victims will be handled with sensitivity and confidentiality.

3.  The MOA, in conjunction with the state and federal authorities, should develop a Memorandum of Understanding (MOU) with the AKNG that clearly establishes the respective lines of responsibility and authority when an AKNG member desires to report that he or she was the victim of a crime. The MOU should contain guidelines that ensure victim confidentiality. Finally, the MOU should provide specific guidance regarding case documentation, processing, and referral for review and prosecution.

4.  The MOA should refer the allegations made by AKNG ███ S.T. ███ to the APD that she was potentially targeted for further abuse by senior AKNG commander LTC Tim DeHaas because he knew ███ S.T. ███ made a restricted report of sexual assault and had not reported the incident. These allegations, learned over the course of this investigation, should be brought to the attention of the National Guard's Office of Complex Investigations so that the AKNG may

determine if any AKNG members perpetrated further acts of sexual abuse or intimidation against vulnerable victims who were afraid to report their assaults to the APD or any other law enforcement agency of jurisdiction.

5.  The APD should electronically record all sexual assault victim interviews, verbatim, even when it is determined that the elements of a criminal offense are not met. This process will ensure that the proper sensitivity is shown to the sexual assault victims and the victims' accounts of the incidents will be described in their own words.

6.  The MOA, Municipal Attorney's Office should continue to assess the APD's civil exposure related to Chief Mew's and LT Henry's conduct identified during this investigation and take corrective action to mitigate any future risk that is identified.

## LIST OF ATTACHMENTS

1.  APD Internal Investigations Policy 2.04.005 (Currently in use).

2.  Department of Defense, National Guard Bureau, Office of Complex Investigations, Report of Assessment of the AKNG, dated September 4, 2014.

3.  Undated timeline prepared by Chief Mark Mew beginning with the spring of 2010. SGT Carson and Officer McMillan contributed the "Guard Timeline" portion located on the last three pages of the combined document.

4.  APD Investigations-Use of Informants Policy 3.02.070.

5.  APD Vice Unit Detective Training Guide received from the MOA on October 3, 2014.

6.  News Article McClatchy Washington, DC Bureau, dated February 24, 2014.

7.  Army ███████████ Documents received (box) by APD from AKNG ███████ E.P. ███████ forwarded by the MOA on October 7, 2104.

8.  APD Special Assignment Unit (SAU) Organizational Roster for 2010 from IA Pro Records.

9.  APD Internal Investigations Policy 2.04.0056 (Older Version in use 2010).

10. Interview Transcript for Retired APD DC Steve Hebbe, dated October 15, 2014.

11. Interview Transcript for APD DC Myron Fanning, dated October 15, 2014.

12. APD Releasing Information Protocol provided by Michael C. Chin. Records Manager.

13. AKNG Investigations Table of Contents provided by LT Kenneth McCoy.

14. List of APD Employees that are members of the AKNG.

15. Interview Transcript for APD SGT Jack Carson, dated October 15, 2014.

16. APD Pre-Interview Admonition for Witness Interviews SGT Jack Carson, dated October 15, 2014.

17. Interview Transcript for APD LT Rich Henning, dated October 16, 2014.

18. APD Pre-Interview Admonition for Witness Interviews LT Rich Henning dated October 16, 2014.

19. Emails provided by LT Rich Henning Re: Complaint Filed with the Mayor's Office by former AKNG Member █████████

20. Interview Transcript for APD Captain (CPT) Bill Miller, dated October 16, 2014

21. APD Pre-Interview Admonition for Witness Interviews CPT Bill Miller, dated October 16, 2014.

22. Interview Transcript for APD Chief Mark Mew, dated October 15, 2014.

23. APD Pre-Interview Admonition for Witness Interviews Chief Mark Mew, dated October 16, 2014.

24. Letter of Complaint from Alaska State Senator Lisa Murkowski Re: E.P. E.P. dated July 14, 2014.

25. Response Letter to Senator Lisa Murkowski from Chief Mew, dated January 24, 2011.

26. Emails from Chief Mark Mew to SGT Jack Carson and Officer Seth McMillan Re: U.S. Attorney's Office not interested in pursuing criminal charges against E.P.

27. Emails from DC Myron Fanning to Chief Mark Mew Re: SAU drug case and recent media interest.

28. Interview Transcript for APD LT Kenneth McCoy, dated October 16, 2014.

29. APD Pre-Interview Admonition for Witness Interviews LT Kenneth McCoy, dated October 16, 2014.

30. Interview Transcript for APD Officer Seth McMillan, dated October 17, 2014.

31. APD Pre-Interview Admonition for Witness Interviews Officer Seth McMillan, dated October 17, 2014.

32. Interview Transcript for Retired APD DC Ross Plummer dated October 17, 2014.

33. First Supplemental Interview Transcript for APD SGT Jack Carson, dated October 20, 2014.

34. Supplemental Interview Transcript for APD LT Rich Henning, dated October 20, 2014.

35. Interview Transcript for APD LT Anthony Henry, dated October 20, 2014.

36. Pre-Interview Admonition LT Anthony Henry, dated October 20, 2014.

37. Email from Keith L. Mallard (DPS – Department of Public Safety) to Joseph M. Hazelaar, dated February 11, 2010.

38. Liberty Planet Weblog Article authored by Retired K.B. dated January 13, 2013.

39. SAU Request for Informant Registration for D.A.

40. SAU Request for Informant Registration for E.P.

41. SAU Slideshow, Special Weapons and Tactics, Street Level Drugs, dated March 2010 (References the arrest of R.Z.

42. Interview Transcript for Retired AKNG General Tom Katkus, dated October 29, 2014.

43. Interview Transcript for Retired AST Joseph Hazelaar, dated October 29, 2014.

44. Copy of Text Message between AST Joseph Hazelaar and LT Anthony Henry undated, emailed by LT Anthony Henry to APD LT Kevin Vandegriff on October 29, 2014.

45. Email authored by Danielle Newberry, U.S. Attorney's Office Re: Initiation Meeting – dated June 10, 2010.

46. Alaska Dispatch News Article "AKNG Recruiter's Lawsuit," dated October 29, 2014.

47. Alaska Public Media Article "Colonel's Military Honors Questioned in Wake of Guard Scandal," dated October 8, 2014.

48. Interview Transcript for Retired APD SGT Darrel Redick, dated November 13, 2014.

49. Interview Transcript for Retired AKNG K.B. , dated November 13, 2014.

50. AKNG AR 15-6 Investigation Documents Re: ████ K.B. ████ (Provided by ████ K.B. ████

51. Second Supplemental Interview Transcript for APD SGT Jack Carson, dated November 13, 2014.

52. Supplemental Interview Transcript for APD Officer Seth McMillan, dated November 13, 2014.

53. Photograph of a document from part of an AR 15-6 Investigation provided by Officer Seth McMillan on November 13, 2014. (Determined it was ████ K.B. ████'s AR 15-16 file.)

54. Email from Officer Seth McMillan Re: Aguilar-Spinelli Judicial Test for Informants, dated November 13, 2014.

55. Interview Transcript for APD Officer Chris Simmons, dated November 13, 2014.

56. APD Pre-Interview Admonition for Witness Interviews Officer Chris Simmons, dated November 13, 2014.

57. Interview Transcript for APD Officer Eric Smith, dated November 14, 2014.

58. APD Pre-Interview Admonition for Witness Interviews - Officer Eric Smith, dated November 14, 2014.

59. Memorandum from LT Anthony Henry to Independent Investigator Rick Brown, dated November 15, 2014.

60. Excerpt of Online Manifesto ████████ K.B. ████████

61. LT Anthony Henry's Personal Work Activity Logs from February 15-28, March 1-14, and June 6, 2010.

62. Email to DC Fanning Re: Media Questions, dated October 17, 2013.

63. Full Online Manifesto purported to be authored by ████ K.B. ████

64. ████████ Case Initiation Documentation for ████████

65. ████ Background Documentation for ████████

66. Email from AST Trooper Joseph Hazelaar, dated June 23, 2010.

67. Emails (2) from the Assistant U.S. Attorney's Office, dated June 7, 2010.

68. Email from Ann Kirkland, FBI SSTF, Supervisory Special Agent (SSA), dated July 9, 2010.

69. Email from APD Officer Eric Smith with attached Press Release, dated February 28, 2011.

70. Emails (2) dated February 17 and March 21, 2011 Re: ████████████ Travel.

71. SSTF Monthly Reports (two) for February and June 2011.

72. Email RE: ████ E.P. ████ dated September 25, 2014.

73. ████████████ Briefing Slides.

74. FBI/APD SSTF MOU, dated November 21, 2005.

75. SAU Training Outline for New Drug Enforcement Strategy, dated 2009.

76. APD Drug Enforcement Strategy Matrix, dated 2009.

77. Drug Enforcement Management Review 2007-2009 (Authored by LT Anthony Henry).

78. Copy of Anchorage Municipal Code Section 3.90.040 C. Police Investigative Files.

79. Email from LT Anthony Henry to Independent Investigator, Rick Brown Re: Determination of Exact Dates Meeting with the AKNG, dated November 14, 2014.

80. Summary of Telephone Interview with AKNG ████ S.T. ████ by APD LT Kevin Vandegriff, dated November 17, 2014.

81. Summary of Telephone Interview with FBI Special Agent (SA) Agent Steve Payne by APD LT Kevin Vandegriff, dated November 24, 2014.

82. APD Memorandum from APD LT Kevin Vandegriff to LT Anthony Henry Notice of Interview, dated December 15, 2014.

83. Interview Transcript for AKNG ████ E.P. ████ dated December 17, 2014.

84. APD Code of Conduct Policy 1.02.000.

85. Supplemental Interview Transcript for APD Chief Mark Mew, dated December 18, 2014.

86. Pre-Interview Admonition Chief Mark Mew, dated December 18, 2014.

87. Supplemental Interview Transcript for APD LT Anthony Henry, dated December 18, 2014.

88. APD Pre-Interview Admonition - LT Anthony Henry, dated December 18, 2104.

89. Email from LTC Ruth Cresenzo, National Guard Regional Special Victims' Counsel Alaska, dated December 19, 2014.

90. Supplemental Interview Transcript for APD CPT Bill Miller, dated December 19, 2014.

91. APD Pre-Interview Admonition for Witness Interviews - CPT Bill Miller, dated December 19, 2014.

92. Supplemental Interview Transcript for APD LT Kenneth McCoy, dated December 19, 2104.

93. APD Pre-Interview Admonition for Witness Interviews - LT Kenneth McCoy, dated December 19, 2014.

94. Undated Memorandum Authored by ███████ K.B. ███████

95. APD – Special Victims' Unit (SVU) Investigations Review, Nation Guard, Table of Contents.

96. AKNG Cases Reported to APD.

97. National Guard Investigations, Table of Contents.

98. National Guard Cases, ████████████████████

99. APD Police Reports Case Numbers ███████ Initiated February ██ 2010, and ███████ Initiated February ██ 2010.

100. Interview Transcript for AKNG ██████ S.T. ██████, dated December 22, 2014.

101. Victim Preference Statement Restricted Reporting, ████ S.T. ████ dated March 29, 2010

102. Letter from Anchorage, Alaska Assistant District Attorney Paul J. Niovas, Jr., Referencing ████ S.T. ████ dated March 7, 2014.

103. Citizen Records Request Form, ████ S.T. ████, dated July 11, 2013.

104. Interview Transcript for Mia Carson, dated December 22, 2014.

105. State Of Alaska. Office of Special Prosecutions and Appeals, Anchorage District, Attorney Declination Letter, dated March 4, 2014.

106. Alaska Rules of Evidence, Rule 509, Identity of Informer.

107. Memorandum from Municipal Attorney Dennis Wheeler to Independent Investigator Rick Brown, dated January 26, 2015.

108. Email and Photograph from Mia Carson, dated February 27, 2010.

109. AKNG Memorandum Re: ██████████ Mia Carson from the AKNG, dated October 15, 2010.

110. APD SVU Investigations Policy 4.10.000.

111. Edited Timeline prepared by Chief Mew received January 15, 2015.

112. Correspondence from APD Chief Mark T. Mew to J. Rick Brown dated February 12, 2015.

113. Email from APD Chief Mark T. Mew to Rick Brown dated February 12, 2015.

114. APD Police Report Case Number ██████ dated June ██ 2015.

115. APD Police Report Case Number ██████ dated January ██ 2013.

116. APD Police Report Case Number ██████ dated June ██ 2013.

117. APD Police Report Case Number ██████ dated July ██ 2013.

118. APD Police Report Case Number ██████ dated August ██ 2013.

119. General Katkus Cellular Telephone Records, June 3-4, 2010.

120. General Katkus Cellular Telephone Records, March 8-9, 2010.

121. General Katkus Cellular Telephone Records, July 2010-September 2014.

122. APD Organization Chart September 2010.

123. APD Organization Chart October 2014.

## DETAILS

On October 1, 2014 this Investigator received an electronic copy from the MOA, Assistant Municipal Attorney Blair M. Christensen of the APD's recently revised Internal Investigations Policy 2.04.005. A copy of the policy is attached to this report. **(Refer to Attachment #1)**

This investigator reviewed a copy of the Department of Defense, National Guard Bureau, Office of Complex Investigations; Report of Assessment of the Alaska National Guard, dated September 4, 2014. The full report will not be included as an attachment due to its volume. Pages 1 through 9 are included because they briefly mention law enforcement. The following was noted from the report:

- Page 3 of 57, under section A. Findings: the third bulleted paragraph indicates that the AKNG does not have a formal mechanism to facilitate coordination with local law enforcement regarding cases of misconduct committed by members of the National Guard. **(Refer to Attachment #2)**

On October 3, 2014 this Investigator received an electronic copy from the MOA, through Assistant Municipal Attorney Christensen of a timeline prepared by APD Chief Mark Mew and an AKNG Line prepared by SGT Jack Carson and Officer Seth McMillan. Chief Mew's timeline begins with the spring of 2010 and ends on September 29, 2014. The AKNG timeline begins on February 23, 2010 and ends in 2012-2013. The combined timeline was used by this investigator to begin the investigation due to having no prior knowledge of the allegations and the persons involved. A copy of the combined timelines is included with this investigative report. **(Refer to Attachment #3)**

On October 3, 2014 this Investigator received an electronic copy from the MOA, through Assistant Municipal Attorney Christensen of the APD's Investigations-Use of Informants Policy 3.02.070. The policy clearly states the responsible use of informants for the furtherance of the police mission is authorized, but only if such use and the management of information gained, is conducted in a safe and legal fashion. **(Refer to Attachment #4)**

On October 3, 2014 this Investigator received an electronic copy from the MOA, through Assistant Municipal Attorney Christensen of the APD's Vice Unit Detective Training Guide which verifies that the Department provides basic training on the use of confidential informants in section III. **(Refer to Attachment #5)**

On October 3, 2014 this Investigator obtained a copy of an online article published on February 24, 2014, by McClatchy News Washington, DC Bureau titled, Alaska National Guard Members Face Accusations of Sexual Misconduct. **(Refer to Attachment #6)**

On October 7, 2014 this Investigator received an electronic copy of documents received by the MOA, Assistant Municipal Attorney Christensen, from Alaska National Guard member ▅▅▅▅▅E.P.▅▅▅▅▅ The documents contained a cover memorandum from the Department of the Army, Alaska Army National Guard. The memorandum was dated December 24, 2013. The subject of the documents was a legal review of an ▅▅▅▅▅▅ regarding ▅▅▅E.P.▅▅▅ The memorandum was authored by Major Robert J. Warren who conducted the legal review and found that the investigation complied with legal and regulatory requirements. The memorandum noted ▅▅E.P.▅▅ did commit misconduct involving the sale and possession of illegal drugs. The memorandum also indicates that ▅▅E.P.▅▅ admitted to selling drugs for about a year, told a source where to receive and to distribute the

drugs, sold both marijuana and cocaine and admitted to receiving four pounds of marijuana and regularly receiving up to five ounces of cocaine from another drug dealer.

The investigator Major Thomas Elmore was assigned to conduct the investigation on ███ E.P. ███ on October 23, 2013. Major Elmore completed his investigation on December 18, 2013. This is evidenced by the two memos attached to the cover memo pages 4 through 5 of the packet. This investigator noted that this ██████████ commenced three years and seven months after ████ E.P. ███████ was last used as a confidential informant and the outcome is still pending final resolution.

Included in the documents are emails between █████ E.P. █████ and the AKNG. Additionally, there are a number of APD reports exhibiting APD Incident Number ████████ The earliest date in the reports is February 24, 2010 and the following partial summary is noted from this investigator's review:

On February 24, 2010 Officer Carson, AST Hazelaar, and Officer Eric Smith met with SAU Confidential Source █████ D.A. █████ who informed the officers that he could purchase and receive drugs from a person known to him as █████ R.Z. █████ ███ D.A. ███ indicated that Source 2 ████ E.P. ████ had paid ████ R.Z. ████ $3,000 for the drugs that the APD seized the day before ████ D.A. ████ related that he now owes ███ E.P. ███ $3,000 as a result of the APD seizure. ████ D.A. ████ indicated that he had informed ███ E.P. ███ of what happened the day before (February 23, 2010), that ████ E.P. ████ was okay with everything, and that ████ E.P. ████ would help the APD with purchasing drugs from █████ R.Z. █████

████ D.A. ████ indicated that he made drops two to three times a month for █████ R.Z. █████ and that he ████ D.A. ████ got paid by the drop, not by the quantity of drugs. ████ D.A. ████ informed the officers that █████ R.Z. █████ had a couple stash houses around town (Anchorage) where he keeps his drugs. ████ D.A. ████ according to ████ E.P. ████ said that ████ R.Z. ████ may want to drop off a load of drugs to be brought to a female in Fairbanks. ████ D.A. ████ told ████ E.P. ████ what happened with the APD traffic stop and that he was working with the police. ████ D.A. ████ then told the investigating officers that ████ E.P. ████ was willing to work with the APD to help him out with his pending drug charges. ████ D.A. ████ related that he tried to talk to ████ H.Z. ████ later that day with ████ E.P. ████ to arrange a drug purchase.

On February 25, 2010 AST Hazelaar made contact with ████ E.P. ████ ████ E.P. ████ admitted that he had been selling drugs with ████ D.A. ████ for about one year ████ E.P. ████ told officers that they ████ E.P. ████ and ████ D.A. ████ have both sold cocaine and marijuana but that he preferred to sell marijuana because it was easier to sell. ████ E.P. ████ indicated he did not have the connections to sell cocaine but everybody in the Wasilla area would buy marijuana. ████ E.P. ████ indicated that ████ D.A. ████ had the connections to sell cocaine, but ████ E.P. ████ didn't know who ████ D.A. ████ was selling to. ████ E.P. ████ then indicated he had given three pounds of marijuana to a person he only knows as ████ who is from Valdez. ████ E.P. ████ also admitted he was recently fronted four pounds of marijuana from ████ R.Z. ████ but he was having trouble selling it because it was of poor quality. ████ E.P. ████ also informed AST Hazelaar that he was friends with ████ Y.D. ████ and had purchased drugs off him in the past. According to ████ E.P. ████ he and ████ D.A. ████ never brought marijuana from ████ Y.D. ████ but stated that they would regularly get fronted around five ounces of cocaine from him and pay for the drugs after they were sold.

On March 3, 2010 through March 5, 2010 the SAU investigators were actively working with both informants ███ **D.A.** and ███ **E.P.** to arrange a drug deal with ███ **R.Z.** ███ During that time the SAU investigators also applied for and received a Glass Warrant #10-401SW (required by the Alaska Constitution for state level third party wire intercepts, not federal intercepts) from Judge Paul E. Olson of the Anchorage District Court. A copy of the documents provided to the APD by ███ **E.P.** ███ are attached to this investigative report. **(Refer to Attachment #7)**

This investigator noted the additional following information from the review of the APD Incident Number ███████ summarized above:

The APD reports, refer to Attachment #7, provided by ███ **E.P.** ███ do not appear to be a complete set of APD report documents. No documentation was enclosed that described the initial contact between the SAU unit members and confidential informant ███ **D.A.** ███

The APD reports revealed that both informants were at the early stages of cooperation with SAU members. This is evidenced by both informants' admissions involving their illegal drug dealing activity, the information they were providing about other potential targets by name and location in the area, and the fact they were actively working and arranged with the SAU a significant drug purchase with a major drug target ███ ███ **R.Z.** ███ This activity occurred between February 24, 2010 and March 5, 2010. The APD reports reviewed verify that the AKNG drug investigation was in the early stages of cooperation with both informants, and, therefore, the depth and breadth of persons who may be involved was still in question. ███ **D.A.** ███ s girlfriend, ███ ███ **E.J.** ███ was an AKNG recruiter and ███ **E.P.** ███ also was a member of the AKNG recruitment team. This documentation confirms that one drug suspect, ███ **E.P.** ███ was an AKNG member and held the rank of SFC (Non-Commissioned Officer, rank E-7), which is a significant enlisted rank, and the other drug suspect, ███ **D.A.** ███ had a girlfriend, ███ **E.J.** ███ who worked in the same unit with ███ **E.P.** ███

On October 7, 2014 this investigator received an electronic copy of the SAU Organizational Roster from 2010. AST Joseph Hazelaar, Officer Eric Smith (SSTF), and Officer Jack Carson (SSTF) were assigned to the unit under the command of LT Anthony Henry and the supervision of SGT Darrel Redick. A copy of the SAU Roster for 2010 is included with this investigative report. **(Refer to Attachment #8)**

On October 7, 2014 this Investigator received an electronic copy of the APD Internal Investigations Policy 2.04.005 in effect at the time of the SAU drug investigation involving ███ **E.P.** ███ and ███ **D.A.** ███ which began on February 23, 2010 and ran through on or about March 12, 2010. The policy clearly provides that the APD will accept complaints originating from any source, including other employees. A copy of the Internal Investigations policy in effect at the time the events were under investigation is included with this investigative report. **(Refer to Attachment #9)**

On October 15, 2014 this investigator scheduled interviews with current and former APD personnel to learn of the circumstances that lead to the initiation of this outside independent investigation with the assistance of the Anchorage Municipal Attorney's

Office and the assigned Liaison LT Kevin Vandegriff, Commander, APD Internal Affairs Unit.

**On October 15, 2014 at 12:34 pm, Retired APD Deputy Chief (DC) Steve Hebbe was interviewed telephonically at the MOA offices (7th Floor), 632 West 6th Avenue, Anchorage, AK 99501. The interview was conducted telephonically. DC Hebbe acknowledged he knew that the interview was being digitally recorded. A certified transcript was completed of the recording. (Refer to Attachment #10)**

The following is a summary of the interview with DC Hebbe:

DC Hebbe had been employed by the APD for approximately twenty three years and two months. He was promoted to Deputy Chief in October 2011. DC Hebbe related that he is currently the Chief of Police of the Farmington, New Mexico Police Department.

DC Hebbe related that he was not aware of the APD drug dealing investigation into the AKNG until October 2013. DC Hebbe related that SGT Jack Carson, who had been at Safe Streets (APD/FBI Drug Task Force), brought it to his attention. During the conversation with SGT Carson, DC Hebbe indicated that he was more focused on the sexual element of the allegations. However, DC Hebbe knew that there was also a drug nexus involved. SGT Carson also alleged that he and Officer Seth McMillan were ordered to stop investigating the AKNG by a commander at APD (LT Henry). DC Hebbe also learned from SGT Carson that Officer McMillan, who was also a member of the AKNG, was ordered to reveal a confidential source that both he (McMillan) and Carson were using in their investigations of the AKNG. The disclosure occurred at the AKNG office with AKNG General Katkus, the APD Commander (LT Henry, and Officer McMillan in attendance. DC Hebbe related that he could not think of a reason for the APD to release the names of confidential informants from a criminal investigation, particularly over the objections of the involved police officers.

DC Hebbe related he was concerned about what he learned and informed Chief Mew and DC Steve Smith (Chief of Operations) of the allegations involving the APD Commander (LT Henry). Neither Chief Mew nor DC Smith was aware of an APD order not to investigate the AKNG. DC Hebbe wanted this incident investigated to determine APD's role in this incident. DC Hebbe related he went to Chief Mew on at least two occasions requesting an investigation. No investigation was conducted. DC Hebbe related Chief Mew told him LT Tony Henry regrets the decisions he made. This comment made it clear to DC Hebbe that Chief Mew in some way had been in contact with the lieutenant about the AKNG concerns. DC Hebbe related there was a policy violation (releasing confidential informant information to non-law enforcement personnel) and no one above the lieutenant in the chain of command knew about it.

**On October 15, 2014 at 3:15 pm, APD DC Myron Fanning was interviewed at the MOA offices (7th Floor), 632 West 6th Avenue, Anchorage, AK 99501. DC Fanning acknowledged he knew that the interview was being digitally recorded. A certified transcript was completed of the recording. (Refer to Attachment #11)**

The following is a summary of the interview with DC Fanning:
C Fanning related that he is currently the Deputy Chief of Operations and Administration for the APD. DC Fanning did not have any direct involvement with the incidents that began with the AKNG back in the spring of 2010. DC Fanning related he has been employed by the APD for over twenty-two years.

DC Fanning related that he first became aware of the allegations that the AKNG recruiters had ties to drug dealing and were involved in sexual activity with recruits after he was promoted to captain in May 2013. DC Fanning believes that it was Officer Seth McMillan who informed him of the AKNG investigation toward the end of October 2013.

After reading an online post by retired AKNG **K.B.** titled "Illegal Activities within the Alaska National Guard", DC Fanning reached out to LT Henning, the current SAU Unit Commander, to set up a meeting with Chief Mew. DC Fanning related that his purpose for setting up the meeting was to make sure that Chief Mew was aware of the situation. (Note: LT Henning was not the SAU/SWAT Commander at the time of the initial investigation.)

DC Fanning related that the meeting with Chief Mew occurred at the Fourth Avenue Substation in early November 2013. (The meeting attendees included Chief Mew, LT Henning, DC Fanning, and two investigators, SGT Carson and Officer McMillan.) DC Fanning related that this was the first time that he became aware of all the criminal allegations involving the AKNG. During the meeting the investigators explained their entire drug investigation of the AKNG. Both investigators related that they were ordered to stop their investigation of the AKNG by LT Henry. SGT Carson went on to relate that he thought General Katkus, the commander of the AKNG, was aware of the situation and was dirty (tolerated by looking the other way from the suspected activity).

DC Fanning related that Officer McMillan explained later (not the same night of the Fourth Street meeting) that he was also ordered by LT Henry not to take sexual assault information from **K.B.** anymore. Officer McMillan was told that he could no longer work with **K.B.** who had been his and SGT Carson's confidential informant until that point. DC Fanning also related that Officer McMillan was very upset that he was ordered not to take information from **K.B.** because Officer McMillian had worked for **K.B.** while deployed on National Guard duty in Iraq. Officer McMillan related he was getting a lot of his information from **K.B.** and he felt terrible that he had to disclose his **K.B.** 's name to General Katkus. DC Fanning related not disclosing confidential informant information to the target of an investigation is basic cop work 101 (basic fundamental police practice).

DC Fanning related that he informed Chief Mew that answers were needed in regard to the allegations. DC Fanning wondered why the department would order an investigation stopped. DC Fanning related that he learned the full extent of the AKNG allegations of sexual assault and drug dealing and APD's involvement (disclosure of confidential informants and ordering the investigations discontinued) in November 2013. DC Fanning asked SGT Carson why he did not inform his chain of command. SGT Carson related that if he reported what occurred up to CPT Miller nothing would have been done. LT Henry would have found out and ruined his career. DC Fanning related that he felt both SGT Carson and Officer McMillan were intimidated by LT Henry.

DC Fanning related that he serves on the Anchorage Youth Court. A member of the Democratic Party that also serves asked him how General Katkus from the AKNG obtained the information being reported in the media. DC Fanning answered that he did not know. DC fanning related that the community was asking and people were talking about the alleged activities of the AKNG and APD.

DC Fanning related that he was informed by SGT Carson that he was ordered to provide his investigative reports involving the AKNG to AKNG LTC Lawendowski. DC Fanning once again commented that he did not understand why the APD would give their reports on the AKNG investigation to the Colonel (LTC Lawendowski) who was in command of the recruiters under investigation. DC Fanning related that he wanted to get that situation also investigated, but Chief Mew was reluctant to initiate an investigation. DC Fanning related that the reluctance by Chief Mew may have something to do with EEOC (Equal Employment Opportunity Commission) complaints that he filed because of an APD K-9 (canine) Unit issue. DC Fanning further related that Chief Mew was reluctant to initiate investigations involving LT Henry when he (Henry) was insubordinate to CPT Plummer and to Chief Mew on separate occasions.

DC Fanning related that in the spring of 2014 there was another meeting in Chief Mew's office to discuss the situation with LT Henry. The meeting attendees included Chief Mew, DC Smith, DC Fanning, CPT Miller, and LT McCoy. DC Fanning related that the purpose of the meeting was to discuss the ███████ M.C. ██████████. M.C. ████ was an AKNG member that was providing information to K.B. about sexual assaults and drug dealing in the AKNG. K.B. ████ alleged that told him ████████████████████████ DC Fanning related M.C. was also ████████████████████ During the meeting CPT Miller related this was the first time he learned about the AKNG situation with ████ M.C. ████ CPT Miller related that these incidents should be investigated. DC Fanning related that Chief Mew mentioned it was not too late to investigate. (Note: ████ M.C. ████████████████████████████████████████████████████████████████████

DC Fanning related that there was another meeting in the Municipal Manager's conference room. DC Fanning remembered the date of May 1, 2014 because it was the same day the two Alaska State Troopers were killed. The meeting attendees included Chief Mew, DC Fanning, DC Smith, Officer McMillan, SGT McKinnon, LT McCoy, and SGT Carson.) The purpose of the meeting was again to discuss the ████ M.C. ████ ████████ DC Fanning related that the discussion centered on the appropriateness and completeness of APD's response. DC Fanning related that the meeting was cut short because of notice that two State Troopers were killed in Fairbanks (Alaska) and that SGT Carson was best friends with one of the deceased.

On October 15, 2014 at 4:17 pm, MOA, Assistant Municipal Attorney Christensen forwarded an electronic copy of the APD's Releasing Information protocol she received on September 30, 2014 from Michael C. Chin, APD Records Manager. This protocol is used when APD reports are being released have to be redacted. This protocol should have been followed when APD reports were provided to the AKNG that eventually were provided to former AKNG drug informant and drug dealing suspect ████ E.P. ████
**(Refer to Attachment #12)**

On October 15, 2014 at 10:00 pm, MOA, Assistant Municipal Attorney Christensen forwarded an electronic copy of a document that she received from LT Ken McCoy that involved a Table of Contents for the AKNG investigations that were conducted under his command when he was in the Special Victim's Unit between calendar years 2009 through 2014. **(Refer to Attachment #13)**

.On October 15, 2104 at 10:01 pm, MOA, Assistant Municipal Attorney Christensen forwarded an electronic copy of all APD employees who are members of the AKNG. **(Refer to Attachment #14)**

**On October 15, 2014 at 5:57 pm, APD SGT Jack Carson was interviewed at the MOA offices (7th Floor), 632 West 6th Avenue, Anchorage, AK 99501. SGT Carson acknowledged he knew that the interview was digitally recorded. A certified transcript was completed of the recording. (Refer to Attachment #15)**

**SGT Carson was provided with the APD Pre-Interview Admonition for Witness Interviews prior to being recorded. (Refer to Attachment #16)**

The following is a summary of the interview with SGT Carson:

SGT Carson had previously provided a copy of a timeline he and Officer McMillan prepared for inclusion with Chief Mew's timeline of events  This interview followed the timeline for date reference purposes **(Refer to Attachment #3, last three pages titled Guard Time Line with first date of 02/23/10 for reference).**

SGT Carson related that on February 23, 2010, SAU personnel that included Officer Seth McMillan observed ▮▮D.A.▮▮ (AKNG ▮▮▮E.J.▮▮▮ s boyfriend) conduct a hand-to-hand drug transaction in the Costco Debarr parking lot. SGT Carson related that investigating officers seized fifty-six grams (56) cocaine and three hundred and twenty (320) grams of marijuana from the car stop.

SGT Carson related that on February 24, 2010, SAU personnel met with ▮▮D.A.▮▮ and debriefed him. ▮▮D.A.▮▮ informed SAU personnel about AKNG Recruiter ▮▮E.P.▮▮ and his willingness to help SAU investigators in their drug dealing investigation into the AKNG for consideration on ▮▮D.A.▮▮ s pending drug charges. SGT Carson related that he did not participate in the initial debrief because he was injured and did not want to have direct contact with ▮▮D.A.▮▮ SGT Carson related that the information started coming from ▮▮D.A.▮▮ just a day or two after initial contact with him.

SGT Carson related that on February 24, 2010, he got involved in the AKNG drug investigation. SGT Carson met with ▮▮E.P.▮▮ who initially denied dealing drugs but after confrontation admitted to being the main contact into a larger Mexican drug ring operating in the Anchorage area. ▮▮E.P.▮▮ also admitted to transporting drugs on AKNG time and in AKNG vehicles. ▮▮E.P.▮▮ identified his source as being ▮▮▮R.Z.▮▮▮ SGT Carson related that he also learned that ▮▮D.A.▮▮ was dating ▮▮E.J.▮▮ another AKNG recruiter ▮▮E.P.▮▮ also mentioned, during the debrief meeting, that he ▮▮E.P.▮▮ absolutely did not want his boss (Army National Guard) to be notified. SGT Carson related that he told ▮▮D.A.▮▮ that SAU investigators (SAU investigators Carson, McMillan, AST Hazelaar) had no intentions of notifying his boss or

his command. SGT Carson related that it was not the SAU's common practice to notify employers.

SGT Carson related that when he inquired of ███ E.P. ███ if any other AKNG members were involved, ███ E.P. ███ said no. During the investigation SGT Carson's wife was an Air Guard recruiter and worked right next to the Army Guard recruiters. SGT Carson related that he talked to his wife, Mia Carson, and she said if one of the recruiters is involved the whole group is involved in the criminal activity. SGT Carson related that is when, through his wife's observations, the investigators started suspecting more wide-spread criminal activity within the Army Guard. The recruiters would brag to SGT Carson's wife that General Katkus was in their pocket. SGT Carson further related that they (SAU investigators Carson, McMillan, and Hazelaar) suspected the whole recruitment unit was somehow involved, while General Katkus was not directly involved.

SGT Carson related when all the information was gathered that he and AST Hazelaar informed LT Tony Henry of the possible scope of the AKNG investigation. SGT Carson and AST Hazelaar related to LT Henry that the two confidential informants, ███ D.A. ███ and ███ E.P. ███, were talking about obtaining pounds of marijuana and large amounts of cocaine. LT Henry then stated that he was going to notify General Katkus and was going to set up a meeting. SGT Carson related that he and AST Hazelaar voiced their concern that ███ E.P. ███ had been told by both he and AST Hazelaar that they were not going to contact ███ E.P. ███ s employer. LT Henry told SGT Carson that he made a promise that he (SGT Carson) could not keep and that notifying General Katkus was going to happen. LT Henry set up the meeting with the AKNG. SGT Carson related that he believed it was the very next day or very shortly thereafter.

SGT Carson related that he attended a meeting on or about February 26, 2010 with General Katkus, LTC DeHaas, LT Henry, and AST Hazelaar in the general's conference room. AST Hazelaar was an Alaska State Trooper assigned to the SAU at the time. SGT Carson related that LT Henry ordered him and AST Hazelaar to completely disclose everything going on with the AKNG, which they did. SGT Carson related the disclosures at that meeting included that he and AST Hazelaar believed ███ E.J. ███ ███ E.P. ███ ███ J.C. ███ and ███ J.N. ███ were all involved or had knowledge of the drug trafficking in the AKNG. ███ D.A. ███ s name was also disclosed as a source of drug information. SGT Carson related he informed the meeting attendees that SAU investigators had very little proof of it at the time. SGT Carson indicated he and AST Hazelaar knew that ███ E.P. ███ was heavily involved in drug dealing and it was suspected that the rest of the Army Guard recruiters were also involved in the illegal activity. General Katkus then informed them (LT Henry, SGT Carson and AST Hazelaar) that there were some suspicions within the AKNG that ███ J.N. ███ had been returned from Afghanistan or Iraq because of suspected steroid use.

SGT Carson related that the meeting clearly ended up compromising the drug investigation into the AKNG recruiters because confidential informants ███ D.A. ███ and ███ E.P. ███ became uncooperative and ceased providing information to SAU investigators that would further the SAU drug investigation. SGT Carson related that he did not think the confidential informant disclosures compromised the drug case into the Mexican cartels coming to Anchorage to establish drug houses. (Note: The Mexican drug cartel investigation was a separate investigation being done independently by the federal



SSTF) SGT Carson related that within a couple days of that meeting with members of the AKNG command, Army Guard recruiters [E.P.] and [J.N.] were observed by his wife Mia Carson in her office looking through her things. SGT Carson related that he talked to his supervisor SGT Redick about his concern for his wife's safety. SGT Carson related that not long after the incident in his wife's office the information from [E.P.] dried up and he became an uncooperative informant.

SGT Carson related between February 26, 2010, through March 5, 2010 his wife Mia felt threatened and intimidated because [E.P.] and [J.N.] were in her office and were asking questions about his identity. SGT Carson further related that General Katkus and his wife's supervisors were notified and she was moved to later shift hours to avoid contact with the Army Guard recruiters. Mia Carson reported information about the Army recruiters intimidating her to her supervisor Air Guard Recruiter Beth Miller. SGT Carson related that both Mia Carson and Beth Miller were ordered to sign a gag order by AKNG command.

SGT Carson related that on March 5, 2010, informants [D.A.] and [E.P.] introduced undercover AST Hazelaar to their source of drug supply. During their contact, AST Hazelaar observed over a pound of methamphetamine and ½ kilo of cocaine in the vehicle. Trooper Hazelaar purchased ½ ounce of methamphetamine and one ounce of cocaine.

SGT Carson related that on March 12, 2010, Airport Interdiction intercepted thirty-three pounds of marijuana. The amount does not meet federal minimums so the case was handed to SAU. SAU completed a controlled delivery followed by a search warrant of a residence. The interdiction case was immediately linked as the source of supply for [E.P.] and [D.A.]'s main drug source [R.Z.]. The total amount seized is 126 pounds of marijuana and approximately $60,000 in cash.

SGT Carson related that on March 24, 2010, the SAU was working in conjunction with the Safe Streets Task Force (FBI/APD) and had located several residences around the Anchorage area linked to a complex drug ring run out of California and Mexico with reported ties to the Mexican Cartel La Familia. Confidential Informants [E.P.] and [D.A.] had become uncooperative and were no longer working with law enforcement. SGT Carson related that this drug trafficking organization was responsible for supplying drugs to [E.P.] and [D.A.]. All the Army Guard recruiters seemed to be on edge and then the case meets a roadblock into any additional AKNG members. SGT Carson related that he and other SAU investigators believed General Katkus had interfered with the investigation. During this time [E.P.]'s source of supply found a tracker (GPS) on his vehicle. SGT Carson related that believing the case was in jeopardy search warrants were executed on several residents in the Anchorage area. The SAU and Safe Streets Task Force seized approximately five pounds of methamphetamine and one-half kilogram of cocaine and $181,000 in cash.

SGT Carson related that through Officer Seth McMillan, who had talked to [K.B.] that [K.B.] told him that General Katkus told all of the recruiters to knock off their illegal activity and that the feds and the APD are investigating them. SGT Carson related that finally around June 2010, the SAU obtained information to prove that General Katkus interfered with the federal investigation. SGT Carson related

that the SAU investigators (at the time Officer Carson, Officer McMillan and AST Hazelaar) were excited because they were going to get proof that a general had betrayed the information given to him into the Army Guard recruiter investigation.

SGT Carson related that he then talked about the interference by General Katkus with FBI SA Steve Payne. SGT Carson related that he and SA Payne had concerns with informing LT Henry about the allegations involving General Katkus. SGT Carson related that this was a bad move on his part because LT Henry is his supervisor. SGT Carson related that he told Seth McMillan to go through the SSTF side (FBI) and not inform LT Henry. SGT Carson related that he, Officer McMillan, and SA Payne, all believed that the second LT Henry found out he was going to go straight to General Katkus with the information and it was going to interfere with the investigation. They chose to go behind LT Henry's back. SGT Carson related that Officer McMillan met with Army Guard recruiter ███ J.N. ███ in the parking lot of the FBI. The meeting between ███ J.N. ███ and Officer McMillan did not last very long. SGT Carson related that Officer McMillan called him and said that it didn't go well and ███ J.N. ███ was questioning him like he was trying to find out what was going on with the Army Guard investigation. SGT Carson related that they (at the time Officer Carson, Officer McMillan, and SA Payne) knew it was going to blow-up at that point. They had been set up by ███ J.N. ███ who apparently immediately notified AKNG command that he met with Officer McMillan.

SGT Carson related that Officer McMillan went back to the APD, where he was chastised by LT Henry. SGT Carson related that he told Officer McMillan to tell LT Henry that he told him (Officer McMillan) to meet with ███ J.N. ███ behind his Lt. Henry's back. This way SGT Carson would take the hit (possible administrative action) from LT Henry and not Officer McMillan. SGT Carson related that Officer McMillan just took the hit for some reason because he and Agent Payne at the FBI were ready to take the hit. SGT Carson related that Officer McMillan called him right afterwards and told him what happened and that he (Officer McMillan) was then ordered to give up his informant. Officer McMillan gave the name to LT Henry and then LT Henry called General Katkus to provide ███ K.B. ███'s name. SGT Carson related we (at the time Officer Carson, Officer McMillan, and SA Payne) were done because ███ K.B. ███ was never going to trust us (APD) with information again.

SGT Carson related that he talked to LT Henry within a couple days of that incident and told LT Henry that he thought that they were making a mistake. The gist of LT Henry's conversation was that you just don't go after a general. SGT Carson related that he informed SA Steve Payne that day as soon as it happened that they (at the time Officer Carson and Officer McMillan) can no longer have involvement with the AKNG drug case and General Katkus.

SGT Carson related that somebody (not an AKNG member) reached out to him stating that they wanted all the reports on ███ E.P. ███ and that they were going to kick ███ E.P. ███ out of the AKNG. SGT Carson related that he does not remember whether it was SGT Redick or LT Henry that told him to release the information. SGT Carson related that the AKNG needed it for prosecution. SGT Carson related that he talked to SAU command and found out what they wanted released. SGT Carson related that the only information that was released was the audiotape of ███ E.P. ███'s debrief and the debrief

report where ███ made admissions to being a drug dealer. SGT Carson related that he handed the report and audio file himself to LTC Lewandowski with the AKNG.

**On October 16, 2014 at 9:23 am, APD LT Rich Henning was interviewed at the MOA offices (7th Floor), 632 West 6th Avenue, Anchorage, AK 99501. LT Henning acknowledged he knew that the interview was being digitally recorded. A certified transcript was completed of the recording. (Refer to Attachment #17)**

**LT Henning was provided with the APD Pre-Interview Admonition for Witness Interviews prior to being recorded. (Refer to Attachment #18)**

The following is a summary of the interview with LT Henning:

LT Henning related that he has been employed by the APD for 22 ½ years. LT Henning was a Patrol Lieutenant from September 2010 to October 2012. In October 2012, LT Henning was assigned to the SAU, which is composed of SWAT members and the unit that handles street-level drug enforcement and street-level buys.

LT Henning related that he became familiar with the APD's drug investigation regarding the Army Guard in the spring of 2010 on or about October 16. 2013. LT Henning related that the illegal activities occurring in the AKNG began to come out in the news around that time. Officer Seth McMillan and SGT Jack Carson brought media reports to his attention by mentioning that the news had recently been discussing an old investigation and that he (Henning) should be aware. Both SGT Carson and Officer McMillan informed LT Henning that they had meetings with the AKNG command staff and the AKNG command staff was provided with SAU confidential informant information.

LT Henning related that he decided to brief his supervisor at the time, then CPT Fanning (May 2013). LT Henning related that a briefing occurred on October 16, 2013 with recently promoted DC Fanning. The briefing attendees were LT Henning, SGT Carson, Officer McMillan, and DC Fanning. LT Henning related that this briefing occurred before the November 7, 2013 meeting with Chief Mew.

LT Henning related he received a copy of an email string from Chief Mew. LT Henning indicated that the email string began on November 6, 2013 and was from the executive assistant to the mayor. The email from the mayor's executive assistant, Mary Croxton, related that ██████████ (a former member of the AKNG) had contacted the mayor's office in reference to the AKNG allegations and that the email information was forwarded all the way up through to Chief Mew's secretary.

LT Henning related that on November 7, 2013. Chief Mew requested a meeting with him to discuss the whole string of events contained in the email. LT Henning related that he was unavailable due to SWAT training. LT Henning related that a meeting was held at an intermediate location at the Fourth Avenue Substation on November 7, 2013. The meeting attendees were Chief Mew, DC Fanning, SGT Carson, Officer McMillan, and LT Henning. During the meeting, Chief Mew was briefed on the SAU drug investigation that occurred with the AKNG in 2010 and the allegations made in the email by ██████

███████ LT Henning related that the decision was made to brief the FBI for any Obstruction of Justice violations on General Katkus' part because the meeting attendees did not think it was in APD's jurisdiction to investigate.

LT Henning provided copies of the email strings that centered on the complaint filed with the mayor's office by former AKNG member ███████████ and the subsequent news media inquiry. Copies of the emails are included with this report. **(Refer to Attachment #19)**

**On October 16, 2014 at approximately 11:00 am, APD CPT Bill Miller was interviewed at the MOA offices (7th Floor), 632 West 6th Avenue, Anchorage, AK 99501. CPT Miller acknowledged he knew that the interview was being digitally recorded. A certified transcript was completed of the recording. (Refer to Attachment #20)**

**CPT Miller was provided with the APD Pre-Interview Admonition for Witness Interviews prior to being recorded. (Refer to Attachment #21)**

The following is a summary of the interview with CPT Miller:

CPT Miller related that he has been employed by the APD for almost twenty-nine years. CPT Miller related that he was in command of the SAU from approximately 2005 through 2011.

CPT Miller related that he was not intimately familiar with the APD's drug investigation regarding the AKNG in the spring of 2010 involving the recruiters. CPT Miller related that what he did know was the bad side of it. The allegation surfaced that the lieutenant of the unit then, Tony Henry, had ordered a sergeant and an officer to give the name of an informant over to the head of the AKNG, General Katkus, who is a former captain with the APD. CPT Miller related that the allegation involving LT Henry interfered with the drug investigation that the two officers had started into the Recruiting Section of the AKNG. CPT Miller related that he learned of the allegations late last year (2013) or early this spring (2014). CPT Miller related this information was not brought to his attention back in 2010, not by the investigator or LT Henry. CPT Miller related that the allegations are that this was an illegal order and that it was improper and it impeded the investigation. CPT Miller related that his problem with the situation is the investigators did not bring it up to the next highest level in the chain of command. CPT Miller related that he learned about the allegations involving LT Henry in a meeting with Chief Mew

CPT Miller related that part of the reason to use an informant is because they can get investigators access to places that are normally hard to get to as an officer. CPT Miller related that if everybody knows that person "X" is working as an informant, not only do you have safety concerns for the informant and their family, but once they are brought into the APD the Department in essence own parts of their safety. CPT Miller related that if the informants are exposed to everybody their usefulness ends. CPT Miller also related that officer safety is also a concern, because if an officer is spotted with an informant, particularly if the officer is working in an undercover capacity, all of a sudden everybody (including the targets of the investigating) know who he/she is. CPT Miller

related that it would be a violation of APD policy to inappropriately disclose the confidential informant's information.

CPT Miller related that LT Henry was put back in the Sexual Assault Unit when he first found out about the allegations involving the informant disclosures. CPT Miller related that his reaction to Chief Mew, when he found out about the allegations that LT Henry had forced SAU investigators to turn over informants and it was all wrapped up in the AKNG investigation that was starting to snowball, my reaction and advice to Chief Mew was that the APD has to investigate the matter. CPT Miller further related that he did not know who was going to investigate it but the Department has to get somebody to look at this for no other reason than just to see what our exposure is and where we stand. CPT Miller related that he has not discussed this particular incident with Officer McMillan or Officer Carson.

CPT Miller related that he heard the information late last year, probably later than November (2013). He was in the Chief's office with a few other members. The main issue seemed to be the release of the informants' information to the commander of the AKNG, whose personnel were under review. CPT Miller related that there was also discussion at that meeting about LT Henry directing the SAU not to investigate allegations against the AKNG in general.

CPT Miller related disclosure of informants to principles or somebody that could be involved could have a chilling effect on the people actually reporting crimes, especially if the principals belong to the organization from where the information is coming.

**On October 16, 2014 at 1:22 pm, APD Chief of Police Mark Mew was interviewed at the MOA offices (7th Floor), 632 West 6th Avenue, Anchorage, AK 99501. Chief Mew acknowledged he knew that the interview was being digitally recorded. A certified transcript was completed of the recording. (Refer to Attachment #22)**

**Chief Mew was provided with the APD Pre-Interview Admonition for Witness Interviews prior to being recorded. (Refer to Attachment #23)**

The following is a summary of the interview with Chief Mew:

Chief Mew related that he has been employed just a little bit over twenty-five years with the APD but it came in two phases. Chief Mew related he was first employed by the APD for a little over twenty years retiring in 2003. Chief Mew has been re-employed as Chief of Police for the APD since January of 2010.

Note: Chief Mew was allowed to review his prepared timeline to help him with dates and times. **(Refer to Attachment #3)**

Chief Mew related that LT Henry made him aware of the drug investigation involving the AKNG recruiters during the spring of 2010. Chief Mew related that LT Henry informed him that there were AKNG recruiters who were involved in drug dealing. LT Henry also indicated that the APD was working cooperatively with the AKNG on the investigation and that AKNG General Katkus was in the loop. Chief Mew remembered a time when

there was a significant drug seizure and believed it was the AKNG case. Chief Mew related that the APD conducted a press conference at one of the mayor's weekly press events. Chief Mew related that ninety-five pounds of marijuana, boxes of crystal methamphetamine, a large quantity of guns, and approximately $300,000 in cash were seized. Chief Mew related that he thinks this was the case involving the AKNG recruiters. (Note: This investigation has revealed this was the SSTF airport interdiction case, not the SAU case involving the initial contact with ████ D.A. ████ on February 23, 2010).

Chief Mew related that he did not recall talking to LT Henry about confidential informants at that time. Chief Mew related that it made sense to him that the AKNG would be interested in helping the APD if they have dirty guardsmen and that there might be a cooperative effort. Chief Mew did not find it unusual that LT Henry would work cooperatively with the AKNG because the APD had a long working relationship with General Katkus. General Katkus was an APD Captain when he retired from the Department.

Chief Mew related that the only time he could think of where a confidential informant's information would be released is at the direction of the court or the prosecuting attorney. Chief Mew further related that things happen in vice (undercover police operations) work that he would not know about but thought the release of confidential informant information to the AKNG was highly unusual.

Chief Mew related that he first became aware of allegations of sexual assaults occurring in the AKNG in late 2010 or early 2011. The rumors were perpetuated by someone with AKNG connections who was participating in an APD patrol ride-along. Chief Mew related that he did not remember the first time he heard of ████ K.B. ████ and may have confused him initially with ██ E.P. ██ Chief Mew related that he did not know how long he confused ██ K.B. ██ with ██ E.P. ██ from the AKNG. Chief Mew indicated he came into work one morning (the date is unknown) and was informed by someone (unknown) in APD senior command that an APD officer had a ride along with a connection to the AKNG the night before. Chief Mew related that the male (unnamed) ride along alleged that General Katkus was involved in sexual assaults in the AKNG and the sexual assaults were being covered up or something to that effect. Chief Mew related that the allegations were very vague. Chief Mew related that he could not determine if the allegations by the patrol ride-along meant that General Katkus was actually committing the sexual assaults, or if he (General Katkus) knew about them or tolerated them. Chief Mew then related the allegations needed to be looked into so he contacted the FBI by telephone and reported the allegations involving General Katkus and the sexual assaults occurring in the AKNG to FBI Special Agent-in-Charge (SAC) Kevin Fryslie. The FBI indicated that they had the willingness to investigate the allegations. Chief Mew related that FBI SAC Fryslie returned his telephone call later that same afternoon. He SAC Fryslie related that there was nothing to the allegations, that the FBI checked it out, that the FBI had been hearing these rumors and it was nothing more than noise or drama.

Chief Mew related that, on October 27, 2013, the Anchorage Daily News (Currently named the Alaska Dispatch News) reported allegations about sexual assaults occurring

in the AKNG. The article mentions the AKNG recruiters in terms of committing sexual assaults but there is no mention of the drug investigation into the AKNG.

Chief Mew related that he heard more about the sexual assault allegations occurring in the AKNG allegations on November 7, 2013. Chief Mew related that he received an email from the mayor's secretary Mary Croxton. Chief Mew related that the email message from Ms. Croxton essentially said that ███████████ (a former AKNG member) alleges there was a cover-up by the APD and he █████ might have mentioned ███ M.C. ██████████████████ (Anchorage, AK residential community). The content of Ms. Croxton's email message was brief and the date on the message was November 6, 2013. Chief Mew related that the message alleged the following (taken from the email):

- National Guard abuse, discrimination, sexual fraud, etc. ████████ alleges he witnessed much while he served in the AKNG.

- The illegal activity now involves APD and General Katkus

- ████████ urges the Mayor to get involved.

- Ms. Croxton writes on the email that former guardsmen ████████ reports that he urged state legislators to pursue the AKNG abuse.

- ████████ reports he will testify as a witness on issues of abuse that are legally reviewed and that he ████████ witnessed.

- ████████ alleged many of the issues, including fraud, logged hours, assault, discrimination, etc., APD cover-ups.

- ████████ talks about the ████████████ M.C. ████████ who reported to her superiors her ██ M.C. ██████████████████ ██ K.B. ██ testified in court for ██ M.C. ██████ covered-up by General Katkus and ultimately APD.

- General Katkus has put the "kibosh" (Put a stop to many allegations moving forward.) on many allegations and APD never pursued.

Chief Mew related what he just described was in Mary Croxton's notes and he received that message on November 7, 2013. Chief Mew related that prior to November 7, 2013 he had never heard of ████ M.C. ████ or any of the rest of the allegations made by ████████

Chief Mew related that LT Henry did not notify him of his (LT Henry) unit's concerns regarding General Katkus. Chief Mew indicated LT Henry also did not notify him of his (LT Henry) decision not to investigate the allegations regarding General Katkus. Chief Mew related he was not sure LT Henry made the wrong call in not investigating General Katkus but Chief Mew's belief was that APD command should have been told about the allegations involving General Katkus. Chief Mew related the APD has a policy called Reporting Matters of Importance and if there is an allegation against a Commissioner (General Katkus was appointed by the Alaska Governor to his position as

Commissioner of the Department of Military and Veteran's Affairs) the matter should be reported up the chain of command to the Chief. Chief Mew related reporting the allegations regarding AKNG General Katkus up the chain of command to him would have been appropriate to be handled at the Chief's level because the other APD officers believed they were in over their pay grade. Chief Mew related he would have expected that notification to occur in 2010 not three years later. Chief Mew further related LT Henry was untouchable (free from any APD investigation or disciplinary action) during that period of time.

Chief Mew related LT Henry being untouchable by the APD started with the K-9 Unit issue involving an officer under LT Henry's command who was AWOL (absent without leave). The APD mediated the K-9 Unit situation. Chief Mew related he told the EEOC at mediation that the department had another investigation into LT Henry's conduct. The EEOC was fine with the investigation and said nothing in the mediation will prevent him from conducting another investigation. Chief Mew related the APD did conduct that investigation. LT Henry went ballistic because LT Henry thought Chief Mew was retaliating against him and that violated the EEOC matter that had just been mediated. Chief Mew related LT Henry refiled with the OEO (Office of Equal Opportunity). The OEO sent the APD a Cease-and-Desist Order indicating the OEO would see the APD in court if the investigation continued. The APD was disseminating new policies and the legal justifications for those policies to APD personnel at an Anchorage School District (ASD) location, attended by guests and members of other agencies. At the meeting it is alleged that LT Henry bad mouthed several people up his chain of command to include Chief Mew in front of a mixed audience of attendees, and there were those present who wanted to discipline LT Henry for his conduct. Chief Mew related the Municipal Attorney's Office told APD command not to discipline LT Henry because of the OEO recommendations. Chief Mew further related all this was going on at the same time and APD command felt that to investigate LT Henry for something that happened three years in the past probably would not work.

Chief Mew related holding LT Henry accountable for his conduct that occurred three years ago would look like retaliation, as would an investigation into LT Henry's conduct at the policy meeting (described in the previous paragraph).

Chief Mew related he recently learned there was a chance LT Henry told SAU investigators to divulge confidential informants and quit working the AKNG recruiter's drug investigation. Chief Mew related he did not understand that allegation on November 7, 2013. Chief Mew related he only recognized one (LT Henry's decision not to allow SAU investigators to investigate General Katkus) of three allegations on November 7, 2013. Chief Mew related he did not recognize the remaining allegations (The other two allegations are: 1) LT Henry's disclosure of confidential informants to the Guard and 2) LT Henry's decision not to investigate the AKNG recruiters for drug dealing) totally until September 11, 2014.

Chief Mew related he did not hear anything that indicated to him that the APD had done anything wrong, with the possible exception of LT Henry's decision regarding AKNG General Katkus. Chief Mew related he contacted the FBI the next day after hearing about LT Henry's decision not to investigate General Katkus. He assumed if the FBI discovered any wrongdoing by APD they would notify him. Chief Mew related his

thought at that point was not to investigate anything. Chief Mew related he had bullet points in his timeline. He knows it looks bad and there are many issues contained in the timeline that look unusual, but he (Chief Mew) was hearing the information for the first time.

Chief Mew related he requested the FBI to investigate General Katkus, the AKNG, and to conduct the investigation that SAU wanted to complete (possible interference with the SAU drug investigation into the AKNG) but were told not to investigate by LT Henry. Chief Mew related he wanted to investigate the allegations regarding LT Henry but was told no on a couple of other occasions by the Municipal Attorney's Office. At his point he had lost a year on investigating LT Henry's conduct and four years on any possible AKNG investigation.

Chief Mew related on November 7, 2013 he remembered Officer McMillan talking about submitting what the SAU investigators had in their investigation in front of General Katkus. Chief Mew thought Officer McMillan was saying what information was provided to General Katkus occurred after the recruiter case fell apart. Chief Mew indicated he might have been wrong because there were so many details and he was not sure he got all of them right. Chief Mew related he did not remember hearing that LT Henry may have disclosed information about the AKNG informant that was providing information about the sexual assaults until he read SGT Carson and Officer McMillan's timeline on September 11, 2014. Chief Mew related he took it as being they were informants in the AKNG drug case and did not realize that they were informants in a sexual assault matter, but he could be wrong about that.

Chief Mew related he shared all the information with the National Guard OCI investigator that he provided during this interview up to May 1, 2014. Chief Mew related there is information in his timeline that occurred after May 1, 2014, that is not reflected in the OCI report. Chief Mew related he has not discussed the AKNG drug case with LT Henry since the press release (approximately March 2010) for seizing a significant amount of drugs from people who were supplying the AKNG recruiters not from the AKNG recruiters themselves. Chief Mew related he remembered at the November 7, 2013 meeting either SGT Carson and/or Officer McMillan relating that LT Henry came to regret making the decision (no specifics were provided about LT Henry's decision mentioned here as Chief Mew never heard LT Henry make this statement) he (LT Henry) made. Chief Mew never heard that from LT Henry. At the conclusion of the interview Chief Mew provided this investigator with copies of the following documentation:

1. Letter of complaint from Alaska State Senator Lisa Murkowski, dated July 14, 2010. The letter was from her constituent, AKNG member ███ **E.P.** ███ alleging the APD violated his confidentiality by informing his employer, the AKNG, that he was working as an informant for the APD and that was after the APD gave ██ **E.P.** ██ assurance the department would not notify his employer. **(Refer to Attachment #24)**

2. Letter to State Senator Lisa Murkowski from APD Chief Mark Mew, dated January 24, 2011. **(Refer to Attachment #25)**

3. Email chain with last date and time September 9, 2014 @ 10:08 am from Chief Mew to Jack Carson and Seth McMillan. The emails discuss the possibility of charging some of the recruiters. The U.S. Attorney's Office is relating they were not interested in pursuing criminal charges due to ███ **E.P.** and his supplier's ████ **R.Z.** ████ cooperation, and the amount of time that has passed. **(Refer to Attachment #26)**

4. Email chain with last date and time September 9, 2014 @ 3:35 pm from DC Myron Fanning to Chief Mew. Included in the chain is an email from Chief Mew dated November 7, 2013 @ 1:28 pm to Richard Henning with CC's to Stephen J. Smith and Myron Fanning. Chief Mew wanted to know about a UC (Undercover) dope case SAU was working a couple years ago that may be related to the situation that has been in the news lately. The subject line of this email states ████ (correct spelling ████ ████ alleges cover-up, etc. w/alleged abuse from the Nat. Guard. **(Refer to Attachment #27)**

Note: Chief Mew mentions the ████ email in his timeline dated November 7, 2013. The beginning of the paragraph related ████ alleges a cover-up by the APD and then later in the chronology there is bulleted information that SAU wanted to investigate Katkus for interfering but LT Henry would not let SAU investigators continue with the investigation. **(Refer to Attachment #3 for additional details).**

**On October 16, 2014 at 4:00 PM, APD LT Kenneth McCoy was interviewed at the MOA offices (7th Floor), 632 West 6th Avenue, Anchorage, AK 99501. LT McCoy acknowledged that he knew the interview was being digitally recorded. A certified transcript was completed of the recording. (Refer to Attachment #28)**

**LT McCoy was provided with the APD Pre-Interview Admonition for Witness Interviews prior to being recorded. (Refer to Attachment #29)**

The following is a summary of the interview with LT McCoy:

LT McCoy related that he has been employed by the APD for twenty years and in the spring of 2010 he would have been the supervisor of the SVU.

LT McCoy related that during that time he was not aware of the APD's drug investigation dealing with the AKNG. LT McCoy related in May of this year (2014) was the first time he learned of the allegations of the disclosure of confidential informant information to the AKNG. Lt McCoy related that there was a lot of publicity regarding the misconduct that was taking place and the allegations of misconduct within the AKNG.

LT McCoy related that Chief Mew wanted to be briefed on what actions the police department had taken in regards to sexual assault investigations, because there was a lot of information in the media that cases were being covered up and the APD was not properly investigating sexual assault cases. LT McCoy related that he was called to a meeting on May 1, 2014, held at the police station. LT McCoy related he was on the way up to the chief's office and ran into SGT Jack Carson. LT McCoy related that his

interest was piqued when he noticed SGT Carson heading to the same meeting. LT McCoy related that he and SGT Carson sat down and briefed LT McCoy on the SAU investigation of the information they received regarding drugs within the AKNG and the possible sexual assaults that were also being committed there.

LT McCoy related that media information was coming out about the alleged APD cover-up and when he heard that, it really disgusted him. LT McCoy related that every case the SVU has received was investigated and evaluated, each one of those cases on their own merits. LT McCoy related back on May 1, 2014 after he had the discussion with SGT Carson and learned of the information involving the drug investigation and revealing K.B. s name to the National Guard, he informed CPT Bill Miller his supervisor. LT McCoy related that after hearing the information he then met with the Chief (Mew), both Deputy Chiefs, CPT Miller, and SGT John McKinnon. LT McCoy related SGT McKinnon is the current supervisor of the SVU.

LT McCoy related he was the SVU commander at the time so he reviewed the information. DC Fanning and CPT Miller both pretty much at the same time indicated a need to open and internal investigation. LT McCoy related that he agreed with initiating an investigation at that time. DC Steve Smith intervened in the conversation at that point and indicated APD command needs to be cautious because LT Henry has current lawsuits against the department and this could be deemed or viewed as retaliation. LT McCoy related Chief Mew made the comment that he referred to LT Henry as Tony and he said Tony feels real bad about that decision. Which at that point, led those in attendance at the meeting to believe that Chief Mew was already aware of what had taken place. LT McCoy related once again, with the other attendees, the recommendation for an investigation.

LT McCoy related about an hour or so later Chief Mew wanted to meet again regarding the incident at City Hall. There were two additions to the meeting, (SGT Carson and Officer McMillan). The other meeting attendees were Chief Mew, DC Fanning, DC Smith, CPT Miller, LT McCoy, and SGT McKinnon. The information regarding the AKNG drug investigation and informants was again discussed. Once more recommendations were made to open an investigation into LT Henry's decision regarding the AKNG drug case, the informant disclosures and the sexual assaults allegedly being covered up by the APD. Chief Mew said he would take it under advisement. LT McCoy related Chief Mew said that he was going to reach out to the FBI and speak to them more about the whole scenario, but to LT McCoy's knowledge the investigation was never launched until now.

**On October 17, 2014 at 10:26 am, APD Officer Seth McMillan was interviewed at the MOA offices (7th Floor), 632 West 6th Avenue, Anchorage, AK 99501. Officer McMillan acknowledged he knew that the interview was digitally recorded. A certified transcript was completed of the recording. (Refer to Attachment #30)**

**Officer McMillan was provided with the Pre-Interview Admonition for Witness Interviews prior to being recorded. (Refer to Attachment #31)**

The following is a summary of the interview with Officer McMillan:

Officer McMillan had previously provided a copy of a timeline he and SGT Jack Carson prepared for review and inclusion with Chief Mew's prepared timeline. This interview followed the timeline for date reference purposes. **(Refer to Attachment #3 for additional details under the Guard Time Line on the last three pages).**

Officer McMillan related that in the winter of 2010 he was assigned to the SAU and was involved in APD's drug investigation of illegal drug dealing within the AKNG recruiters. Officer McMillan related on February 23, 2010, he saw a drug deal or behavior that was consistent with a drug deal while on duty with SAU at the Costco Debarr. There was a subsequent car stop resulting in a seizure of marijuana and cocaine. D.A. D.A. was involved. D.A. turned out to be the boyfriend of an AKNG Army Recruiter E.J. D.A. or E.P. Officer McMillan related he was not involved in the initial debriefs of D.A. or E.P. Officer McMillan related no one from the federal law enforcement side was involved at that time. Officer McMillan related the case quickly went the federal direction but not initially. Officer McMillan related both D.A. and E.P. became confidential informants for the SAU.

Officer McMillan related he remembered when SAU personnel reached out to the AKNG. Officer McMillan related he did not think that the outreach needed to occur. Officer McMillan indicated it was completely unnecessary for LT Henry, SGT Carson, and AST Hazelaar to go and notify General Katkus of the SAU investigation involving AKNG personnel. Officer McMillan related the investigators did not know where things were going and to reach out to a non-law enforcement entity when investigating members of an organization provides unnecessary information that could compromise the case. Officer McMillan related it t was so early in the investigation that SAU investigators (SGT Carson, Officer McMillan, and AST Hazelaar) were definitely suspicious of a larger AKNG involvement due to the information provided by E.P. Information such as the degree of movement, dope weight, and number of people involved operating under AKNG business hours indicated possible wide-spread abuse. Officer McMillan related E.P. and D.A. stopped cooperating after the meeting with General Katkus. E.P. was not involved in the interdiction, but the dope came from his supplier R.Z. who has ties to the Mexican drug cartel La Familia). During the interdiction he (McMillian) realized. The investigation into the AKNG recruiters and the airport interdiction were separate ongoing cases.

Officer McMillan related sometime in May 2010. K.B. reached out to him to report sexual assaults by the Army National Guard Recruitment and Retention Unit. Officer McMillan related to K.B. that he (Officer McMillan) was not a sexual assault investigator, and referred him to the APD Sexual Assault Unit. Officer McMillan related he knew at that time for a fact K.B. was being very vocal in the AKNG about sexual assault victims in the AKNG and missing money. K.B. was calling everybody out at the AKNG and at the same time he (K.B. was trying to come to Officer McMillan and feed him information. Officer McMillan related K.B. did not give him sexual assault victim's names even though he asked.

K.B. related to Officer McMillan significant concerns that the chain of command could not be trusted because there was too much of a direct connection between the problem recruiters and General Katkus. Officer McMillan related K.B. had told



him that he had brought some of these women to the military SARC (Sexual Assault Response Coordinator), which is not criminal, but basically a resource equating to STAR (Standing Together Against Rape) program on the civilian side. Officer McMillan related it was three or four women, and that ████ K.B. ████ had at least three names for sure. Officer McMillan related at the time the only thing he could do was encourage ████ K.B. ████ to get these victims to use the resources. These women were allegedly assaulted by other members of the AKNG.

Officer McMillan related on June 3, 2010, AKNG ████ J.N. ████ reached out to him through ████ K.B. ████ Officer McMillan related he believed ████ J.N. ████ was going to reveal criminal activity within the AKNG and possibly General Katkus' involvement. Officer McMillan related he had received information from ████ K.B. ████ that General Katkus went to the Army Guard recruiters and told them to lay low (after the first meeting with General Katkus on February 26, 2010). The police were looking at them. Officer McMillan related during this contact with ████ J.N. ████ he ████ J.N. ████ did not provide any information but was actually trying to get details into the APD and FBI investigations. Officer McMillan related upon leaving the meeting with ████ J.N. ████ LTC DeHaas from the AKNG was trying to call him on his personal phone.

Officer McMillan related when he returned to the APD he was ordered into LT Henry's office and questioned why he was still looking into the AKNG. LT Henry said he had just heard from General Katkus, and he (General Katkus) asked him for the name of Officer McMillan's AKNG source of information. Officer McMillan related he argued with LT Henry and he (Officer McMillan) said this might not be the best idea to disclose his source's name. He indicated that Lt. Henry ordered him to provide the AKNG source's name. Officer McMillan complied with LT Henry's order. Officer McMillan related LT Henry then called General Katkus and ordered him again to disclose his AKNG source of information that connected him (Officer McMillan) with ████ J.N. ████ which was ████ K.B. ████ Officer McMillan related that ████ J.N. ████ himself was suspected at the time to be part of the criminal conduct occurring in the AKNG. Officer McMillan related ████ J.N. ████ was an AKNG recruiter and they (SGT Carson, Officer McMillan, and FBI SA Steve Payne) suspected ████ J.N. ████ would be a good source of drug information.

LT Henry ordered Officer McMillan not to look any further into the AKNG recruiters. Officer McMillan related the AKNG criminal investigation issue was an issue for civilian law enforcement since the AKNG does not have a criminal investigation arm. Officer McMillan related at some point in time he and SGT Carson were told by LT Henry that the drug busts were done, people were arrested, and the APD is not going to move any further with people inside the AKNG. Lt. Henry indicated this was now the AKNG chain of command's responsibility to deal with their people. LT Henry told Officer McMillan that there was going to be a meeting the next day and then dismissed him.

Officer McMillan related on June 4, 2010 he was directed into a meeting at AKNG Headquarters in General Katkus' office. Officer McMillan related he was present at that meeting along with LT Henry, SGT Redick, General Katkus, and LTC DeHaas. General Katkus advised Officer McMillan that he was barking up the wrong tree and ████ ████ K.B. ████ is crazy. General Katkus said ████ K.B. ████ believes in aliens. Officer McMillan related General Katkus said that he understood that he (Officer McMillan) was

trying to chase down drug dealers but [K.B.] is not someone to listen to. Officer McMillan related that [K.B.] was then marched into General Katkus' office and given an order by LTC DeHaas to provide the names of sexual assault victims in the AKNG. [K.B.] refused and stated that he has already referred the victims to the APD and reported the information to the SARC. Officer McMillan related there was discussion about [J.N.] and the AKNG recruiters at that meeting. Officer McMillan related he was also told to disclose the name of [J.N.] too. Officer McMillan related he did not remember who ordered him to disclose [J.N.] name but he would not have voluntarily done so.

Officer McMillan related right after the meeting [K.B.] did try to contact him. Officer McMillan indicated he was ordered after that meeting by LT Henry that he would not be talking to [K.B.] anymore, and that [K.B.] was no longer a source for him. Officer McMillan further related he told [K.B.] that he had orders, and [K.B.] needed to do whatever was within his capacity to help the AKNG sexual assault victims or try to relay information to other people. Officer McMillan told [K.B.] that he could not be a conduit for confidential information to him any longer.

Officer McMillan related also on June 4, 2010, after conversation with LT Henry, he informed FBI SA Steve Payne that the APD can have no more involvement in the AKNG case. Officer McMillan related after that he felt that he could not move forward with any investigations involving the AKNG without getting into trouble. Officer McMillan related at one point during the meeting with LT Henry told him this was the kind of behavior that is going to get him removed from the SAU.

Officer McMillan related AKNG LTC Jane Wawersik conducted a review of AKNG reports and identified some sexual assault victims. She referred the incidents over to APD. Officer McMillan related this occurred in 2013. Officer McMillan related LTC Wawersik had to go on her authority as a military officer to get that information from within the AKNG. Officer McMillan related that was certainly information that could have been developed with [K.B.] earlier on if the informant relationship had been kept intact. Officer McMillan related some of the victims that LTC Wawersik talked to already talked to [K.B.] Officer McMillan further related there was a connection between [K.B.] and those sexual assault victims the APD received reports on.

**On October 17, 2014 at 1:48 pm, retired APD DC Ross Plummer was interviewed at the MOA offices (7th Floor), 632 West 6th Avenue, Anchorage, AK 99501. DC Plummer acknowledged he knew that the interview was being digitally recorded. A certified transcript was completed of the recording, Refer to Attachment #32.**

The following is a summary of the interview with DC Plummer:

DC Plummer related that he was employed by the APD for thirty-six years and retired from the department in July 2013.

DC Plummer related that the incidents that occurred in February 2010 began while he was the Captain of Investigations. DC Plummer first became aware of the APD's drug investigation and the allegations of sexual assaults occurring in the AKNG in the

summer of 2013. DC Plummer related that the Captain of Investigations is supposed to be notified of all felony investigations. DC Plummer indicted this is so the department can ensure consistency and coverage of all prosecutorial requirements.

DC Plummer related that while he was the Captain of Detectives LT Henry was his subordinate in charge of the SAU. According to DC Plummer, LT Henry had a responsibility to report this investigation to his supervisor. LT Henry's captain at the time was Bill Miller. Then CPT Miller would have reported the investigation up the chain of command to the Captain of Investigations (at the time CPT Plummer). DC Plummer related then a discussion would have occurred with the three of them (CPT Plummer, CPT Miller, and LT Henry) on what we were going to do with the case and how it was going to be handled.

DC Plummer related, in regard to confidential informants, any experienced detective or commander knows the most important consideration is the possibility of putting that informant in danger. DC Plummer indicated decisions by police are based on what's able to be done in a safe manner with confidential informants. DC Plummer related police do not want to put an informant in a situation where they can be hurt or compromise the investigation. The unauthorized disclosure of confidential information to an unauthorized person puts the informant at risk.

DC Plummer related that if the SAU was conducting an investigation while he was Captain of Investigations and the unit under his command had not made proper notification, an internal investigation would have been initiated. DC Plummer related that the incident would be investigated to determine why the commander breached protocol, and why department procedures were not followed. DC Plummer related that he and LT Henry had been best friends for close to thirty years. Their friendship ended in 2012. DC Plummer related there was no reason in 2010 that would have prevented LT Henry from notifying him about the AKNG drug investigation.

DC Plummer related he was familiar with retired APD CPT Tom Katkus (During this investigation he is AKNG General Tom Katkus). DC Plummer related Katkus worked for him in the K-9 Unit and they both worked together at some point in Internal Affairs. DC Plummer indicated he is aware of the relationship between General Katkus and LT Anthony Henry. It's been a long relationship with the AKNG and a good working relationship. The AKNG provided trainers for APD regarding SWAT field tactics. The APD does training missions with the AKNG in helicopters. The APD has conducted numerous training scenarios with the AKNG and used their training facilities.

DC Plummer related it was not appropriate to notify the National Guard of the investigation until after it was completed or there was some internal reason that the APD needed something from them. DC Plummer further indicated the notification would come from the APD Chief of Police or a Deputy Chief, not from the lieutenant's level. DC Plummer related other options would be considered not to compromise the investigation. There is also concern for the safety of the informants and the safety of the involved officer.

Case 3:15-cv-00187-RRB   Document 899-1 *SEALED*   Filed 09/14/18   Page 50 of 50