DC Plummer related that disclosing sources of information could possibly create a chilling effect on victims coming forward to the APD. DC Plummer related the APD had experience with officers that committed sexual assaults. The victims told the department that until the APD reached out to them (sexual assault victims) that they felt that they would not be listened to and that something could happen to them if they reported the incident. DC Plummer related sexual assault victims are not going to want their information shared and they are not going to trust the department to investigate it fairly.

**On October 20, 2014 at 9:46 hours, the first supplemental interview of APD SGT Jack Carson was conducted at the MOA offices (7th Floor), 632 West 6th Avenue, Anchorage, AK 99501. SGT Carson acknowledged he knew that the interview was being digitally recorded. A certified transcript was completed of the recording. (Refer to Attachment #33)**

The following is a summary of the interview with SGT Carson:

SGT Carson related the SAU investigation with ties to the AKNG recruiters started on February 23, 2010. SGT Carson related he was in the office (limited duty and not on the street) and recovering from a calf injury. SGT Carson related that day (February 23, 2010) he was ending his injury status so he was available to work by the next day or two.

SGT Carson related he was not sure who mentioned the use of AKNG aircraft during the illegal drug dealing activity. SGT Carson related he thought it was ▮E.P.▮s source of supply and thought it was ▮R.Z.▮ who told SAU investigators about the use of AKNG aircraft. SGT Carson related ▮R.Z.▮ was going to meet with AKNG members and that he ▮R.Z.▮ had connections on an aircraft that basically was going between California and Alaska and AKNG members were going to start sticking drugs on the AKNG aircraft. SGT Carson also related this information could have been provided by ▮E.P.▮

SGT Carson related he honestly did not remember informing SGT Redick of the investigation of drug dealing into the AKNG but that most of his conversations went straight to LT Henry who was heavily involved in what the SAU was investigating.

SGT Carson related that he and AST Hazelaar informed LT Henry of the status of the investigation after the informant debriefs. LT Henry immediately said that he (was going to notify General Katkus about the investigation into the AKNG. SGT Carson related that he expressed his concern to LT Henry over notifying General Katkus because he had made a promise to ▮E.P.▮ that his employer was not going to be notified. SGT Carson related LT Henry informed him (that he had made a promise to ▮E.P.▮ that he could not keep. SGT Carson did not recall a reason given by LT Henry to notify General Katkus of the SAU drug investigation. SGT Carson related he thought from the gist of the conversation with LT Henry that APD cannot just make a deal with AKNG members and not inform the AKNG. SGT Carson related he explained to LT Henry that the SAU was using ▮D.A.▮ and ▮E.P.▮ as confidential informants and LT Henry knew both men were being used as sources.

SGT Carson related General Katkus and LTC DeHaas knew during the meeting (February 26, 2010) we (SGT Carson and AST Hazelaar) were going to use E.P. and D.A. as informants to see how high the investigation could go and what could be discovered both into the AKNG and into the supplier side of the drug dealing organization. SGT Carson related that is when he remembered General Katkus offering up everything that he and AST Hazelaar needed to further the drug investigation into the AKNG. SGT Carson related that he and AST Hazelaar had no clue of the extent of the drug dealing activity in the AKNG.

SGT Carson related on March 12, 2010 there was an airport interdiction and the recovery of a large amount of marijuana. SGT Carson related the interdiction was completely random and did not have anything to do with his informants D.A. and E.P. SGT Carson related the AKNG was not providing any assistance to him or his investigators on this case.

SGT Carson related that on March 24, 2010 the SAU was working in conjunction with the SSTF. SGT Carson related personnel from both the SAU and FBI SSTF served a series of search warrants in and around Anchorage. SGT Carson related during this investigation he and AST Hazelaar obtained glass warrants on the state side. SGT Carson related that after March 24, 2010 there was a lot of follow-up investigative work that was being done with the investigation. The leads that were being followed-up were more into the Mexican Cartel. The recruiting side of the drug dealing criminal activity in the AKNG completely dried up. SGT Carson related that the AKNG recruiters knew APD was investigating their drug dealing activities. SGT Carson related he and AST Hazelaar had actually given up on the AKNG side and then all of a sudden K.B. reached out and started to revive the investigation for the SAU. SGT Carson related that is where the tie into the AKNG sexual assault complaints occurred.

SGT Carson related the investigation into the drug dealing with the AKNG recruiters ended in two parts. SGT Carson related that they (SGT Carson, Officer McMillan and AST Hazelaar) were told they weren't allowed to investigate it further by LT Henry. SGT Carson related a big reason was because they (SGT Carson and AST Hazelaar) could not effectively investigate the AKNG allegations was because Officer McMillan had to disclose the AKNG informant, K.B. to the suspects involved in the criminal activity.

**On October 20, 2014 at 11:25 am, a supplemental interview of APD LT Rich Henning was conducted at the MOA offices (7th Floor), 632 West 6th Avenue, Anchorage, AK 99501. LT Henning acknowledged he knew that the interview was being digitally recorded. A certified transcript was completed of the recording. (Refer to Attachment #34)**

The following is a summary of the interview with LT Henning:

LT Henning related sometime after the notification to then CPT Fanning and Chief Mew in October or November of 2013 Officer Seth McMillan was assigned to work with the AKNG as a liaison with the AKNG (Office of Complex Investigations or OCI). Officer McMillan was meeting with LT Henning's knowledge and approval with LTC Jane

Wawersik a Special Investigator for the AKNG. LT Henning related Officer McMillan was providing LTC Wawersik with the information that both he (McMillan) and SGT Carson had learned during their drug investigation into the AKNG. Part of the information provided to LTC Wawersik included AKNG members bringing drugs in on military equipment and whether the APD could verify that before the informant information dried up. LT Henning believed Officer McMillan provided information about sexual assaults from the information he received from ████ K.B. ████

LT Henning related ████ J.N. ████ a member of the AKNG, was at a ████████ while the drug investigation was evolving on the AKNG side and made████████ in regards to ████ J.W. ████ LT Henning related an ████ was obtained for ████ J.N. ████ for ████████ ████ J.N. ████ was detained and was taken for a ████████ When Officer McMillan parked in the back lot of the APD he noticed there was a blacked-out (windows) SUV that pulled in and parked on the detective side. LT Henning related Officer McMillan thought he might have been followed by someone who was known to ████ J.N. ████

**On October 20, 2014 at 1:27 pm, APD LT Anthony Henry was interviewed at the MOA offices (7th Floor), 632 West 6th Avenue, Anchorage, AK 99501. LT Henry acknowledged he knew that the interview was being digitally recorded. LT Henry was afforded the opportunity to make his own recording of this interview. A certified transcript was completed of the recording. (Refer to Attachment #35)**

**LT Henry was provided with the APD Pre-Interview Admonition prior to being recorded. (Refer to Attachment #36)**

The following is a summary of the interview with LT Henry:

LT Henry related he has been employed by the APD almost twenty-three years. Lt Henry related in 2010 he was the commander of the SAU.

LT Henry related the background information relevant to this investigation centered on the disbandment of the Metro Drug Unit. LT Henry related he was tasked by the APD to conduct the management review of that unit. LT Henry related the APD implemented a new drug strategy that started in September 2009.

LT Henry related as a result of the Metro Drug Unit disbandment the APD's implementation of the new drug strategy involved three tiers. The SAU comprised of the SWAT members were tasked with the responsibility to conduct street-level investigations that would take one to two weeks in duration to complete. The Vice Unit conducted mid-term investigations that would take anywhere from one week to six months to investigate. These are not hard fast rules but they want these in place. Task force positions that includes both the DEA and the FBI would do long-term investigations focusing on interstate drug activity. LT Henry related the Metro Drug Unit had problems with detectives developing relationships with the U.S. Attorney's Office. As a result of those relationships the detectives were conducting long-term federal investigations under federal rules not following state statutes. LT Henry related the

Metro Drug Unit management review started in June 2010 after members of the Metro Drug Unit filed a lawsuit against the city.

LT Henry related he feels part of this matter involves an ongoing EEOC (Equal Employment Opportunity Commission) complaint that he filed. LT Henry related in 2012 he was reassigned based on some issues that are currently being dealt with under the guise of the EEOC.

LT Henry related an AKNG member with the Recruitment and Retention Section was identified as a drug dealer in February 2010. Investigation revealed the AKNG member was **E.P.** LT Henry related there was no direct connection in which this member of the AKNG was using the AKNG to facilitate his drug dealing activity. LT Henry related the AKNG member traveled around the state and sold dope but the Army was not facilitating that criminal activity. Therefore, the AKNG was not part of a drug dealing conspiracy. **(Note: This was quite an assumption by LT Henry since other AKNG members are later implicated and were found to have ties with a Mexican drug cartel.)** LT Henry related **E.P.** s source of drugs was a civilian. LT Henry related the name **D.A.** does not ring a bell (from February 2010). The SAU was arresting a lot of people in parking lot jump outs and **D.A.** s arrest doesn't stand out to LT Henry.

LT Henry related **E.P.** was developed from a cold contact. LT Henry related this was his understanding because he was not directly involved in this investigation (involving AKNG member **E.P.** ) because the investigation was ████████████████ ████████████████ federal case. LT Henry related **E.P.** is a target of that federal ██████ investigation. LT Henry related **E.P.** is on the indictment list; however, the U.S. Attorney's Office has chosen not to indict **E.P.** at this point in time. LT Henry related the FBI may have provided information to the AKNG for administrative proceedings to facilitate discharging **E.P.** but he was not certain. LT Henry related AST Hazelaar was the case task force officer until his SAU assignment ended and he was replaced by APD Officer Eric Smith who finished this investigation. LT Henry related Chief Mew was fully aware because this case (involving **E.P.** from the AKNG) because it came up in APD depositions in the lawsuit that the department has with the disbandment of the Metro Drug Unit. LT Henry related the civil trial ended in a hung jury so the case is going back to trial.

LT Henry related the issue to come to mind with regards to the AKNG is that General Tom Katkus called him because Officer Seth McMillan had talked to a police officer that's also in the AKNG and is connected with General Katkus Chief of Staff. (Investigation revealed the AKNG Chief of Staff was Tim DeHaas). General Katkus called LT Henry and said he was upset because SGT Jack Carson or Officer Seth McMillan alluded that he was not trustworthy. LT Henry related General Katkus is a retired Captain from APD and the past Counter Drug Support Program's Colonel of the AKNG. As such, he worked with the FBI, DEA, and provided all the intelligence assets. LT Henry related General Katkus obviously has a top-secret security clearance and has worked intimately with the FBI and DEA over the years with regards to drug investigations. LT Henry related he had a conversation with Officer McMillan and

explained that he (LT Henry) was not happy because the task force was working ███ ████████case.

LT Henry related he was unhappy because Officer McMillan talked to an AKNG member (APD Officer Chris Simmons) about the investigation involving AKNG members. He felt the communication could potentially compromise the ████████case LT Henry related the drug investigation into the AKNG was not a SAU case because the case was being worked by the federal task force. LT Henry related Officer McMillan had no business communicating to anyone outside the SAU with that information. LT Henry related Officer McMillan had been chastised for that (disclosure) and then they (LT Henry and Officer McMillan) ended up talking to General Katkus and found out that Officer McMillan really did not say that General Katkus could not be trusted. LT Henry related Officer McMillan had some relationship with ███ K.B. ████, which he (LT Henry) was sure has been mentioned in this whole AKNG mess, because ██ K.B. █posted some allegations online. LT Henry related that ██ E.P. █came onto his radar screen after he received a call from General Katkus indicating that one of his AKNG members and one of his (LT Henry) members are talking out-of-school about an investigation, indicating that General Katkus could not be trusted.

LT Henry related he did not think that ██ E.P. █was ever registered as an informant, but did not know that for certain. ██ E.P. █was registered in the SAU as an informant. LT Henry related the federal ████████case was called ██████████ LT Henry related in reference to the AKNG connection the investigation never disclosed that any AKNG members were actually involved (Even though LT Henry eventually mentions that ██ E.P. █ is on the U.S. Attorney's indictment list). LT Henry related that an AKNG member was identified as a drug dealer, but no information came to light to indicate that there was a cell of AKNG members involved. ██ E.P. █was just a member of the AKNG selling dope on the side. LT Henry related AST Joe Hazelaar was the person that had contacted ██ E.P. █and AST Hazelaar was the person that got ██ E.P. █to confess. LT Henry related he thought SGT Jack Carson might have been with AST Hazelaar when the contact with ██ E.P. █occurred. AST Hazelaar took this ████████case as a state trooper and AST Hazelaar was the initial case officer. The AKNG investigation always fell under the umbrella of the SSTF. LT Henry related the drug investigation was definitely AST Hazelaar's first case he ran as a task force officer. LT Henry did not believe AST Hazelaar developed this as an SAU case and carried the case over to the SSTF. LT Henry related he guessed it was possible that AST Hazelaar carried the drug investigation over (from the SAU) to the SSTF, but he did not know when AST Hazelaar transitioned from the SAU to the SSTF.

LT Henry related that he did not set up a meeting with the SAU and the AKNG command staff. He reiterated the information about Officer McMillan alleging that General Katkus was not trustworthy. LT Henry related there was a meeting that he attended with SGT Redick and Officer McMillan with AKNG General Katkus. He did not know if Colonel DeHaas was there. LT Henry related the only person he knows in the AKNG is General Katkus. LT Henry related that General Katkus should not have been calling him about an investigation that the federal task force was investigating. LT Henry related there was nothing malicious on Officer McMillan's part. LT Henry related Officer McMillan was just talking to his friends who were police officers in the AKNG and

the information got back to General Katkus. General Katkus was aware something (an investigation) was going on.

LT Henry related there is nothing wrong with General Katkus and that he is trustworthy. LT Henry related General Katkus has been involved in high-level drug investigations for a long time in the AKNG with the CDSP (Counter Drug Support Program). LT Henry related General Katkus was obviously aware that there was an investigation ongoing that generated conversation with FBI (Agent Annie Kirkland) over at the SSTF. LT Henry related there was a follow-up discussion with General Katkus regarding that federal investigation but that was the only two time that he ever talked with General Katkus about this federal investigation.



LT Henry related he does not know ████ K.B. ████ from the AKNG and only heard of ████ K.B. ████ from the AKNG conspiracy theory information ████ K.B. ████ posted online. LT Henry related he knew ████ K.B. ████ and Officer McMillan were deployed somewhere together in the AKNG together and had some kind of AKNG relationship or friendship. LT Henry related he did not have anyone from his command deliver police reports and recordings relating to ████ E.P. ████ to the AKNG. LT Henry related that the release of reports and recordings would have been approved by the SSTF people and that he did not know if FBI Agent Kirkland was there at the time or when that might have occurred. LT Henry related there definitely were communications with General Katkus (by the SSTF) because the intent at the end of the investigation was for General Katkus to commence administrative proceedings to discipline and discharge ████ E.P. ████

LT Henry related SGT Carson had nothing to do with this ████████ investigation. LT Henry related SGT Jack Carson has an ulterior motive (not specifically described by LT Henry at this time but is described later on in this interview). LT Henry related SGT Carson never received orders from him to take APD reports and recordings to anyone. LT Henry related this was a SSTF case and SGT Carson was not involved in the investigation. LT Henry related any investigation reports and recordings should have been coordinated through the FBI and not SGT Jack Carson. LT Henry related if SGT Jack Carson took it upon himself to do deliver reports and recordings to the AKNG he (SGT Carson) did not have the permission or the authority to do that.

LT Henry related Officer McMillan sent ████ K.B. ████ s manifesto (online article referred to by LT Henry) to him back in 2013 when it was posted on the Internet. LT Henry related there is one thing mentioned in ████ K.B. ████ s manifesto about him and SGT Redick in the first meeting with General Katkus. General Katkus had some AKNG people in that meeting. LT Henry was not certain if ████ K.B. ████ was present. LT Henry related there were two meetings with the Guard. The very first meeting was Officer McMillan communicating things that Officer McMillan shouldn't have communicated about the drug investigation involving an AKNG ████ E.P. ████ to Officer Simmons who is also an AKNG member. LT Henry related in the second meeting, General Katkus was generally briefed on the ████████ investigation by the task force officer AST Hazelaar because the FBI would not provide detail. General Katkus did not receive any investigation details in the second meeting either. (LT Henry reiterated the first meeting with General Katkus really centered on the allegation Officer McMillan

made the statement to one of the members of the APD that General Katkus cannot be trusted during the time the ████████ drug investigation was ongoing.

LT Henry related that he did not know anything about the sexual assault allegations involving the AKNG recruiters. LT Henry related that he thought he would remember sexual assault allegations because his wife has worked in that field for two decades. LT Henry related he is tuned to the sexual assault aspect of things and if someone told him about something with regards to sexual assault, he would have notified APD LT Ken McCoy, no question about that.

LT Henry related he did not order Officer McMillan to disclose the identity of the AKNG sexual assault informant, ███K.B.███, to General Katkus. LT Henry related the only conversation he had with General Katkus was about Officer McMillan's involvement with talking to APD Officer and AKNG member Chris Simmons about this federal drug ████████ investigation. LT Henry related there were no issues with sexual assaults, and that he had no conversation with General Katkus about sexual assaults.
LT Henry related SGT Jack Carson has an ax to grind with him and the command staff. It relates to an OEO and an EEOC investigation. (LT Henry filed complaints through the EEOC and OEO.) LT Henry related SGT Carson apparently has issues with other members of the AKNG and takes it upon himself to conduct an investigation on his own behind his (LT Henry) back because he (LT Henry) allegedly ordered a stop to an investigation involving the AKNG. LT Henry related the allegations made by SGT Carson are not true. LT Henry related he was troubled with SGT Carson because of the strong possibility of his wife's relationship (did not elaborate) in the AKNG Recruitment and Retention Unit. SGT Carson took it upon himself to investigate and he (did not get that direction from LT Henry.

LT Henry related these are serious issues (discussed during the interview) and not at any time have these questions been asked of him by anyone other than this investigator (End of LT Henry's summarized interview).

LT Vandegriff on an unknown date provided this investigator with an email exchange from Keith L. Mallard (DPS) to Joseph M. Hazelaar (DPS), copied to LT Henry dated February 11, 2010, thirteen days before the initial detention of drug suspect ██D.A.██ by the SAU. Mr. Mallard indicated he spoke with LT Henry the day before (February 10, 2010) and that he (LT Henry) was willing to keep him (AST Hazelaar) as long as he can. Mr. Mallard told AST Hazelaar once he gets his clearance transferred (from the DEA) he saw benefit with him going over to the FBI but until this transfer occurs was directed to stay with the SAU. Note: this email exchange provides verification that AST Hazelaar was assigned to the SAU and was working a state level drug investigation. AST Hazelaar was not assigned to the SSTF at the time of the detention of ██D.A.██ ██D.A.██ on February 23, 2010 that initiated the drug investigation into the AKNG. (**Refer to Attachment #37**)

On October 22, 2014 this investigator went online and located the Liberty Planet Weblog and found an article titled, Illegal Activities within the Alaska National Guard that was posted ███████████████K.B.███████████████ The article included allegations that General Katkus and LTC Tim DeHaas had ordered him to

reveal the names of sexual assault victims that were reported to the police. **(Refer to Attachment #38)**

On October 23, 2014, this investigator received copies of the APD's SAU Request for Informant Registration documents for both ████ D.A. ████ and ████ E.P. ████ D.A. ████ was given Informant ████ D.A. ████ and was processed on March 3, 2010 by Control Officer AST Hazelaar. ████ D.A. ████ was terminated as an informant by Officer Eric Smith on April 21, 2010. ████ E.P. ████ was given informant ████ E.P. ████ and was processed February 26, 2010 by Control Officer AST Joseph Hazelaar. ████ E.P. ████ was terminated as an informant on April 21, 2010 by Officer Eric Smith. Both requests were approved by SGT Darrel Redick on March 4, 2014, the SAU Supervisor. These attached documents provide verification that both ████ D.A. ████ and ████ E.P. ████ were registered SAU confidential informants that were processed under LT Henry's command. **(Refer to Attachments #39 and #40)**

On October 28, 2014 LT Vandegriff forwarded a copy to this investigator of the APD side show referenced by LT Henry informing Chief Mew of the arrest of ████████ ████ R.Z. ████ The presentation was from March 2010 and is titled:

Anchorage Police Department, Special Weapons and Tactics, Street Level Drugs, Special Assignment Unit. **(Refer to Attachment #41)**

**On October 29, 2014 at 1:41 pm LT Kevin Vandegriff, APD Internal Affairs Commander, conducted a telephonic interview with retired AKNG General Thomas H. Katkus. The interview was recorded and a transcript was completed by the APD. (Refer to Attachment #42)**

The following is a summary of the interview with General Katkus:

General Katkus related that he did not have any information specifically into who or what was being investigated at the AKNG. General Katkus related that he thought it was the SSSTF investigators that came and visited his office about the AKNG drug investigation. General Katkus related that he told the female FBI agent and AST Hazelaar not to give him additional information because he was not law enforcement anymore. General Katkus related he was not sure if LT Henry was there or not or even if there was an APD person there. General Katkus related there might have been a third person present but it was a long time ago. General Katkus related he told the law enforcement personnel present not to provide him with any specifics of their investigation.

General Katkus related that Mark Headland from the Air Guard came to see him and was asking him (General Katkus) about the drug investigation ongoing in the AKNG. General Katkus related that he called the female agent from the FBI and said he did not know what you (SSTF) are doing but it seems that this information (about the drug AKNG drug investigation) is out there.

General Katkus related LT Henry came to his office much later on because Officer Seth McMillan (also an AKNG member) made contact unknowingly with one of the bad guys,

█████ J.N. █████ General Katkus related he was concerned about cross threading (overlapping) issues that should be handled by either the AKNG or the APD. General Katkus related LT Henry brought SGT Redick with him and sat in his (Katkus) office and all three of them met with all the players to try and get the story straight. General Katkus related his point to Officer McMillan was in the future if you are an APD officer and you have a case involving a guardsman get somebody not a guardsman to investigate. LT Henry and SGT Redick sat there during the interview when Officer McMillan was brought in. General Katkus related he talked to LTC Lawendowski, █████ J.N. █████ and █████ K.B. █████ from the AKNG that day.

Note: General Katkus was asked was this the meeting where he had asked █████ K.B. █████ to provide the names of sexual assault victims. General Katkus related he did not recall. General Katkus related he did not want to get the victims' names themselves but to get their names to Octavia who was in charge of the sexual assault unit at that time. General Katkus related he wanted to ensure the victims received assistance and were all accounted for.

Note: General Katkus was asked how he found out about the original investigation and was it from the female FBI agent (SSA Kirkland), AST Hazelaar, or maybe somebody from the APD, or if it was essentially the SSTF. General Katkus related he had no idea. General Katkus was also asked if he ordered LTC Lewandowski to contact AST Hazelaar about getting copies of reports and audio files that can help with the █████ █████ to discharge █ E.P. █ for his unlawful conduct. General Katkus related that sounds like something which should have occurred because he (LTC Lawendowski) is to get in touch with the investigating officer to obtain the details of the offenders conduct. General Katkus indicated he did not think anybody did anything wrong in this situation.

**On October 29, 2014 at 4:44 pm LT Kevin Vandegriff, APD Internal Affairs Commander, conducted a telephonic interview with retired AST Joseph Hazelaar. The interview was recorded and a transcript was completed by the APD. (Refer to Attachment #43)**

The following is a summary of the interview with AST Hazelaar:

AST Hazelaar related he was familiar with the drug transaction that took place in the parking lot at the Costco Debarr, which turned into the █████ investigation (in 2010). AST Hazelaar related he was either the lead or the case officer. AST Hazelaar related he did participate in the briefing of General Katkus. LT Henry initiated the meeting and took the lead and answered most of the questions. (The meeting attendees were General Katkus and a Colonel (later identified as Tim DeHaas from the AKNG, LT Henry, AST Hazelaar, and Officer Jack Carson) AST Hazelaar believed Officer Eric Smith was also in attendance but was not sure do to the passage of time. LT Henry took the lead on briefing the general. AST Hazelaar related he and Officer Carson were actually a little upset that LT Henry wanted to expose the investigation prematurely in the beginning. AST Hazelaar related when LT Henry realized that there was an AKNG person involved in the drug transaction he said we have to immediately take this to the AKNG and let them know were investigating one of their people.

AST Hazelaar related the FBI was not involved at all at this time. AST Hazelaar related those SAU members in attendance told the AKNG command staff who the informant was and where he worked. The general or the colonel said they knew the name of ███ immediately as soon as his name was mentioned. This happened within a day or two of us (AST Hazelaar and Officer Carson) knowing the AKNG recruiters were involved. AST Hazelaar related LT Henry said this takes precedence because the General of the AKNG needs to be advised of the drug investigation and the informant. AST Hazelaar related both he and Officer Carson did not feel this was necessary because a case had not been developed against the AKNHG recruiters yet. AST Hazelaar related the investigation definitely seemed compromised because a lot of information got leaked. AST Hazelaar related he was not sure if that was a result of briefing the general or not.

AST Hazelaar related the only time reports or audio recording were revealed was about a year later when the JAG (Military Judge Advocate General) was requesting information through Officer Eric Smith to discharge ███ from the AKNG. The investigation was complete and the audio recordings could be released at this point. AST Hazelaar related he would have given permission to release the reports and audio recording when the investigation was complete but not early on in the investigation.

On October 29, 2014 MOA, Assistant Municipal Attorney Christensen spoke with the attorney that handled the Kennedy-Feliciano lawsuit and she (unnamed lawsuit trial lawyer) has no recollection of the AKNG ever coming up in Chief Mew's deposition or at trial. The trial attorney searched Chief Mew's deposition for "national', "guard", ███ ", "Carson", "Katkus", and "informant." None of those items were found in the transcript. This is in conflict with LT Henry's recorded interview on October 20, 2014 where he indicates that his superiors knew about the drug case because Chief Mew testified to it. This investigation revealed APD command was aware of the interdiction and large drug busts when they were made and press releases publicized.

On October 30, 2014 at 9:24 pm LT Vandegriff forwarded an electronic copy of a text message he received from LT Henry. AST Joe Hazelaar texted LT Henry and advised that he just got off the phone with a lieutenant from internal investigations from his department. LT Henry texted back he was ordered not to talk until the investigation was complete. **(Refer to Attachment #44)**

On November 12, 2014 LT Vandegriff provided a copy of an email from Danielle Newberry, United States Attorney Alaska dated June 7, 2010 with the Subject: ███ Case Initiation Meeting-███████ The meeting was set for June 10, 2010 at 8:30 am and LT Henry is included on the email. **(Refer to Attachment #45)**

On November 12, 2014 this investigator obtained an online copy of a news article published by the Alaska Dispatch News on October 29, 2014 titled; Alaska National Guard Recruiters File Lawsuit Claiming Privacy Violations. **(Refer to Attachment #46)**

On November 12, 2014 this investigator obtained a copy online of a news article published by the Alaska Public Media on October 8, 2014 titled: Colonel's Military

Honors Questioned in Wake of Guard Scandal. The article specifically outlines complaints and alleged abuses by LTC Tim DeHaas. **(Refer to Attachment #47)**

**On November 13, 2014 at 7:57 am, retired APD SGT Darrel Redick was interviewed at the MOA offices (7th Floor), 632 West 6th Avenue, Anchorage, AK 99501. SGT Redick acknowledged he knew that the interview was being digitally recorded. A certified transcript was completed of the recording. (Refer to Attachment #48)**

The following is a summary of the interview with SGT Redick:

SGT Redick related that he was employed by the APD just shy of twenty-two years. SGT Redick retired in December of 2013.

SGT Redick related he knew there was a vehicle stop where drugs were seized from ▮D.A.▮, but that he had no knowledge of SGT Carson doing a SAU investigation into the AKNG recruiters until SGT Carson mentioned an issue with his wife (an Air Force National Guard recruiter at the time) in the early spring of 2010. There was discussion in the SAU office that SGT Carson's wife received a direct or indirect threat. SGT Redick believed this is when the drug investigation into the AKNG recruiters first started.

SGT Redick related there was further discussion about Officer McMillan having a conversation with APD Officer Simmons (an AKNG member at the time) who was having LTC Tim DeHaas from the AKNG over to his residence. Officer Simmons was concerned that LTC DeHaas was going to start asking him questions about the AKNG drug investigation. SGT Redick related Officer McMillan told Officer Simmons not to say anything because SAU was working on the situation.

SGT Redick related he was guessing it was in that same time frame (early spring of 2010) that he got a phone call the same day (the day conversations occurred in the SAU office described above) from LT Henry directing him and Officer McMillan to come over to General Katkus' office. SGT Redick related he went over to General Katkus' office. LT Henry was already there. The meeting attendees were General Katkus, LTC DeHaas, LT Henry, SGT Redick, and Officer McMillan initially. ▮K.B.▮ was brought in and General Katkus proceeded to severely chastise ▮K.B.▮ SGT Redick related he originally thought the meeting was about a drug investigation, but General Katkus was chastising ▮K.B.▮ about the way he was reporting sexual misconduct allegedly occurring in the AKNG. General Katkus during the meeting wanted ▮K.B.▮ to disclose the names of the victims of sexual assault. SGT Redick related ▮K.B.▮ would not violate the victim's confidentiality. General Katkus and ▮K.B.▮ seemed to have a difference of opinion on how sexual misconduct was supposed to be reported in the AKNG.

SGT Redick related he did not recall anybody else being at that meeting from the AKNG. SGT Redick did not recall General Katkus giving ▮K.B.▮ a direct order to disclose the victim's names but it could have been perceived as an order by the way he ▮K.B.▮ was being dressed down. SGT Redick related he would not disagree the time frame of the subject meeting was around June of 2010. General Katkus wanted

sexual assault victims in the AKNG to report their incidents through their chain of command.

SGT Redick related he did not think he said two words at the meeting. SGT Redick related after ███ K.B. ███ was excused the meeting was over. SGT Redick has no recollection of AKNG command saying anything about referring victims of sexual assault to the police.

SGT Redick related he did not know if there was a reason to disclose confidential informant information to anyone in the AKNG relating to the drug investigation of the recruiters. SGT Redick related he did not know that the disclosure of confidential informant information to the AKNG had occurred until last week (week of November 3, 2014). SGT Redick related typically the SAU would not disclose confidential informant information to unauthorized persons. SGT Redick also related that just because someone is a general or a police chief does not mean they could not be involved in criminal activity.

SGT Redick related he did not have any discussions at all with AST Joe Hazelaar, Jack Carson, or Seth McMillan with regard to providing APD police reports and audiotapes to the AKNG. SGT Redick related he is not familiar with LTC Lewandowski from the Guard.

**On November 13, 2014 at 10:00 am, retired AKNG ███████ K.B. ███████ was interviewed at the MOA offices (7ᵗʰ Floor), 632 West 6ᵗʰ Avenue, Anchorage, AK 99501. ███ K.B. ███ acknowledged he knew that the interview was being digitally recorded. LT Kevin Vandegriff, APD Internal Affairs, was also present for the interview. A certified transcript was completed of the recording. (Refer to Attachment #49)**

The following is a summary of the interview with ███ K.B. ███:

███ K.B. ███ related that he joined the Alaska National Guard in 1982 and went to Officer's Candidate School in 1986. He became full-time in 1990 and retired in 2012.

███ K.B. ███ related that he heard from ███ J.N. ███ in the AKNG that APD LT Henry and Audie Holloway, Director of the Alaska State Troopers, friends of General Katkus, provided information to General Katkus about illegal activities such as sexual assaults occurring in the AKNG and law enforcement cover-ups.

███ K.B. ███ related the rumor ███ J.N. ███ was using steroids. He also related that ███ J.N. ███ had displayed emotional swings while he ███ J.N. ███ was talking to him ( ███ K.B. ███ ), ███ J.N. ███ related ███ J.N. ███, even though at times ███ J.N. ███ did not make sense they ( ███ J.N. ███ and other unnamed other persons) kept having to move product and General Katkus protected us ███ J.N. ███ and unnamed other persons). ███ K.B. ███ related Director Holloway and LT Henry briefed General Katkus on the investigation and General Katkus called ███ J.N. ███ and unnamed other persons to get rid of all the evidence. ███ K.B. ███ related ███ J.N. ███ told him there were no arrests.

██ K.B. ██ related ██ J.N. ██ told him that he is a married man and that he ██ J.N. ██ should not have messed with those girls (sexual assault victims), and that he ██ J.N. ██ hurt the victims. ██ K.B. ██ related this occurred in the May 2010 time frame. ██ K.B. ██ related other conversations with female soldiers within the AKNG regarding sexual assaults began to tie in with ██ J.N. ██ claims, but the female soldiers would never be specific. ██ K.B. ██ related he finally had one female soldier say she was raped. ██ K.B. ██ related AKNG ██ S.T. ██ had a rape kit completed (March 29, 2010).

██ K.B. ██ related three other women then eventually talked to him about being sexually assaulted. ██ K.B. ██ related the perpetrators were all male members of the AKNG. ██ K.B. ██ related he asked the sexual assault victims if they reported the incidents to the police and every one of them said they went through the AKNG SARC and the chain-of-command to report their sexual assaults. ██ K.B. ██ related the sexual assault victims said that they do not want to talk about their assaults anymore because now they're more afraid of the chain-of-command than they are of anything else. ██ K.B. ██ related at that time none of the sexual assault victims had gone to the police. ██ K.B. ██ asked the sexual assault victims for their permission to contact the police on their behalf and the four women gave him permission to contact the police.

██ K.B. ██ related he told the AKNG sexual assault victims (four total) that he would talk to the police on their behalf and set something up and that was when the meeting occurred with General Katkus verbally chastising him. ██ K.B. ██ related APD LT Tony Henry was in the room and Officer Seth McMillan was told not to talk to him anymore by LT Henry.

██ K.B. ██ related he called up Officer Chris Simmons from the APD who was also in the AKNG at the time. ██ K.B. ██ related he has known Officer Simmons for years and informed Officer Simmons that he has four women that informed him ██ K.B. ██ regarding sexual assaults in the AKNG. ██ K.B. ██ further related ██ J.N. ██ told him about hurting those girls and crying while he told ██ K.B. ██ ██ K.B. ██ related he suspected that ██ J.N. ██ is a rapist and a drug dealer and he told Officer Simmons that is his ██ K.B. ██ suspicion. ██ K.B. ██ related Officer Simmons referred him to Officer Seth McMillan. ██ K.B. ██ related he met with Officer McMillan who started taking notes and said the APD has a Sex Crimes Unit and the sexual assault victims can talk to that unit. ██ K.B. ██ related Officer McMillan mentioned that ██ J.N. ██ is a person of interest and he would like to talk to ██ J.N. ██

██ K.B. ██ related there was no one in the AKNG that had the authority or the ability to investigate the alleged sexual assaults. ██ K.B. ██ related under Alaska state law all criminal offenses are investigated by civilian authorities. The AKNG, unlike the regular Army, has no CID (Criminal Investigation Division).

██ K.B. ██ related on Friday, June 4, 2010 he was at a confidence building exercise a mile from the AKNG Armory and he saw Colonel Jorgenson who was his commander. She (Colonel Jorgenson) said General Katkus needs to see him immediately. ██ ██ K.B. ██ related he drove over and walked inside General Katkus' office in Fort

Richardson, **K.B.** related he remembered as he was walking into General Katkus' office that LTC Joe Lawendowski was coming in his direction. He just looked at him **K.B.** and said we (implied AKNG Command) got your number buddy. We know what you're trying to do, and we are going to take care of you **K.B.**.

**K.B.** related he entered General Katkus' office. The attendees were General Katkus, LTC DeHaas, LT Henry, SGT Redick, and Officer McMillan. Officer McMillan was sitting down and was visibly perspiring. **K.B.** related LT Henry was sitting right next to Officer McMillan. **K.B.** related he remembers LT Henry sitting directly to his right and that LT Henry just kept staring at him ( **K.B.** . **K.B.** related LT Henry had a name tag on his uniform shirt. **K.B.** related in the corner of the room was SGT Redick or SGT Carson, he was not sure which one of them it was. **K.B.** related he told the meeting attendees he was not at liberty to disclose what he reported to the police. **K.B.** related General Katkus and LTC DeHaas said no, that if the sexual assaults involve the AKNG he ( **K.B.** ) has to report sexual assaults to the command staff. **K.B.** related he was even given a direct order by the command staff to release the names of the AKNG sexual assault victims and he refused to comply. **K.B.** once again related he remembered looking at LT Tony Henry because he knows what an intimidating stare looks like and LT Henry just locked eyes on him.

**K.B.** related General Katkus said that he violated the chain of command and all kinds of rules. General Katkus said he wanted the name of the sexual assault victims. **K.B.** related he refused to give out the names of the AKNG sexual assault victims and had been forbidden by the victims. **K.B.** related the command staff also asked him what interaction he had with Officer McMillan in regard to **K.B.** . **J.N.** **K.B.** related the APD officers in the room did not say anything while he was there. **K.B.** related he just got the stare from LT Henry who was in uniform. **K.B.** related the Army initiated an AR 15-6 investigation on him.

**K.B.** related he tried to reach out to Officer McMillan again and Officer McMillan said he was ordered not to talk to me by the APD (LT Henry) and by the AKNG (General Katkus) chains of command. **K.B.** related he informed the sexual assault victims of what happened and they told **K.B.** they were more afraid their AKNG chain of command than anything else and lost interest in coming forward. **K.B.** related some of the sexual assault victims did not want to talk to him anymore. **K.B.** related when he received the General Letter of Reprimand from the AKNG several victims told him how guilty they felt because he tried to help them. **K.B.** related the sexual assault victims were afraid to go to the police because he told the victims everything that happened at the meeting (occurred June 4, 2010). **K.B.** further related he actually drove a sexual assault victim (AKNG victim **S.T.** to the APD and talked to LT Ken McCoy and another sexual assault victim had gone on her own volition to the police when he ( **K.B.** was her commander.

At the conclusion of the above interview **K.B.** provided a copy of an AKNG AR 15-6 investigation completed on him on September 26, 2010. The report recommended **K.B.** be removed from command and receive a General Officer Memorandum

of Reprimand. Included in the AR 15-6 investigation is a sworn statement by LTC Joseph Lawendowski dated July 28, 2010. In this sworn statement LTC Lawendowski mentions the following in part:

On June 28, 2010 LTC Lawendowski completed a sworn statement as part of ████ K.B. 's AR 15-6 investigation and related on June 3, 2010 that ████ K.B. had a telephone conversation with ████ J.N. who related that he was ordered by ████ K.B. to meet with APD Officer Seth McMillan referencing something to do with E.P. and further with the RSP (Recruit Sustainment Program). ████ K.B. informed J.N. not to inform his chain of command because his chain of command could not be trusted, his career depended on it, and his chain of command would throw him under the bus. After J.N. called and informed LTC Lawendowski of the conversation with K.B. he contacted Officer McMillan. LTC Lawendowski called and notified the Chief of Staff (LTC DeHaas) and General Katkus of the conversation K.B. had with J.N. The AR 15-6 sworn statement goes on further to describe the meeting between J.N. and Officer McMillan. Later that evening LTC Lawendowski indicated he was informed by General Katkus that the officer (Officer McMillan) was not in any position to conduct this investigation as he had not coordinated with anyone in his chain of command or with the lead investigator AST Hazelaar. LTC Lawendowski further related that General Katkus informed him that the officer (Officer McMillan) and his (APD) chain of command would be in the general's office the next day (June 4, 2010) at 1100 hours. The events described in this paragraph is additional evidence to the events that occurred the day before and leading up to the June 4, 2010 meeting between SAU personnel and the AKNG Command Staff.

On June 4, 2010 LTC Lawendowski details he was informed by the Chief (AKNG position) to stand by with J.N. for a meeting at General's Katkus office. LTC Lawendowski then details how K.B. arrived and when he (LTC Lawendowski) entered the general's office that the general, the Chief of Staff (LTC DeHaas), the APD Officer (McMillan), his supervisor (SGT Redick), and his supervisor's boss (LT Henry) were already in the office. **(Note: This is the meeting LT Henry says did not occur due to him not having any notes or memory of it.)** A copy of the AKNG AR 15-6 documents are included with this investigative report. **(Refer to Attachment #50)**

**On November 13, 2014 at 12:57 pm, a second supplemental interview of APD SGT Jack Carson was conducted at the MOA offices (7th Floor), 632 West 6th Avenue, Anchorage, AK 99501. SGT Carson acknowledged he knew that the interview was being digitally recorded. A certified transcript was completed of the recording. (Refer to Attachment #51)**

The following is a summary of the interview with SGT Carson:

SGT Carson related that he does not have a clear recollection of handing APD reports and audiotapes over to the AKNG. SGT Carson related he was contacted by somebody (no recollection of whom) but it was someone from within the department because it wasn't from the AKNG side. SGT Carson related that the AKNG wanted the information because E.P. had since moved ████ but wanted to return to Alaska. SGT Carson

related the AKNG finally wanted to deal with ▓E.P.▓ and discharge him ▓E.P.▓). SGT Carson related he remembered discussing with SGT Redick or LT Henry what information the APD would be turning over to the AKNG. SGT Carson related he does not remember what was finally decided, but the he left the discussion thinking it was reasonable.

SGT Carson related the AKNG recruiter case was run largely from within the SAU. The SSTF people were also heavily involved. FBI personnel provided help, knowing the case would eventually go federal. SGT Carson related it was not until the SAU did all the search warrants and took down a large sum of drugs and money that the FBI took over.

**On November 13, 2014 at 2:45 pm, a supplemental interview of APD Officer Seth MCMILLAN was conducted at the MOA offices (7th Floor), 632 West 6th Avenue, Anchorage, AK 99501. Officer McMillan acknowledged he knew that the interview was being digitally recorded. Present for the interview was LT Kevin Vandegriff, APD Internal Affairs Commander. A certified transcript was completed of the recording. (Refer to Attachment #52)**

The following is a summary of the interview with Officer McMillan:

APD Officer McMillan related that he and APD Officer Chris Simmons are personal friends and AKNG members. Officer McMillan related when they (Officer McMillan and SGT Carson) first started this drug investigation, ▓E.P.▓ admitted to being a drug dealer, and agreed to cooperate. Officer McMillan related he called Officer Simmons and asked Officer Simmons what he knew about ▓E.P.▓? Officer McMillan related at that time he was in SAU and Officer Simmons was on patrol. Officer McMillan mentioned that Officer Simmons knows better than to ask the "why" question. Officer McMillan related Officer Simmons told him that ▓E.P.▓s an AKNG recruiter that he was asking about. Officer McMillan related rumors were circulating in the AKNG that the Army Guard recruiters were trouble.

Officer McMillan related sometime later Officer Simmons saw him, SGT Carson, and AST Joe Hazelaar walking ▓E.P.▓ into the back of APD. A short time later there is a big drug bust, so Officer McMillan was sure Officer Simmons put all that together. Officer McMillan related that shortly thereafter Officer Simmons called him and indicated LTC DeHaas casually asked him (Officer Simmons) about the unusual activity in the AKNG and especially about ▓E.P.▓

Officer McMillan related that he informed LT Henry, because he knew that this was after SGT Carson, AST Hazelaar, and LT Henry had disclosed information to General Katkus and LTC DeHaas about the AKNG drug investigation. Officer McMillan related LTC DeHaas obviously heard ▓E.P.▓s name because they (LT Henry, SGT Carson, and AST Hazelaar) provided all the current investigative information to General Katkus and LTC DeHaas. Officer McMillan related that he never called Officer Simmons and told him that ▓E.P.▓was working as an informant for APD.

Officer McMillan related when they (AKNG members General Katkus and LTC DeHaas, and APD members LT Henry, SGT Redick, and Officer McMillan) met with on June 4, 2010, LT Henry did not indicate to him (Officer McMillan) they were meeting to discuss a statement he allegedly made about General Katkus being untrustworthy. Officer McMillan related the catalyst for the meeting was that he (Officer McMillan) was talking to ████ K.B. ████ and eventually to ████ J.N. ████

On November 13, 2014 at 7:43 pm Officer McMillan sent this investigator an email with an attached photograph of a document from the conclusion of the AKNG AR15-6 investigation of ████ K.B. ████. Officer McMillan did not have the original copy but indicated the attached copy was provided to him after then Colonel Bridges sat down with him at the Ding How Restaurant in Muldoon. Officer McMillan indicated the meeting was under a false pretense of his reenlistment when in fact the Colonel was actually pushing him for information on any APD pending AKNG investigations. **(Refer to Attachment #53)**

This investigator acquired a copy of ████ K.B. ████'s AR 15-6 investigation and contained therein is the memo from Colonel Bridges. **(Refer to Attachment #50 for reference).**

On November 13, 2014 at 7:45 pm Officer McMillan sent this investigator an email referencing the Aguilar-Spinelli Test. The test is a judicial guideline for the legal criteria to be a police informant versus a citizen informant, whose identity need not be concealed. **(Refer to Attachment #54)**

**On November 13, 2014 at 4:05 pm, APD Officer Chris SIMMONS was interviewed at the MOA offices (7th Floor), 632 West 6th Avenue, Anchorage, AK 99501. Officer Simmons acknowledged he knew that the interview was being digitally recorded. APD Union Steward Chris Lutes and LT Kevin Vandegriff, APD Internal Affairs, were also present for the interview. A certified transcript was completed of the recording. (Refer to Attachment #55)**

**Officer Simmons was provided with the APD Pre-Interview Admonition for Witness Interviews prior to being recorded. (Refer to Attachment #56)**

The following is a summary of the interview with Officer Simmons:

Officer Simmons related that he has been employed by the APD for eleven years and ten months. The vast majority of his time has been spent in Patrol.

Officer Simmons related he knew ████ K.B. ████ provided Officer McMillan with information a few times. Officer Simmons related ████ K.B. ████ would often stop by during AKNG drill to complain about General Katkus' command and ████ K.B. ████ would mention drug allegations involving AKNG members. Officer Simons always told ████ K.B. ████ to meet with Officer McMillan. Officer Simmons related the first time he heard about ██ E.P. ██ was the day Officer McMillan made his first drug bust because Officer McMillan called him and asked who ████ E.P. ████ was. Officer Simmons related he did not have any discussion with anyone in the AKNG about the drug bust and all that he

knew was that ▮E.P.▮ was involved because Officer McMillan had asked about him ▮E.P.▮ previously.

Officer Simmons related he did not know any of the details or specifics of what was going on in the AKNG drug investigation. Officer Simmons related he was not aware of any of the other targets of the investigation. Officer Simmons related about a month later he was at APD and saw ▮E.P.▮ being escorted into the building by SAU personnel so he put two and two together and figured ▮E.P.▮ who was not in handcuffs, was working with APD.

Officer Simmons related on one occasion someone from the AKNG tried to get information from him about what was going on with ▮E.P.▮ Officer Simmons related his wife worked at Family Programs which is located at the AKNG armory. Officer Simmons related he and his wife were at LTC Tim DeHaas' house one evening, maybe a couple months after the initial phone call from Officer McMillan. Officer Simmons related after dinner LTC DeHaas said to him there is a lot of big stuff going on with ▮E.P.▮ Officer Simmons related that he knew enough to know that nobody should really know about ▮E.P.▮ Officer Simmons related he informed Officer McMillan about the statement made by LTC DeHaas immediately. Officer McMillan related he did not discuss anything about ▮E.P.▮ with LTC DeHaas and it seemed to him that LTC DeHaas was probing for information.

Officer Simmons related ▮K.B.▮ also came into his office and in one of those general; what do you think he ▮K.B.▮ should do if he knew discussions, and mentioned what if he knew some victims of sexual assault in the AKNG? Officer Simmons related he and ▮K.B.▮ would have open-ended conversations like that. Officer Simmons related ▮K.B.▮ would never provide an actual name or an actual victim, AKNG unit, or any specific information. Officer Simmons related since ▮K.B.▮ alleged the involvement of the AKNG recruiting command again that he referred ▮K.B.▮ to Officer McMillan.

**On November 14, 2014 at 10:15 am, APD Officer Eric Smith was interviewed at the MOA offices (7th Floor), 632 West 6th Avenue, Anchorage, AK 99501. APD Union Steward Chris Lutes and LT Kevin Vandegriff, APD Internal Affairs Commander, were also present for the interview. Officer Smith acknowledged he knew that the interview was being digitally recorded. A certified transcript was completed of the recording. (Refer to Attachment #57)**

**Officer Smith was provided with APD Pre-Interview Admonition for Witness Interviews prior to being recorded. (Refer to Attachment #58)**

The following is a summary of the interview with Officer Smith:

Note: Officer Smith related that the task force lead agent in charge is Elizabeth Oberlander. She, the FBI attorney, and other people at the SSTF discussed his coming in for an interview. Officer Smith related he understood we were not going to discuss specifics of the ongoing FBI investigation so he could participate in this interview.

Officer Smith related that he has been employed by the APD for over thirteen years. Officer Smith related he was assigned to the SAU until roughly the end of January or the beginning of February 2010 when he was put back on the FBI SSTF and has been there since that time. Officer Smith related he was technically assigned to the SAU, but is housed with the FBI.

Officer Smith related that his supervisor on the SAU side was SGT Darrel Redick who was his sergeant and LT Henry was his Commander. Officer Smith related on the FBI side he had a supervising special agent. Her name was Annie Kirkland.

Officer Smith related that he was aware of the SAU encounter with illegal drug dealing within the AKNG on February 23, 2010 and the traffic stop that involved a Samoan man. Officer Smith did not remember his full name but he thinks it was ▮▮D.A.▮▮ investigation revealed ▮D.A.▮'s last name is ▮D.A.▮). Officer Smith related that he was called by AST Hazelaar and notified that he and Officer McMillan had done a jump out and a traffic stop and needed some help because there were a lot of people everywhere. Officer McMillan and AST Hazelaar also asked him if there was anyone else at FBI that could come to assist. Officer Smith related at this time this drug investigation was a SAU case.

Officer Smith related he helped interviewing ▮▮D.A.▮▮ but AST Hazelaar and Officer McMillan took control of ▮D.A.▮ Officer Smith related AST Hazelaar and SGT Carson started to conduct controlled buys and that he would help with those buys. SGT Jack Carson had been part of SSTF before and AST Hazelaar has been part of the DEA before. Both officers quickly realized that this was going to be a bigger case than what SAU typically would handle and investigate. Officer Smith related that was his impression as to why the SSTF got called right off the bat and why the task force assists SAU to this day.

Officer Smith related there was a big drug bust, a drug interdiction around March 10, 2010, at the airport that tied into one of the two men from the initial traffic stop (that occurred February 23, 2010). Officer Smith related the federal task force did not take over the SAU investigation definitely until March of 2010 after the interdiction at the airport. Officer Smith related based on all the information he had been given by the SAU, that he wrote four federal search warrants and one state search warrant.

Officer Smith related he wrote those (federal and state) warrants and the warrants did have something to do with ▮▮R.Z.▮▮ Officer Smith related there is never really a clear date when the SSTF says it's their investigation. Officer Smith explained he meant that somewhere in between the controlled delivery of the marijuana that came from the seizure at the airport (March 10, 2010) to the day of the search warrants (March 24, 2010), the SAU drug case involving ▮D.A.▮ and ▮E.P.▮ just morphed into becoming a SSTF case. Officer Smith related one search warrant specifically of the five search warrants was the basis for the next ten months of the federal investigation for sure. Officer Smith reiterated that prior to the big interdiction seizure the day-to-day involvement with that drug case (AKNG recruiters) was being run out of the SAU. For the first few weeks, the SAU reached out to SSTF when they (SAU) needed a hand to debrief or do a buy or something. Officer Smith related he did help with multiple SAU buys before the AKNG drug investigation became a SSTF case. Officer Smith related

he did not know at the time where this SAU drug case was going to go. Officer Smith related the case started to transition because he (Officer Smith) was the one that wrote the warrants but all that information came from the SAU investigators and the work that AST Hazelaar had done. Officer Smith related all the early investigative work was documented on APD paperwork so it was clearly still an SAU case. Officer Smith related he was not aware of any meeting that may have taken place between Annie Kirkland, LT Henry, and General Katkus to talk about this drug investigation.

**On November 14, 2014 at 12:45 pm this investigator and LT Kevin Vandegriff, APD Internal Affairs Commander conducted a telephonic interview with AKNG member LTC Timothy DeHaas in the 7th Floor Conference Room of the MOA offices, 632 West 6th Avenue, Anchorage, Alaska, 99501. The interview was not recorded and the following information was documented.**

The following is a narrative summary of the telephone interview with LTC DeHaas of the Idaho Army National Guard:

The interview was not digitally recorded.

After identifying this investigator and LT Vandegriff, LTC DeHaas was informed that an independent investigation was being conducted that was initiated by the Municipality of Anchorage to look into the drug dealing and sexual assault issues relating to the AKNG and their handling by the APD. This investigator requested LTC DeHaas talk to us (Brown and Vandegriff) about his knowledge of these issues and he readily agreed. This investigator advised LTC DeHaas that in this investigator's possession was a copy of an ▇▇▇▇▇▇▇ document that contained specific details about the issues under investigation that mentioned his position within the AKNG.

The following is a summary of the telephone conversation in question and answer format with LTC DeHaas and not a certified transcript. The summary was derived from this investigator's notes taken during the conversation.

Brown: I am looking at some ▇▇▇▇ documents from 2010. There was a meeting you attended in late February 2010 (noted in an ▇▇▇▇ document as approximately one month prior to March 29, 2010 by Major General Katkus) with members of the Anchorage Police Department and Major General Katkus of the Army National Guard. The meeting related to drug dealing by a member or members of the Alaska National Guard Recruitment and Retention Unit. What can you tell me about that meeting?

LTC DeHaas: I only attended part of that meeting. I was called in and it was already ongoing.

Brown: What happened at that meeting and what was your role?

LTC DeHaas: There was a matter that was being discussed and I was asked to sit in by the General.

Brown: Did you learn that ███E.P.███ was an informant for the APD's criminal investigation?

LTC DeHaas: I don't recall hearing that at that meeting.

Brown: Did you learn about ███D.A.███ the boyfriend of ███E.J.███ of the Recruitment and Retention Unit?

LTC DeHaas: I don't recall hearing that at that meeting but other times we talked about she was involved.

Brown: Did you learn specifics of what was being investigated?

LTC DeHaas: That might've been discussed; that ███E.P.███ was possibly involved in a drug incident and that it was an ongoing investigation. We were also briefed by APD that ███J.N.███ and ███J.C.███ were involved.

Brown: Did you discuss this with any of the recruiters?

LTC DeHaas: There was no discussion with ███E.P.███ by Major General Katkus and myself.

Brown: Did Major General Katkus discuss with you the disclosures made by the APD?

LTC DeHaas: No.

Brown: June 4, 2010 there was a meeting at Major General Katkus' office attended by LT Henry, Seth McMillan, you, and SGT Darrel Redick where ███K.B.███ was called in. What was your role at that meeting? Were there allegations of sexual assault in the Alaska National Guard made against male members against female members?

LTC DeHaas: Yes, Seth (McMillan) was at that meeting with ███K.B.███ and it came up about sexual assaults occurring in the Guard.

Brown: Were the names disclosed?

LTC DeHaas: If you have information on that ███K.B.███ was supposed to provide the information (on sexual assaults in the AKNG) and ███K.B.███ would not give it. I don't recall an order to ███K.B.███ to give the information (on sexual assaults in the AKNG). The general was trying to determine if it was an AKNG matter or a civilian matter. I don't think any of the APD people that were there were in uniform. Five (people) is correct that were at the meeting. We (Katkus and DeHaas) were introduced but I do not remember the three individuals (from the APD). I do not know them. ███K.B.███ did not give specifics on names and was dismissed from the meeting. We had no other meetings like that. There were two meetings, if the record shows, no more than that. I recall more about ███K.B.███ versus what I remember about ███E.P.███.

On November 15, 2014 at 1: 29 pm, LT Henry notified this investigator electronically that he located and would provide documentation requested from his first interview with this investigator to LT Vandegriff. LT Vandegriff received and inventoried the documents on November 14, 2014. LT Vandegriff forwarded the documents to this investigator and was received at my business address, P.O. Box 6598, Harrisburg, PA 17112 on December 8, 2014. The following documents were reviewed and are attached to this report as follows:

1. Memorandum from LT Anthony Henry to Independent Investigator Rick Brown dated November 15, 2014. **(Refer to Attachment #59)**

Note: A review of this document revealed that LT Henry acknowledges a meeting on February 26, 2010 with MG Katkus. The next significant date in the memo is March 8, 2010. LT Henry indicates there was a SSTF case meeting. The next date listed as March 9, 2010 that mentions a meeting with the FBI at the FBI office reference the ▊▊▊▊ case (SSA Kirkland would have been involved in that meeting). The last date listed was March 11, 2010 and it mentions a meeting with General Katkus with possibly AST Hazelaar.

Additionally, the memo goes on further to state that providing General Katkus with information concerning the misconduct of AKNG members was part of the plan that was coordinated through the FBI. These issues would have clearly been discussed in both the March 8 and March 9 meetings with the FBI SSA, FBI, and task force officers prior to the follow-up meeting with MG Katkus.

2. An excerpt of the online manifesto purported to be authored by ▊▊▊▊▊▊ ▊ K.B. ▊ **(Refer to Attachment #60))**

3. LT Henry's work activity logs for the time periods of February 15-28, 2010; March 1-14, 2010; and May 24-June 6, 2010. **(Refer to Attachment #61)**

LT Henry's work activity log for February 26, 2010 confirms he had a meeting with General Katkus. During LT Henry's interview he stands firm that the meeting was to discuss allegations involving Officer Seth McMillan that the general could not be trusted.

Note: The allegation that Officer McMillan made the statement that General Katkus could not be trusted did not surface until June 3, 2010 when ▊ J.N. ▊ was referred to him (McMillan) by ▊ K.B. ▊. ▊ J.N. ▊ details this event in his ▊▊▊ investigation's sworn statement. During the initial telephone conversation with Officer McMillan, ▊ J.N. ▊ alleges in the phone conversation that Officer McMillan told him not to inform his chain of command because they could not be trusted. ▊▊▊▊ ▊ J.N. ▊ informed LTC Lawendowski and in his ▊▊▊▊ sworn statement from June 2010 he clearly indicates he relayed that information to his chief of staff and the general that same evening.

LT Henry's work logs for March 8, 9, and 10, 2010 reflect the information provided in item number one above. LT Henry's work logs for June 3 and June 4, 2010 indicate he

was on duty working SWAT/SAU both days and there is no mention of any meetings with the AKNG.

    4. Email to DC Fanning dated October 17, 2013 reference media questions. **(Refer to Attachment #62)**

    5. Full online manifesto purported to be authored by  **(Refer to Attachment #63)**

    6.  Initiation paperwork, undated. The ███ was submitted March 9, 2010, for ███████ **(Refer to Attachment #64)**

These documents provided by LT Henry clearly verifies the initial SAU case involving the AKNG was not a federal investigation and any releases of case information or disclosure of confidential informants would have to be authorized by the proper APD authority. This document is in conflict with LT Henry's assertions that from the very beginning the SAU case was a federal investigation and that any disclosures to the AKNG were approved under the FBI's authority. The FBI's disclosures did not occur until March 11, 2010 clearly after the early stages of the SAU investigation.

    7. ███████ Background paperwork for ███████ **(Refer to Attachment #65)**

    8. Email dated June 23, 2010 from AST Hazelaar. **(Refer to Attachment #66)**

Note: This email relates this case was initiated in February 2010 and it has taken this long (June 23, 2010) to get it ███████ for FBI funding.

    9. Email dated June 7, 2010 from AUSA Office (2). **(Refer to Attachment #67)**

Note: This email is the verification of the initiation of the federal ███████ investigation that was scheduled for June 10, 2010 for ███████ that LT Henry refers to in his interviews.

    10. Email dated July 9, 2010 from Ann Kirkland, FBI SSTF Supervisory Special Agent. **(Refer to Attachment #68)**

Note: This email is from Ann Kirkland to LT Anthony Henry about the federal ███████ case. The message to LT Henry from SSA Kirkland was that she was not sure how much involvement the SAU will have in the federal investigation. It also provided federal funding documents for APD personnel who were not assigned to the SSTF.

    11. Email dated February 28, 2011 from Eric Smith with attached press release. **(Refer to Attachment #69)**

    12. Emails dated February 17 and March 21, 2011 reference ███████ Travel (2). **(Refer to Attachment #70)**

13. February 2011 and June 2011 SSTF Monthly Report (2). **(Refer to Attachment #71)**

14. Email from John McKinnon to Anthony Henry dated September 25, 2014 reference perjury allegations against ▇▇▇ E.P. ▇▇▇ **(Refer to Attachment #72)**

15. ▇▇▇▇▇ Briefing Slides (5). **(Refer to Attachment #73)**

16. FBI/APD SSTF MOU dated November 21, 2005. **(Refer to Attachment #74)**

17. Training outline for SAU regarding new drug enforcement strategy (2009). **(Refer to Attachment #75)**

18. APD Drug Enforcement Strategy Matrix (2009) (CPT Cobb). **(Refer to Attachment #76)**

Note: This investigator noted the APD Drug Enforcement Strategy Matrix for street level drug investigations indicates the investigation from February 23, 2010 to approximately March 12, 2010 fell clearly within the purview of the SAU.

19. Drug Enforcement Management Review 2007-2009 (LT Anthony Henry). **(Refer to Attachment #77)**

Note: LT Henry authored and provided a copy of the executive summary of this review. On page 18 of 48, under Confidential Informant Records, paragraph one indicates the following, "Informant records must be maintained by the department in a secure location. It is well understood that the identities of the persons who cooperate with the police do so at considerable risk to their own safety and keeping their identities protected is critical."

20. Copy of Anchorage Municipal Code section 3.90.040 C (Police Investigative Files). **(Refer to Attachment #78)**

On November 14, 2014 at 6:18 pm LT Henry sent this investigator an email and related he keeps a personal log of his time and was able to determine the exact dates of the meetings this investigator discussed with him regarding the AKNG. LT Henry wrote:

- February 26, 2010 would have been the first meeting with General Katkus we discussed.

- March 11, 2010 met with MG Katkus both me and the FBI but his memory says AST Hazelaar.

A copy of the subject email is included with this report, **Refer to Attachment #79.**

November 17, 2014 LT Vandegriff notified this investigator that he received a telephone call from AKNG ▇▇▇ S.T. ▇▇▇ who advised she was a victim of sexual assault back

in March 2010. She related that the meeting that occurred on June 4, 2010, in which General Katkus attempted to obtain sexual assault victim information from ███K.B.███ in front of APD members, very much impacted her confidence in the department. The interview was not recorded; however, LT Vandegriff compiled a narrative summarizing their conversation. **(Refer to Attachment #80)**

On November 19, 2014 at 10:00 pm, this investigator, while on another assignment not related to this investigation, was in the Commonwealth of Puerto Rico and spoke with AKNG ███S.T.███. She reiterated the information captured by LT Vandegriff on November 17, 2014. ███S.T.███ expressed her willingness to be interviewed by this investigator about the personal impact of her command staff trying to obtain the names of sexual assault victims in the presence of APD officers. This investigator was very clear that we would not discuss the merits of her case because this was not the forum for that type of evaluation. This investigator will schedule an interview with ███S.T.███ during this investigator's next visit to Anchorage.

**On November 24, 2014 at 6:50 am LT Vandegriff, APD Internal Affairs Commander conducted a telephonic interview with FBI SA Steve Payne. The interview was not recorded and a narrative report was completed. (Refer to Attachment #81)**

The following is a summary of LT Vandegriff's report:

SA Payne related he remembered the drug investigation which involved the AKNG which began in February of 2010. SA Payne related he was aware that employees from the APD had briefed General Katkus of the AKNG of the existence of the AKNG drug investigation within several days of it being initiated and frankly this disclosure blew him (SA Payne) away.

SA Payne related the choice to brief one of the potential subjects of an investigation of its existence impeded the investigation. SA Payne related he didn't understand why that was done and was at a loss for why that was done. SA Payne related compromising the informant so early in the investigation rendered the informant no longer effective. SA Payne related any squared away police officer, regardless of whether they were a detective or not, should have known better than to compromise their informant.

SA Payne related he remembered both SGT Carson and Officer McMillian being bent-out-of-shape about the informant disclosures. SA Payne related SGT Carson and Officer McMillan were extremely frustrated by LT Henry's decision to brief the General so early in the investigation especially when they (SGT Carson and Officer McMillan) were unsure as to who might be involved and its subsequent effect on the case.

SA Payne related he did not remember having any discussions with APD personnel about releasing audio files and APD police reports to the AKNG to assist with an administrative discharge of AKNG member ███E.P.███ SA Payne related that after the drug investigation was complete or whenever ███E.P.███ was no longer assisting in the investigation it would be permissible to assist the AKNG in its administrative proceedings.

SA Payne related he did not participate in any briefing of General Katkus with regard to this federal investigation. SA Payne related he was not aware of any meetings between the FBI and General Katkus. SA Payne related he was not aware of SSA Annie Kirkland briefing General Katkus. SA Payne related SSA Kirkland was the squad supervisor and he (SA Payne) did not believe for a second that SSA Kirkland would have briefed the general and not told him (SA Payne) about it as he (SA Payne) was the team leader for the federal case. SA Payne related General Katkus had been briefed about the AKNG investigation before the FBI had even become involved.

SA Payne related he was assigned to work the case and both SGT Carson and Officer McMillan had invaluable knowledge of the AKNG and its inner workings. SA Payne related LT Henry had specifically told SGT Carson and Officer McMillan they were not to be involved in working the case against the AKNG. SA Payne related that both SGT Carson and Officer McMillan were terrified of the negative repercussions that would befall them if LT Henry found out they were talking to him (SA Payne) about the AKNG case.

SA Payne related LT Henry made an agreement with SSA Kirkland to deputize a portion of the SAU. SA Payne related the purpose of the agreement was to send some federal overtime money SAU's way. SA Payne related this decision did not sit very well with FBI HQ. SA Payne related by the time the issue had surfaced with FBI HQ, SSA Kirkland had stepped down as the supervisor and that he became the supervisor and had to deal with the negative after-effects of their (LT Henry and SSA Kirkland) decision.

SA Payne expressed his dissatisfaction with how this drug investigation had been handled by LT Henry. SA Payne related that by the time he had gotten involved all of the critical decisions had been made and it was an impossible case to solve. SA Payne related the pre-mature notification of the AKNG chain of command, when they (AKNG command) were supposedly part of the problem, had done too much damage to the case.

On December 15, 2014 this investigator received an electronic copy of an APD Memorandum from LT Vandegriff to LT Henry that served LT Henry notice that his next interview will be conducted on December 18, 2014 at 1300 hours as part of this investigation. **(Refer to Attachment #82)**

**On December 17, 2014 at approximately 1:00 pm LT Kevin Vandegriff, APD Internal Affairs Commander and this investigator conducted a telephonic interview with AKNG member ▆▆▆▆ E.P. ▆▆▆▆. The interview was recorded and a certified transcript was completed. (Refer to Attachment #83)**

The following is a summary of the interview with ▆▆ E.P. ▆▆.

Note: ▆ E.P. ▆ wrote a letter of complaint to Alaska State Senator Lisa Murkowski that was signed on July 9, 2010.



E.P. related that he did get a response letter back from Senator Murkowski probably within six weeks of the July 2010 timeframe. All Senator Murkowski's letter said was that she sent the complaint to the AKNG and the APD. The AKNG responded back to Senator Murkowski and related he ( E.P. had been given proper due process and was under a _____ E.P. related Senator Murkowski gave it to the AKNG and the AKNG gave it to General Katkus, who was the person his ( E.P. complaint was actually filed against. E.P. related his complaint did not go anywhere after that.

E.P. related he was working with Jack Carson and a gentleman by the name of Joseph (AST Hazelaar) and they told him that they already talked to General Katkus. General Katkus wanted him to continue working with Jack Carson and Joe (Hazelaar) and that General Katkus wanted him to implicate other AKNG members who were selling guns. E.P. refused to do that. E.P. related General Katkus called him into the general's office and informed him that he (General Katkus) was already aware of what was going on, and that he better cooperate with the APD or that would be the end of his ( E.P. career.

E.P. related he was working with D.A. in February or March of 2010. That was probably a month after he started working with the APD. General Katkus told E.P. he used to be a police officer and knew everything that was going on with him ( E.P. . E.P. related General Katkus told him to continue working with the APD and everything will be okay.

E.P. related he continued to cooperate with the APD and then the name _____ J.N. surfaced. E.P. related he did not want to cooperate anymore and then the APD offered to put him E.P. on the payroll. E.P. related he turned down the APD offer to be a paid informant. General Katkus then called him into the general's office and directed him to his E.P. commander's office to resign. (APD records reveal E.P. was terminated as a confidential informant on April 21, 2010, **(Refer to Attachment #40 for additional details)**.

This investigator asked the following clarifying questions of E.P. "I don't want to beat a dead horse, but just to make sure I am totally clear, before you decided to stop working with them (APD) you did have a meeting with Katkus who told you he knew everything?" E.P. responded "Yes, sir. Correct. Yes, he did." This investigator then asked; "That was during the time you were working for the APD as a confidential informant?" E.P. responded "Yes. Correct. Yes." **(Refer to Attachment #83, page 13, lines 16 through 25)**

On December 17, 2014 this investigator received a copy of the APD Code of Conduct Policy from LT Vandegriff that defines departmental expectations for on and off duty personal behavior. A copy of the APD Code of Conduct Policy is included with this investigative report. **(Refer to Attachment #84)**

**On December 18, 2014 at 9:38 pm, a Supplemental Interview of APD Chief of Police Mark Mew was conducted at the MOA offices (7th Floor), 632 West 6th Avenue, Anchorage, AK 99501. Chief Mew acknowledged he knew that the**

**interview was being digitally recorded. A certified transcript was completed of the recording. (Refer to Attachment #85)**

**Chief Mew was provided with the APD Pre-Interview Admonition prior to being recorded. (Refer to Attachment #86)**

The following is a summary of the interview with Chief Mew:

Note: The interview began with a discussion about a letter of complaint received from Alaska State Senator Lisa Murkowski dated July 14, 2010, wherein ██████ E.P. ████ made a complaint that the APD did not keep the fact he ██ E.P. █ was acting in the capacity of a confidential informant and was actively working in an ongoing investigation confidential from his employer the AKNG.

Chief Mew related that he initially confused ██ E.P. █ with ████ K.B. ████ Chief Mew related that if asked in 2013 who complained to Lisa Murkowski, he probably would've answered it was ███ K.B. ███ Chief Mew related he gave the Murkowski letter to CPT Bill Miller and told him to look into the complaint and figure out what was going on, where APD was with this investigation, and help him (Chief Mew) sort out the department's response to the Senator. Chief Mew related he did not send the Murkowski letter to Internal Affairs but gave it to the Captain (CPT Miller) of the Crime Suppression Division (CSD) at the time to look into it. CPT Miller came back and said ██ E.P. █ is not being completely honest. The APD is working with ██ E.P. █ and ██ E.P. █ is a suspect. CPT Miller related the APD is going to be charging ██ E.P. █ very soon so ██ E.P. is throwing around a bunch of erroneous counter assertions to try take the heat off himself because ██ E.P. █ is about to be indicted federally. Chief Mew related the APD could not explain all this to the senator, but the situation appeared under control. The response to Senator Murkowski didn't go out until January 24 of 2011. Chief Mew related he did not remember if CPT Miller caused the delay or if he lost track of the Murkowski letter.

Chief Mew related he decided to begin a criminal investigation of General Katkus. (The question by this investigator prior to this response was did you consider initiating an internal investigation to see what was going on in the APD?) Chief Mew related he learned the same night that he first requested the FBI to look into the allegations involving General Katkus that the FBI sent SA Steve Payne to ask General Katkus about the allegations directly. Chief Mew related the answer that he received from the FBI in 2011 was not satisfactory to him, because the subject of the investigation was, in part, providing the answer. Chief Mew indicated that if the FBI found fault with General Katkus or a problem with the APD, that he assumed the FBI would advise him.

Chief Mew related he decided not to initiate an internal investigation on November 7, 2013 on LT Tony Henry because LT Henry had several actions against the APD and was accusing the department of retaliation. Chief Mew related LT Henry had EEOC complaints against the department and LT Henry was misbehaving and challenging his chain of command in a variety of ways. Chief Mew related he was told by MOA attorneys not to hold him accountable. Chief Mew related MOA attorneys feel differently about LT Henry today than they did a year ago, and that he is getting different legal advice on

how to proceed with respect to LT Henry. Chief Mew related he discussed these allegations with Dennis Wheeler, George Vakalis, the city manager, and the mayor. Chief Mew related this is identified in his timeline.

This investigator asked Chief Mew what was his attorney's (Attorney Wheeler) legal advice to him? Chief Mew stated, "He did not have any." "It was just a briefing to let him know what we had going on." This investigator asked Chief Mew if the MOA attorney told him that he couldn't investigate LT Henry. Chief Mew responded, "No, but he told me I couldn't investigate Henry on some other things that were happening at that period of time. So I just didn't bother having a discussion with him (Attorney Wheeler)." Chief Mew related he thought that he knew the answer would be the same and the legal advice would be to not investigate LT Henry. Chief Mew related he did what he was permitted to do by MOA attorneys who were assisting the APD work through the cases involving LT Henry. Chief Mew related that he did nothing in respect to LT Henry that was not cleared by MOA legal and Employee Relations.

Chief Mew related in September 2014, that he did not remember ever being told SGT Carson and Officer McMillan were ordered by LT Henry to give up the informant files and quit working the AKNG. Chief Mew also related during this time these specific allegations seemed like new information to him.

Chief Mew related that he did not recall a briefing with retired DC Steve Hebbe about the disclosure of confidential informant information to General Katkus in October 2013. Chief Mew related he has a recollection his information came from reading the newspaper article and then seeing the complaint coming in from the mayor's office with respect to ▮▮▮▮▮▮ Chief Mew related those two pieces of information were the two things that caused him to call up LT Henning to obtain a briefing. Chief Mew related that DC Hebbe might have come to him with some allegation, but he does not remember the DC Hebbe briefing. Chief Mew related he is just drawing a blank on the DC Hebbe briefing (relating to the disclosure of APD confidential informants to the AKNG).

Chief Mew related he couldn't figure out what the date was he talked to the investigator from OCI. Chief Mew related he spoke to the OCI Investigator for probably a couple hours in his office but it wasn't booked with his secretary in advance. **(Note: Chief Mew discussed this interaction in his October 16, 2104 interview as providing details from his timeline to the OCI investigator similar to what he has provided during this investigation)**

Chief Mew related he thinks it's fair to say APD command felt along the way that they would like answers to questions about what LT Henry did or didn't do. Chief Mew related he did not remember anybody from APD command looking at him and saying they don't care what the deal is with the EEOC or what the City Attorney is telling him (Chief Mew), the APD needs an investigation now and answers to these questions.

Chief Mew related other people might say they identified issue one, two, and three for LT Henry on November 7, 2013. Chief Mew related he did not recognize all three of the issues at that time. Chief Mew related he didn't fully understand the issues and then his

memory degraded on issues two and three, or that he never did fully understand issues two and three until it all came together in September of 2014.

Chief Mew explained issue number one was investigating General Katkus. Issue number two was the disclosure of the confidential information to General Katkus at the AKNG. Issue number three was whether LT Henry told SGT Carson and Officer McMillan to quit working the AKNG. Chief Mew related if he was interviewed the day before he read Officer McMillan's timeline in September 2014, that he would have answered on issue one; LT Henry said don't investigate General Katkus. On issue number two LT Henry said give APD case files to the AKNG JAG officer so that the AKNG can run these guys (AKNG drug dealers) out of the service, but he wouldn't have said to give all APD informant files to General Katkus. On issue three Chief Mew related that he would've answered that APD drug investigators were not able to make any headway with AKNG recruiters because the case had soured, not because they were ordered by LT Henry not to work on it.

**On December 18, 2014 at approximately 1:00 pm, a Supplemental Interview of APD LT Anthony Henry was conducted at the MOA offices (7th Floor), 632 West 6th Avenue, Anchorage, AK 99501. LT Henry acknowledged he knew that the interview was being digitally recorded. LT Henry was afforded the opportunity to make his own recording of this interview. A certified transcript was completed of the recording. (Refer to Attachment #87)**

**LT Henry was provided with the APD Pre-Interview Admonition prior to being recorded. (Refer to Attachment #88)**

The following is a summary of the interview with LT Henry:

LT Henry related that he, in conjunction with the FBI, would be investigating and dealing with drug prosecutions tactically, and the timing of that release (of investigative information to facilitate an AKNG military proceeding for a discharge) would have been through the FBI task force officers or FBI Agent Kirkland. LT Henry related his directions were that General Katkus was going to be able to deal with ▮E.P.▮ administratively because that's the only authority General Katkus had and the FBI was still going to prosecute ▮E.P.▮ if the U.S. Attorney would take the case.

LT Henry related that he did not even know that SGT Carson was involved in the AKNG drug investigation until he (SGT Carson) was down in SAU talking to the guys that the DC had told him to develop this timeline on the AKNG drug investigation.

LT Henry provided this investigator with his Personal Log Sheet that covered the time period of February 2010. There was an entry on the log that listed the date of February 26, 2010. Part of the entry for that date indicated there was a meeting with General Katkus. LT Henry confirmed that a meeting occurred with AKNG General Katkus on that date. (Note: This was the date identified of the alleged disclosures made and directed by LT Henry to the AKNG command relating to the specifics of the SAU AKNG recruiter drug investigation.)

LT Henry related that General Katkus said that Officer McMillan had issues with him (General Katkus) being trusted. LT Henry said he did not know if he mentioned to General Katkus at that time there was an on-going drug investigation. LT Henry related the trust issue Officer McMillan had with General Katkus is what generated the AKNG meeting the he, SGT Redick, and Officer McMillan attended at the AKNG. LT Henry related that was the only time, February 26, 2010, that the three of them (LT Henry, SGT Redick, and Officer McMillan) were together at the AKNG to meet General Katkus.

LT Henry related there was no conversation that he remembered about the targets of the AKNG drug investigation at the February 26, 2010 meeting. LT Henry related he thinks that probably occurred at the second meeting (March 11, 2010). LT Henry related there was no release of confidential informant information that he was aware of at the first meeting with the AKNG on February 26, 2010. **(Note: Confidential informant E.P. first signed PAD SAU informant packet the day of the first meeting February 26, 2010.)**

LT Henry related this AKNG drug investigation was already an ▮▮▮▮▮ case and E.P. s introduction lead into the Mexican drug source. LT Henry related the jump out drug buys started the investigation. Jump outs aren't automatically an ▮▮▮▮▮ (federal) case, but they can turn into them (federal cases).

LT Henry related the National Guard, United States military, Army, Air Force, and Navy deals with drug offenses within its ranks, but the primary concern is operational readiness. LT Henry related the military deals with these things mostly through non-judicial means and they (military) remove soldiers from the service because soldiers involved in drug offenses compromise readiness of the military. LT Henry related there was nothing sinister going on with regards to the SSTF interacting with General Tom Katkus to allow him to clean the AKNG ranks.

LT Henry related he has very little memory involving the circumstances surrounding the AKNG drug investigation because it occurred five years ago and that he was reaching to obtain information. LT Henry related unlike SGT Carson and Officer McMillan that he was not allowed to go talk to people, develop timelines, and conduct research to come up with intelligent answers (for this investigation).

Note: LT Henry confirmed he authored the Executive Summary of the Metro Drug Audit. Under confidential informants LT Henry wrote "It is well understood that the identities of the persons who cooperated with the police do so at considerable risk to their own safety and keeping their identities protected is critical." LT Henry related what they (APD/police) are talking about is we (APD/police) do not go out and advertise this person is working for the cops, but that he can guarantee every informant that APD uses to develop cases that APD's informant's identities gets disclosed in court during discovery.

LT Henry related on March 8, 2010 he had a meeting with SSTF officers and then there was a meeting (March 10, 2010) with the FBI with SSTF personnel in the referenced ▮▮▮▮▮ case. LT Henry related then there was a meeting (March 11, 2010) with

General Tom Katkus which is consistent with what he (LT Henry) told this investigator from the beginning.

LT Henry related the only thing that ███ K.B. ███ ever references in his timeline (received from Officer McMillan in 2013) relevant to him (LT Henry) is that ███ K.B. ███ mentions him by name in the online article. LT Henry related he reviewed Personal Log Sheets (for June 2010) and for June 3 to June 4, 2010. The logs just says shift.

LT Henry related he has no memory of what occurred on June 3 and 4 2010. LT Henry related all the meeting information for the end of February 2010, or the beginning of March (2010) came from his personal logs. LT Henry related he remembered two meetings at the AKNG and that is what his (LT Henry) notes say. LT Henry related he never told Officer McMillan to stop investigating the AKNG recruiters.

LT Henry related what ███ K.B. ███ described about him in the online article was not correct. The AKNG meeting did not occur as described. LT Henry further related the only time he had a meeting as described by ███ K.B. ███ in the online article was in February 2010, which was the first meeting (February 26, 2010).

This investigator advised LT Henry of the sworn written statement that was part of an AKNG AR 15-6 investigation completed by LTC Lewandowski. The sworn statement documents on June 4, 2010 LTC Lawendowski went to General Katkus office and LT Henry was there. LT Henry related LTC Lawendowski got his dates wrong. LT Henry related there was one date that he was at the AKNG and that was the very first meeting that he (LT Henry) had with General Katkus and that was in February 2010. LT Henry related LTC Lewandowski may have provided a statement but his dates are wrong.

This investigator asked LT Henry to take away the June 4, 2010) date and asked LT Henry if he was ever in a meeting with General Katkus, SGT Darrel Redick, LTC Tim DeHaas, and then ███ K.B. ███ to discuss sexual assaults happening in the AKNG? LT Henry related no, there was no mention of any sexual assault investigations and if there were some sexual assaults that came to his attention, that he (LT Henry) would have relayed that information to LT Ken McCoy (APD SVU Commander).
LT Henry related he does not remember discussing ███ K.B. ███ with Officer McMillan until he received the online article from Officer McMillan in 2013. LT Henry related he does not know ███ K.B. ███
LT Henry indicated this investigation is politically motivated. LT Henry related that the political piece needs to be understood. LT Henry related the APD does not normally give information about people's criminal behaviors to their employers, but that the Army or the military is different, and they (APD) regularly work with the military for national security and readiness issues.

This investigator asked LT Henry if there was ever a meeting that he attended with General Katkus to talk about the AKNG recruiter investigation in which SGT Jack Carson was present. LT Henry related no, that he does not remember SGT Carson being at any meeting that he (LT Henry) attended with the AKNG. LT Henry related he did not know that SGT Carson was involved in the AKNG drug investigation until SGT Carson was asking APD people to help him create a timeline at the request of the DC.

LT Henry related that he does not have anything sinister going on with General Tom Katkus. LT Henry related whether people like him or not, his (LT Henry) intent was good in the AKNG drug investigation. LT Henry related his intent is to do the right thing and there's no sinister effort here, none.

LT Vandegriff asked LT Henry if General Katkus ever called him and asked him (LT Henry) who Officer McMillan was getting his information from in the AKNG. LT Henry related that did not occur. **(Refer to Attachment #87, page 96, lines 21-24 for this specific conversation.)** LT Henry related he remembered one conversation with General Katkus and it was about General Katkus being accused by Officer McMillan of not being trustworthy. LT Henry related he had no knowledge that Officer McMillan was trying to work with [K.B.] so that incident did not occur.

LT Vandegriff asked LT Henry if his statement was very firm that he did not release any information to the General Katkus prior to the FBI authorizing the release of that information. LT Henry related five years ago on March 11, 2010, there was a second meeting and is the meeting that he remembered AST Hazelaar attending. The meeting was in reference to the [ ] case. LT Henry does not remember SGT Carson ever being there. LT Henry related that was his answer, that he was not being evasive, and that his answers were truthful and honest. LT Henry related his answers are backed up with a written document.

On December 19, 2014 at 1:09 pm this investigator received an email with an attached letter dated December 17, 2014 from LTC Ruth Cresenzo, National Guard Regional Special Victims' Counsel (Alaska) that provided notice she represents AKNG [ ] [S.T.] [S.T.] related to this investigator she wanted to participate in the interview and knew the discussion would not be about the merits of her ([S.T.]) case but about the reporting process. A copy of the email and attached letter are included with this report. **(Refer to Attachment #89)**

**On December 19, 2014 at approximately 1:19 am, a supplemental interview of APD CPT Bill Miller was conducted at the MOA offices (7th Floor), 632 West 6th Avenue, Anchorage, AK 99501. CPT Miller acknowledged he knew that the interview was being digitally recorded. A certified transcript was completed of the recording. (Refer to Attachment #90)**

**CPT Miller was provided with the APD Pre-Interview Admonition for Witness Interviews prior to being recorded. (Refer to Attachment #91)**

The following is a summary of the interview with CPT Miller:

This investigator provided a copy of a letter sent to Chief Mew by Alaska Senator Lisa Murkowski dated July 14, 2010. A copy of the letter was provided to CPT Miller for his review and to refresh his recollection. The letter outlined in part the complaint from [E.P.] that he was forced to resign from the AKNG and that he had been working with the APD. The APD informed him [E.P.] this matter would be kept confidential. [E.P.] indicated he was working as a confidential informant and the APD investigators promised not to notify his employer, the AKNG. **(Refer to Attachment #24 for additional details).**

CPT Miller related that he remembered the letter and completing a response to Senator Murkowski for Chief Mew. CPT Miller does not remember the complainant's name **E.P.** specifically. CPT Miller does not remember who he talked to in the department to obtain information for the response. CPT Miller related APD captains typically contact whatever department unit is involved to obtain a quick background of the situation to intelligently answer a complaint. CPT Miller further related in this case the response was easy because it was an active investigation and the department could not provide any information.

CPT Miller related that if a female writes a letter, for example, and there is an active investigation, but she says that the officer took me to a place and sexually assaulted me, and in researching this, he (CPT Miller) finds that there's a time gap, then we would investigate that situation. However, CPT Miller related in this complaint to Senator Murkowski, it appears the complainant was looking to get information on the APD case.

CPT Miller related letters received from elected officials usually are completed or turned around in a couple of weeks. CPT Miller related he was not sure why the response letter to Senator Murkowski was delayed. CPT Miller related he did not have a good answer for the timeline.

Note: The response to Senator Murkowski didn't get mailed out until January 24, 2011 (Approximately six months later.)

**On December 19, 2014 at 2:35 PM, a supplemental interview of APD LT Kenneth McCoy was conducted at the MOA offices (7th Floor), 632 West 6th Avenue, Anchorage, AK 99501. LT McCoy acknowledged he knew that the interview was being digitally recorded. A certified transcript was completed of the recording. (Refer to Attachment #92)**

**LT McCoy was read the APD Pre-Interview Admonition for Witness Interviews prior to being recorded. (Refer to Attachment #93)**

Following is a summary of the interview with LT McCoy:

LT McCoy related that the OCI report indicated there were originally twenty sexual assault cases forwarded to law enforcement, and of that twenty, seventeen were referred to the APD. LT McCoy verified the forwarding of seventeen sexual assault cases to the APD. LT McCoy related that the APD wanted to ensure that those seventeen cases were properly investigated. The SVU did an inventory of their own and determined that in addition to the seventeen cases that were referred to the APD, there were an additional ten cases that APD investigated from the AKNG. LT McCoy related the additional ten cases brought APD's numbers up to twenty-seven cases that were actually opened related to the AKNG. LT McCoy related one of the 1st cases identified goes back to 2004. There was one additional case that did not involve the AKNG but involved a recruiter from the United States Marine Corps. That makes a total of twenty-eight cases on APD's list.

Note: This investigator identified the AKNG case on the list provided by LT McCoy that is listed as #5, with an actual APD Case Number of ▮▮▮▮▮▮ The list indicates the

case was unassigned and declined with  S.S. listed as the suspect. The 2010 case number was assigned to the incident; however the case was reported in 2013 approximately three years later. The victim in this case is S.T. whose married last name is now S.T. LT McCoy verified the name of the victim and the suspect in this case. LT McCoy verified the date of the actual sexual assault occurred on March 27, 2010. This sexual assault incident occurred between the 1st disclosure of confidential informant information to General Katkus on February 26, 2010 and the 2nd disclosure of confidential informant information on June 4, 2010 to General Katkus. The District Attorney ultimately decided not to bring criminal charges against the suspect S.S. in this case. The first list is titled by LT McCoy as APD-SVU Investigations Timeline Review, National Guard. It contains a total of twenty-eight entries.

LT McCoy related S.T. made an anonymous report in 2010, those reports are assigned APD incident numbers, so the report received a number when she actually made the anonymous report. LT McCoy related he believed S.T. went to the SARC with the AKNG and the SARC referred her to the Anchorage Sexual Assault Response Team. LT McCoy related the APD forensic nurse would have contacted the dispatch center to receive a set of case numbers and then at that point she (forensic nurse) would conduct the sexual assault examination and a brief interview with S.T. and collect the evidence. That evidence would be stored at APD without any identifying information and until such a time that the victim would come forward and remove the restriction for the case so it could be investigated.

Note: LT McCoy provided a 2nd list of cases that were developed from a review of the S.2. case files involving National Guard recruiters J.N. and J.C. The second list is titled by LT McCoy as National Guard Investigations. It contains a total of twenty-one entries.

LT McCoy related that the APD was given the regarding S.2. J.N. and J.C. There were about twelve hundred to fifteen hundred pages of documents. LT McCoy related that the APD went through those documents and identified an additional twenty-one new cases of criminal activity. Therefore, there was a total of twenty-one cases that APD found involving criminal conduct in that group. LT McCoy related out of the twenty-one cases that APD discovered, in those reports, fifteen of the incidents were brand new and the APD had to assign case numbers to those cases. Six cases mentioned in the reports already had some APD involvement and a report had been generated previously. Those six cases have 2013 case numbers assigned to them. LT McCoy related some of the cases do not involve sexual assaults, but other criminal activity. Seven of the cases were sexual assaults. LT McCoy related the APD met with the Army CID (Criminal Investigation Division) and gave them (CID) information that APD had learned from the investigations, which was all new information to Army CID. They (Army CID) knew of some of the information from K.B. s document, but Army CID had no idea about the rape allegation by AKNG member M.C. M.C.

LT McCoy provided the following documents:

1. Undated memorandum authored by ████ K.B. ████ LTC (Ret) AKARNG. **(Refer to Attachment #94)**

2. APD – SVU Investigations Review, National Guard. Table of Contents. **(Refer to Attachment #95)**

3. Alaska National Guard Cases Reported to APD. **(Refer to Attachment #96)**

4. National Guard Investigations, Table of Contents. **(Refer to Attachment #97)**

5. National Guard Cases, Initiated from AKNG ████████ Review. **(Refer to Attachment #98)**

On December 20, 2014 this investigator requested SGT Jack Carson to provide the police reports related to APD Case number ████████ This investigator was attempting to determine if there were any APD reports that predated the February 24, 2010 APD report related to the initial interaction with confidential informant ██ D.A. ██ This was noted earlier in this report on October 7, 2014 with the documents received from ████ E.P. ████ It was apparent that an APD report was missing detailing the actions of the SAU members that explained how they initially came into contact with both informants.

On December 21, 2014 at approximately 4:00 pm. this investigator met with SGT Carson at the Courtyard Marriott Hotel located on Spenard Road near the Anchorage International Airport. A review of the reports revealed the following:

On February 23, 2010 Officer McMillan of the SAU was working miscellaneous street crimes and observed what he felt was a hand-to-hand drug transaction which occurred at the Costco parking lot on DeBarr. Based on Officer McMillan's observation APD Officer Charles Robertson initiated the traffic stop that led to a consent search of the vehicle and the driver. During the search what appeared to be a large amount of powder cocaine fell to the ground from the driver's ██ D.A. ██ pants ██ D.A. ██ was transported to APD for further conversation with AST Hazelaar and Officer Smith. The search of the vehicle resulted in a seizure of a large amount of marijuana.

Note: On February 23, 2010 AST Hazelaar was assigned to the SAU and Officer Eric Smith was an APD officer assigned to the SSTF that works with federal investigations and prosecutions.

Copies of the APD police reports, Case Numbers ████ , initiated February ██ 2010 and ████ initiated February ██ 2010, received from SGT Jack Carson are included with this investigative report **(Refer to Attachment #99)**

On December 22, 2014 at 10:04 am this investigator called FBI SSA Ann M. Kirkland at cell phone number ████ and left a voice mail requesting a call back to discuss some issues brought forward during this investigation as it relates to the alleged OCDETF investigation as mentioned by LT Henry.

December 22, 2014 at 12:21 pm SSA Kirkland returned this investigator's call. This investigator requested an in-person interview with Agent Kirkland due to her assignment to the FBI Field Office located in Allentown, Pennsylvania, which is approximately two hours from this investigator's residence. SSA Kirkland agreed to the interview and it was scheduled for Tuesday, December 30, 2014 at 10:00 am at 504 West Hamilton Ave., Allentown, PA. SSA Kirkland asked for the names of those being investigated. This investigator did not disclose any names and advised SSA Kirkland the case would be discussed at the meeting on December 30th. In closing, SSA Kirkland mentioned briefly that there were some internal things going on here (with the FBI) that was a result of her working in Anchorage.

**On December 22, 2014 at 2:32 pm, AKNG** ▮▮▮S.T.▮▮▮ **was interviewed at the MOA offices (7th Floor), 632 West 6th Avenue, Anchorage, AK 99501.** ▮S.T.▮ **acknowledged she knew that the interview was being digitally recorded. A certified transcript was completed of the recording. (Refer to Attachment #100)**

The following is a summary of the interview with ▮S.T.▮:

▮S.T.▮ related she has been with the AKNG since July 25, 2003 when she first enlisted. ▮S.T.▮ related her last name at the time was ▮S.T.▮ from her first marriage. The night the sexual assault incident occurred would have been early in the morning on March▮▮2010. ▮S.T.▮ related she made an anonymous restricted report to the SARC on March 29, 2010. A restricted report allows a sexual assault victim to have a forensic exam completed and medical behavioral health support. The forensic exam and any results or evidence of that would be held anonymously with the APD. ▮S.T.▮ was not sure how long the evidence was going to be held for, but the SARC just holds that report anonymously and it's given a case number, but nobody's notified. The APD is not notified at that time or her chain of command. ▮S.T.▮ related her chain of command does not know the details and are not supposed to know the details of what happened.

▮S.T.▮ related, at that time, there was a memorandum generated from the SARC coordinator, Gretchen Neely. That memorandum is provided for signature to the Adjutant General, who was Major General Tom Katkus. When General Katkus signs off on the memorandum it is forwarded to the National Guard Bureau. ▮S.T.▮ related her name was not included in the notification, but there was some identifying information in the memorandum that was submitted that could have potentially identified her.

▮S.T.▮ related she told ▮K.B.▮ sometime between March and June 2010. ▮S.T.▮ related that she did not want to make an unrestricted report because of concerns of not being believed by the APD or her chain of command. ▮S.T.▮ knew that General Katkus had been a former Anchorage Police Officer. ▮S.T.▮ related she knew General Katkus had also been part of the counter drug unit at the AKNG. ▮S.T.▮ further related she also knew that General Katkus had connections with the APD. ▮S.T.▮ related the chief of staff, LTC DeHaas, actually brought a group of individuals into the AKNG that included the perpetrator of her sexual assault ▮S.S.▮

**S.T.** related she felt because LTC DeHaas brought **S.S.** into the AKNG that **S.S.** had some connections up high in the chain of command.

**S.T.** related she had heard that LTC DeHaas has sexually assaulted other people that have been in his office. **S.T.** could not say specifically, but she heard that had happened. LTC DeHaas had been in aviation and there were people within that organization that were doing some things that they should not be doing with government aircraft. **S.T.** related at the time when she talked to **K.B.** about the sexual assault she did not trust that anything would be done with that and she **S.T.** would be blamed for the sexual assault happening. **S.T.** related she felt like there were going to be some reprisals for her and her family and she was the sole provider for her kids at that point, having been recently divorced. **S.T.** was not comfortable coming to the police at that point.

**S.T.** related she did not see the memorandum going forward when her assault had been reported. (The memorandum to the NGB (National Guard Bureau) signed by General Katkus) **S.T.** related the memorandum is supposed to be vague, but does include information, such a as rank, unit of assignment, and gender. **S.T.** related she found out later that the memorandum went for General Katkus' signature, and a short time later, LTC DeHaas went into **K.B.** s office. LTC DeHaas asked **K.B.** if **S.T.** had been the person that was sexually assaulted and if **K.B.** knew anything about it. **S.T.** related that LTC DeHaas demanded to know the information from **K.B.** **S.T.** related **K.B.** came and talked to her and explained what happened at the meeting with General Katkus. **S.T.** related that she was very scared at that point.

**S.T.** related she started getting some additional attention from LTC DeHaas. There were a couple of instances that LTC DeHaas was trying to get her alone in a vehicle to go to do a reconnaissance for a conference that was going to take place. LTC DeHaas tried to get **S.T.** in certain situations that she just didn't feel was appropriate for their AKNG positions. **S.T.** related she thought LTC DeHaas was trying to take advantage of her because she had not come forward with an unrestricted sexual assault report. **S.T.** related that she had heard that LTC DeHaas had assaulted someone in the AKNG. **S.T.** related she felt like that was where LTC DeHaas was going, and that **K.B.** was singled out by the general for being there for me and helping other people.

**S.T.** related **K.B.** told her after LTC DeHaas had come into his office and asked, that he was then ordered to go to General Katkus' office with LTC DeHaas. Both General Katkus and LTC DeHaas questioned **K.B.** about sexual assaults, what he knew, and related that he was required to report information to the chain of command. **S.T.** related **K.B.** was to report the names of the victims. **S.T.** related she knew **K.B.** was trying to make an arrangement for her to talk to somebody from APD. McMillan is the last name she can remember. **S.T.** related something happened and even McMillan was compromised or something happened and it was not going to be safe for her to meet with McMillan. **S.T.** believed that was a result of the meeting with General Katkus and she knew there had been law enforcement involved in at least one of the meetings or a meeting one time

when ▇K.B.▇ had been called in. ▇S.T.▇ related the meeting at General Katkus office could have been around June 2010.

▇S.T.▇ related she felt it would not be good to go to the police because General Katkus was connected to the APD and asking about specific victim information, and that LTC DeHaas knew or suspected she was a victim. ▇K.B.▇ was punished by the chain of command. ▇S.T.▇ related she knew ▇K.B.▇ wanted to stay in the AKNG and that ▇K.B.▇ was not retained retirement-wise. ▇K.B.▇ had a couple of investigations that were initiated against him. ▇K.B.▇ received a general letter of reprimand. This was career ending for ▇K.B.▇ ▇S.T.▇ related ▇K.B.▇ never gave her name or information to anyone and that meant a lot to her.

▇S.T.▇ related she talked to ▇K.B.▇ in March or April 2011 and she asked him if he knew somebody down at the APD that he ▇K.B.▇ trusted. ▇S.T.▇ related ▇K.B.▇ asked her if she wanted to talk to the APD about moving her case forward. ▇S.T.▇ related she would like to know if her case would be prosecuted. ▇S.T.▇ related ▇K.B.▇ drove her down to the Multi-Disciplinary Center where the Special Victims' Unit was located. (The place where she had the forensic exam.) ▇S.T.▇ related she and ▇K.B.▇ went to a conference room and she talked to Detective McCoy (LT Ken McCoy of the APD) about what happened. Detective McCoy said that her case would probably not be taken by the district attorney and prosecuted. ▇S.T.▇ decided not to make a police report at that time because she had believed that Detective McCoy was giving her the best information that he could as a police officer. If nothing was going to come of it at that point, ▇S.T.▇ just wasn't going to go forward.

▇S.T.▇ decided to pursue her case after the formation of OCI, the Office of Complex Investigations, with the National Guard Bureau. ▇S.T.▇ was told that unit was being formed and given information from the new SARC about how OCI was trained in investigating sexual assault cases and complex investigative cases. ▇S.T.▇ related her case was not going to be just a regular investigation by some officer who was not trained in investigating sexual assaults at the state. OCI actually has some really extensive training in sexual assault investigations so it would be a team of people coming to look at the case from outside of the AKNG. ▇S.T.▇ related that occurred in January 2013 and that is when she changed her report from restricted to unrestricted. The district attorney decided that the case would not go forward and no information or dialogue between her and the district Attorney has ever occurred.

▇S.T.▇ related she found out after giving a statement to Detective McCoy, after changing the status of her report in 2013, that her interview was never tape recorded. ▇S.T.▇ related when she reviewed her statement in the investigative report, she ▇S.T.▇ felt it was not accurate. ▇S.T.▇ related some thoughts were out of context and the documented account seemed dismissive. ▇S.T.▇ related she has no control over the prosecutor's determination, but the misrepresentation of her statement made her feel the decision was made before she even opened her mouth or before she came forward. ▇S.T.▇ further related she would have difficulty advising somebody to talk to the police about a sexual assault because at that time nothing happened and she

was at the beginning and the end of it.

S.T. related she thought Detective McCoy was sincere. S.T. did not feel like Detective McCoy was being abrasive, brash, or dismissive to her, but regardless of what Detective McCoy said to her, the process itself was pretty devastating. S.T. related if her interview was recorded and there was a copy of that, then those are her words and that was what should come out. S.T. further related if that report was given to the District Attorney to make an evaluation, she could see why the District Attorney would not go forward.

S.T. related she knows the AKNG needs to have a liaison and a good connections with the APD, state troopers, and local law enforcement because that's who does investigate and prosecute sexual assault cases that occur in the AKNG. S.T. wants to know that victims have a way to report sexual assaults that is trusted and appropriate. S.T. related she did not feel like there was any confidentiality as far as her information. The memo that went to General Katkus might as well have just had her name on it because it pretty much had everything else.

S.T. provided electronic copies of the following documents:

1. Victim Preference Statement Restricted Reporting, dated March 29, 2010. **(Refer to Attachment #101)**

2. Letter from the Anchorage, Alaska Assistant District Attorney Paul J. Miovas, Jr., dated March 7, 2014. **(Refer to Attachment #102)**

3. Citizen Records Request Form, dated July 11, 2013 with APD report number ███ ███**(Refer to Attachment #103)**

**On December 22, 2014 at 4:22 pm, Ms. Mia Carson was interviewed at the MOA offices (7th Floor), 632 West 6th Avenue, Anchorage, AK 99501. Ms. Carson acknowledged she knew that the interview was being digitally recorded. A certified transcript was completed of the recording. (Refer to Attachment #104)**

The following is a summary of the interview with Ms. Mia Carson:

Ms. Carson related that she was an Air National Guard Recruiter working in the Diamond Center between the end of February and the end of March of 2010. Ms. Carson related a section of the office was shared with the Air Guard. Looking at the front of the store, the office looked the same, but there was a wall in between the recruiters for about half of the space. Then behind that wall were doors and then there was a common area where the recruiters could go back and forth. Ms. Carson related a person could easily walk through one side without going through the front door. Ms. Carson related a person could walk to and from the office from the back. Ms. Carson further related if the front doors were locked and both recruiting segments were there, then one side could go to the other side, because of the common area.

Ms. Carson related that one day she came back from a school visit and was in her office

and two recruiters, **J.N.** and **E.P.** were in her assigned area, but that **J.N.** and **E.P.** were also talking with the front desk person. Ms. Carson related there were a couple of pictures of her and her husband APD SGT Jack Carson on her desk. Ms. Carson related **E.P.** had leaned in and asked her if the person in the picture was her husband. Ms. Carson related **E.P.** asked if my husband Jack worked at APD. Ms. Carson related she responded yes that it was common knowledge that that my husband was APD (SGT Jack Carson). Ms. Carson related she sent her husband a text and she asked if there was something going on that she should know about?

Note: There is an AKNG Recruiter named **J.C.** who is no relation to Jack and Mia Carson.

Ms. Carson related that **J.N.** s had come over and she did not really know where it came from, but that **J.N.** started talking about how my husband thought that he was a tough guy. **J.N.** was saying that he could kick my husband's ass. Ms. Carson wondered all of a sudden why **J.N.** wanted to fight her husband. **J.N.** commented that he knew we (Mia and SGT Jack Carson) were watching him. Ms. Carson informed **J.N.** that she was not watching him. Ms. Carson related the conversation made her feel uncomfortable. Ms. Carson related she knew something was going on because of **J.N.** and **E.P.** being in her space, and that **J.N.** and **E.P.** were asking about the picture of her husband, and now **J.N.** talking about how much bigger, better, badder, and stronger he is than her husband Jack, all out of the blue. Ms. Carson related that both **E.P.** and **J.N.** had gone behind her desk. Ms. Carson related she didn't initially see it as a threat but her husband Jack took it as a threat. Ms. Carson related she did not remember exactly what happened after that, but was pretty sure that Jack must have had a conversation with **J.N.** because shortly after within a few days' timeframe, **J.N.** came over to see her and was overly nice. He asked her if she took them **J.N.** and **E.P.** being in her space as a threat. Ms. Carson related no, she told **J.N.** she did not take it as a threat.

Ms. Carson related that **J.N.** and **E.P.** would be by the doors, and again the AKNG recruiters work area is a mall, but they would be by the doors in the morning when she would come in and just stare her down. Ms. Carson related she brought this to the attention of her supervisor. Jack had said there was something going on with the recruiters and drugs. Ms. Carson related she could guess which two recruiters, which would be the only two that all of a sudden were in her work space. Ms. Carson related if those two are involved, then they are all involved. **J.N.** is at the top and **E.P.** who was their top recruiter, was always taking trips. **J.N.** ( **J.C.** **E.P.** and General Katkus were going on golfing trips. Ms. Carson related she was nervous at times and she was scared because she did not know what they were going to do and there was always that uncomfortableness

Ms. Carson related that late this year, summer timeframe (2014), both **J.C.** and **J.N.** called her on her phone. **J.C.** informed her of the allegations against him. The purpose of **J.C.** s phone call was for Mia Carson to be a character reference for him. Ms. Carson related she received a note from someone saying that **J.C.** had sexually assaulted them in the Army Guard Office. Ms. Carson related **J.C.** told her there was a person alleging they had

been sexually assaulted. It occurred in the Valley (The Army Guard Recruiting Office) and that ███ J.C. ███ had done it. Ms. Carson related ███ J.C. ███ called recruits into the office after hours and that's where the sexual assaults allegedly occurred.

Ms. Carson related that ███ J.N. ███ had called her saying that he wanted her to go to court and vouch for him by saying the only reason that my husband was looking at him was because my husband thought that they were sleeping together (███ J.N. ███ and Ms. Carson). Ms. Carson related one of ███ J.N. ███ attorneys reached out to her and the attorney said he heard that she and ███ J.N. ███ were sleeping together. Ms. Carson related no one else has heard this information. She wondered where it came from (because this did not occur).

On December 23, 2014 this investigator received an electronic copy from LT Kenneth McCoy of the State of Alaska, Office of Special Prosecutions and Appeals, Anchorage, AK declination letter in the AKNG ███ S.S. ███ sexual assault case involving AKNG ███ S.T. ███ dated March 4, 2014, addressed to Major General Thomas Katkus. A copy of the letter is included with this report. **(Refer to Attachment #105)**

December 29, 2014 at 1:40 pm this investigator received a telephone call from FBI SSA Kirkland who indicated that she was advised not to speak to me due to the ongoing investigation in Anchorage. She was advised by FBI Legal Counsel, Dave Joanson, located in Philadelphia, PA at phone number ███

Immediately after this notification by SSA Kirkland this investigator called Attorney Joansen and left a message indicating this investigator would like to discuss this interview with him to see if we could come to a resolution since interviews with law enforcement personnel associated with the federal investigation in Anchorage were previously permitted by federal authorities in Anchorage.

On December 30, 2014 at 9:58 am this investigator received a detailed voicemail from FBI Chief Division Council Dave Joansen, who indicated the following:

1.  Generally, the FBI would get a subpoena or a letter from a law firm saying who they are and who they represent and what their interest in the party is.

2.  Secondly, if there is still an open federal investigation in Anchorage we are not generally inclined to produce agents to be interviewed that could create statements or Brady material for an ongoing case, and the federal prosecutors in Alaska would not want us or allow us to anyway.

Attorney Joansen closed by indicating if this investigator had any questions to call him back. This was during the Christmas 2014 holiday week and Joansen was out of the office. This investigator did return the call and left a message on December 30, 2014 at 10:55 am. This investigator still wanted to revisit this issue with Joansen to see if it could be resolved. This issue was brought forth by LT Henry involving the initiation of the federal ███ investigation. Additionally, this investigator made it clear there was no desire to discuss any of the merits of the federal investigation, only when the SAU investigation initiated on February 23, 2010 became a federal case.

On January 7, 2015 this investigator received an electronic copy of the Alaska Rules of Evidence, Rule 509. Identity of Informer, from MOA, Assistant Municipal Attorney Christensen. This rule allows for law enforcement to claim a privilege for confidential informants. LT Henry's disclosures may have resulted in a waiver of the privilege under Alaska law and would have compromised any legal protections the prosecution could have claimed for the confidential informants in future court cases. A copy of the Alaska Rules of Evidence, Rule 509, is attached to this report. **(Refer to Attachment #106)**

**On January 15, 2015 at 4:00 pm this investigator had a brief telephone conversation with Chief Mew to clarify his interaction with the National Guard Office of Complex Investigations (OCI) investigator that he met with for a couple hours around May 2014. The telephone conversation with Chief Mew was not electronically recorded.**

Chief Mew related it was a one-way conversation with the OCI investigator and that he did all the talking. He told the OCI investigator everything that he disclosed during his interviews during this investigation. Chief Mew related he did not have his timeline, created yet (at the time of meeting with the OCI investigator around May 2014) since that was not done until August 2014. The OCI investigator's mission was not to investigate APD and no information was coming back to him from OCI.

Chief Mew related he tried to get the information to the governor through the OCI report but that did not happen. Chief Mew related no specifics were in the report but just general descriptions. Chief Mew related the OCI report stopped short of an investigation; however, he told the OCI investigator to interview SGT Carson and Officer McMillan and the OCI investigator could have access to APD personnel.

On January 26, 2015 this investigator received an electronic copy of a Memorandum authored by MOA, Municipal Attorney Dennis Wheeler on this same date. Attorney Wheeler indicated his office, if asked, would not uniformly direct departments not to investigate or discipline for misconduct, even if allegations of retaliation would be made in response. Attorney Wheeler also noted when he first learned that an APD command officer may have forced the disclosure of confidential informants to senior AKNG staff and may have terminated APD investigations, both without the prior knowledge of APD command, he immediately took action to include requesting and instigating this outside investigation in September 2014.

Attorney Wheeler related he does not dispute that a briefing occurred on November 8, 2013 by Chief Mew with the Mayor, the Municipal Manager, and the Municipal Attorney. While it was possible that Chief Mew informed them as early as November 8, 2013 that an APD officer may have directed his staff not to investigate Katkus specifically, and that he was trying to get the FBI involved, he had no recollection of being informed in November 2013 that an APD officer had forced the disclosure of the identity of confidential informants, or had directed officers to no longer investigate drug cases or sexual assault cases involving the AKNG. This is consistent with the Chief's (Mew) own recollection of what he learned at the November 7, 2013 meeting. A copy of Attorney Wheeler's Memorandum is included with this report. **(Refer to Attachment #107)**

This investigator additionally noted in relation to Attorney Wheeler's Memorandum that Chief Mew's prepared timeline under the November 7, 2013 entries only mentions that the SAU wanted to investigate Katkus for possibly interfering, but LT Henry would not let them. The entries on that date by Chief Mew do not mention any allegations of confidential informant disclosures, or ordering SAU personnel to no longer investigate drug cases, or sexual assault cases involving the AKNG. **(Refer to Attachment #3, pages 3 and 4 for details)**

January 28, 2015 this investigator received an email from Mia Carson based on this investigator's request at the time of her interview that she provide any documentation that would assist in this investigation to verify the date range that the Army National Guard recruiters came into her office and made her feel uncomfortable. Ms. Carson indicated on February 27, 2010 she took a picture with actor Danny Glover and Beth Miller her supervisor when they were leaving Dallas, Texas after their annual recruiting conference. Ms. Carson electronically forwarded a copy of the photograph with Mr. Glover. Ms. Carson related she knew the recruiters were in her office around March 2010 after the first recruiter ███ E.P. ███ had contact with the police. She remembers getting the call about ██ E.P. ██ while at the conference because of the amazing view she was having looking out the window there. Ms. Carson then indicated she was back a week or two when they were in her office. The email and dated photograph are included with this report. **(Refer to Attachment #108)**

Ms. Carson also forwarded a copy of a memorandum, dated October 15, 2010, that confirmed the official date of her to ████████████████ was October 14, 2010. A copy of the memorandum and related emails are included with this report. **(Refer to Attachment #109)**

A copy of the APD's SVU policy on conducting unit investigations was received from MOA, Assistant Municipal Attorney Christensen on October 15, 2014 and is included with this report. **(Refer to Attachment #110)**

This investigator has determined there is no need to interview FBI SSA Kirkland at this time. SSA Kirkland from all the documents and interviews had no direct involvement with the SAU case initiated on February 23, 2010. The first verification of her involvement, included in a memo provided by LT Henry, occurred on March 9, 2010. Should new evidence or information surface that SSA Kirkland had earlier involvement this investigator will revisit the need for an interview.

On January 15, 2015 Chief Mew provided an edited copy of his timeline without SGT Carson's and Officer McMillan's "Guard Timeline" portion as noted in **Attachment #3.** (Chief Mew notified this investigator on December 18, 2014 at the conclusion of his supplemental interview that he was forwarding an edited copy of his original timeline.) Chief Mew previously indicated his edits were minor and did not change the facts as listed in his original document. This investigator compared the two documents and noted no significant changes to the content of the original or edited timelines prepared by Chief Mew. A copy of Chief Mew's edited timeline is included with this report. **(Refer to Attachment # 111)**

On February 12, 2015 Chief Mew provided written correspondence to this investigator acknowledging that he was not prevented from investigating LT Henry in May 2014. Chief Mew's correspondence also mentioned that he hoped the FBI or OCI investigations would provide a finding or referral to the department that would initiate an investigation into LT Henry's conduct. Chief Mew indicated that prior to September 2014 no one outside of the APD recommended to him the APD should be investigating LT Henry's decision making conduct that occurred in 2010. Chief Mew further related for a ten month period he did not order an investigation into LT Henry's conduct to protect the APD and the taxpayer. **(Refer to Attachment #112)**

Additionally on February 12, 2015, Chief Mew forwarded an email to this investigator indicating in late spring or early summer of 2014 that he tried to interest the City of Anchorage into hiring a consultant with expertise in ridding police agencies of corrosive commanders. Chief Mew related that he was willing to use department funds to pay for the consultant's services. Note: This process was considered by Chief Mew instead of initiating an internal investigation into LT Henry's conduct. The APD internal investigation and discipline processes were available to resolve LT Henry's APD policy infractions without acquiring the additional costs of an outside consultant to resolve a problematic commander. **(Refer to Attachment # 113)**

On February 13, 2015 MOA, Assistant Municipal Attorney Christensen forwarded an electronic copy of the following APR report:

APD Case No. ▉▉▉ dated June ▉ 2013, Offense Trespass. The suspect in this report is ▉▉ M.G. ▉▉. Officer Seth McMillan transported AKNG ▉ J.N. ▉ K.B. to the APD parking lot in furtherance of processing him for ▉▉▉ J.N. ▉▉ this same date made indirect homicidal threats regarding ▉▉▉ J.W. ▉▉ **(Refer to Attachment #116 for specific details).** When Officer McMillan pulled his vehicle into the ▉▉▉ with ▉▉ J.N. ▉ in custody he was advised by SGT Doll. Detective Jakeway and Officer LaPorte that a suspicious extended cab Chevrolet SUV had pulled in behind Officer McMillan's vehicle and circled through the detective parking lot. There were two occupants in the vehicle and according to Officer McMillan the subjects appeared to be watching him. The suspicious vehicle was captured on APD surveillance video. The APD investigation revealed the driver of the vehicle was ▉ M.G. ▉ a close friend of AKNG Recruiter ▉ S.2. ▉ ▉▉ who is a close associate of ▉ J.N. ▉ This APD report is still pending. **(Refer to Attachment #114)**

On February 19, 2015 this investigator received copies of the following APR reports mailed from SGT Carson:

1. APD Case No. ▉▉▉dated January ▉ 2013, Offense: Suspicious Circumstances. The victim in this report is ▉ L.D. ▉(AKNG member) who reported to AKNG LTC Jane Wawersik that the details about her medical treatment and sexual assault/rape investigation that are confidential and were posted online by ▉ K.B. ▉ The AKNG was in the process of investigating ▉ K.B. ▉ for Misuse of Confidential Information. This APD case is closed citing jurisdiction. **(Refer to Attachment #115)**

2. APD Case No. ████████ dated June ██ 2013. Offense: Threats (Except Bomb or Suicide). The suspect in this report is AKNG ██ J.N. ██ and the complainant is ████ J.W. ████ ██ J.W. ██ who was assigned by the AKNG to investigate recruiter misconduct, was indirectly threatened by AKNG ██ J.N. ██ a potential drug and sexual assault suspect. ██ J.N. ██ J.N. was meeting with ████████ when he threatened to harm ██ J.W. ██ and needed to be ████████ The ████ had a duty to report ██ J.N. ██ and notified ██ J.W. ██ appropriately. ██ J.W. ██ reported the threat to her safety to the APD. ██ J.N. ██ was served with a twenty day preventing ██ J.N. ██ from having contact with ██ J.W. ██ ████████ ██ J.N. ██ had just been released from the ████ ██ J.N. ██ had previously been ████████ This APD case is considered suspended. **(Refer to Attachment #116)**

3. APD Case No. ████████ dated July ██ 2013. Offense: Violation of City/State Regulations. The victim in this report is ████ ██ J.W. ██ and the suspect is AKNG ██ J.N. ██ ██ J.W. ██ learned from ██ J.N. ██ AKNG Commanding Officer (unknown rank) Charles Knowles who visited ██ J.N. ██ while he was ████ ██ J.N. ██ requested that Knowles tell ██ J.W. ██ that he was sorry for his behavior. Knowles related a few days later he delivered the message to ██ J.W. ██ not knowing this indirect contact was ████████ This APD report is closed. **(Refer to Attachment #117)**

4. APD Case No. ████████ dated August ██ 2013. Offense: ████████ AKNG ██ J.N. ██ reported a burglary to the APD and it was suspected that ██ J.N. ██ was ████ to allow him ████████ This APD case is still pending. **(Refer to Attachment #118)**

On March 11, 2015 this investigator received a CD containing the cellular telephone records of AKNG General Katkus. The APD previously made a federal Touhy Request to obtain General Katkus cellular telephone records from July 10, 2009 through September 9, 2014. General Katkus AKNG cellular telephone number during the aforementioned time period was ████████ This investigator reviewed the cellular telephone records that revealed no telephone calls from LT Henry to General Katkus at the time of the first SAU informant and investigation disclosures on or about February 26, 2010. However, General Katkus cellular telephone records revealed that LT Henry made three calls to General Katkus on June 3, 2010. LT Henry made two calls from his APD office telephone number ████████ totaling eight minutes and one call from his APD cellular telephone number ████████ for a total of six minutes. On June 4, 2014 LT Henry placed one call to General Katkus from his cellular telephone for a total of one minute. General Katkus' cellular telephone records support Officer McMillan's version of events from June 3, 2010. Officer McMillan related he was ordered by LT Henry to disclose ██ K.B. ██ as his confidential source of drug and

sexual assault information from within the AKNG. Officer McMillan further related that he was present in LT Henry's office when LT Henry called and informed General Katkus of █████ K.B. █████ as his (Officer McMillan) AKNG source. LT Henry's cellular telephone call to General Katkus on June 4, 2010 at 10:44 am was sixteen minutes before the 11:00 am meeting with General Katkus and LTC DeHaas at the AKNG. A copy of General Katkus cellular telephone records for June 3 – 4, 2010 is included with this report. **(Refer to Attachment #119)**

Note: The cellular telephone records also revealed LT Henry contacted General Katkus from his cellular telephone number ███████████ on March 8, 2010 for seven minutes and on March 9, 2010 for three minutes. These two contacts are noted but this investigator has not to date found any relationship for these contacts with LT Henry's conduct under investigation. **(Refer to Attachment #120)**

General Katkus cellular telephone records for July 2010 through September 2014 have been printed in their entirety and are attached to this report. The initial records indicate the telephone's user as Tim Crawford but these are the records that have been provided through the federal Touhy request for AKNG General Katkus. **(Refer to Attachment #121)**

On March 13, 2015 MOA, Assistant Attorney Christensen provided APD Organizational Charts from calendar years 2010 and 2014. The APD Organization Charts for 2010 and 2014 are included with this report. **(Refer to Attachments #122 and #123 respectively)**