```
 1                    UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF ALASKA
 2

 3    ANTHONY HENRY,              )
                                  )
 4          Plaintiff,            )
                                  )
 5    vs.                         )   CASE NO. 3:15-cv-00187-RRB
                                  )
 6    MUNICIPALITY OF ANCHORAGE,)
      ET AL.,                     )
 7                                )
            Defendants.           )
 8    _____)

 9

10         PARTIAL TRANSCRIPT OF JURY TRIAL - DAY 15
                  (Testimony of Kenneth McCoy)
11     BEFORE THE HONORABLE RALPH R. BEISTLINE, DISTRICT JUDGE
                   November 2, 2018; 8:33 a.m.
12                     Anchorage, Alaska

13    FOR THE PLAINTIFF:
              Dillon & Findley, P.C.
14            BY:  MARGARET SIMONIAN
              BY:  RAY R. BROWN
15            1049 West 5th Avenue, Suite 200
              Anchorage, Alaska 99501
16            (907) 277-5400

17

      FOR THE DEFENDANTS|:
18            Littler Mendelson, PC
              BY:  DOUGLAS S. PARKER
19            BY:  SEAN HALLORAN
              310 K Street, Suite 400
20            Anchorage, Alaska 99501
              (907) 561-1214

21


22    _____

23                  SONJA L. REEVES, RMR-CRR
                 Federal Official Court Reporter
24                 222 West 7th Avenue, #4
                   Anchorage, Alaska 99513
25        Transcript Produced from the Stenographic Record
```

1           (Call to Order of the Court at 8:33 a.m.)

2           (Proceedings took place and are not included in

3    this transcript, after which, the testimony of Kenneth

4    McCoy transpired as follows:)

5           (Oath administered to the witness)

6           DEPUTY CLERK:  For the record, please state and

7    spell your full and last name.

8           THE WITNESS:  Kenneth McCoy, K-e-n-n-e-t-h,

9    M-c-C-o-y.

10                   DIRECT EXAMINATION

11   BY MR. PARKER:

12      Q.  Good afternoon, sir.

13      A.  Good afternoon.

14      Q.  Are you employed by the Anchorage Police

15   Department?

16      A.  Yes, I am.

17      Q.  And what is your current title, sir?

18      A.  I'm the Deputy Chief of police.

19      Q.  And we've had testimony in this case about there

20   having been two deputy chiefs at one time.  Is that

21   still the case?

22      A.  No, sir.  I'm the lone deputy chief at the

23   moment.

24      Q.  So you're it.  So you handle all that the two

25   prior chiefs used to do?

1    A.   Yes, sir.

2    Q.   And how long have you been Deputy Chief?

3    A.   A little over a year now.

4    Q.   And what do you primarily do as Deputy Chief?

5    A.   As Deputy Chief I oversee all of our operations,

6  oversee administration, administer discipline.  Internal

7  affairs reports to me.  So I pretty much have a hand in

8  just about everything at the department, all operations

9  and administration.

10    Q.   Okay.  Do I understand correctly that you spent

11  at least a good part of your childhood here in

12  Anchorage?

13    A.   Yes.  My family got here through the military in

14  1985.  I attended Bartlett High School.

15    Q.   And I understand you were a classmate of Meg

16  Simonian?

17    A.   Yes, I was.

18         MS. SIMONIAN:  Both 1988 Bartlett High grads.

19  You missed our 30-year class reunion.

20    Q.   And I hate to tell you how long it's been since I

21  graduated from East.  Bartlett wasn't around.

22         Anyway, could you give us a thumbnail of your

23  history after graduating from Bartlett High School, sir?

24    A.   Yes.  So after I graduated from Bartlett, I

25  attended New Mexico Military Institute.  It's a military

school in Roswell, New Mexico.  I graduated from there
with a commission as a second lieutenant in the Army.  I
came back to Alaska where I continued to go to school at
UAA and served in the Alaska Army National Guard.

     I worked both part-time and full-time with the
National Guard for about four years.  And then I got on
with the Anchorage Police Department in 1994.  I
remained in the National Guard for a total of ten years.
I got out in the year 2000 as a captain in the Army.
And I have been with the Anchorage Police Department
ever since.

    Q.  So going to school in Roswell, is that the town
where -- that's famous for UFOs?

    A.  Yes, sir, it is.

    Q.  And so you've been -- you've been at APD since
1992?

    A.  Since 1994.  So this month is 24 years.

    Q.  And could you give us again a thumbnail of your
work history beginning with your earliest and bringing
forward to now being deputy chief?

    A.  Yes.  So we all start out in the patrol division
as patrol officers.  So I worked primarily on mid-shift
patrol for about the first six years on the department.
So I was working pretty much 11:00 p.m. until 9:00 a.m.
in the morning.  So I did that for about first six

years.  During that timeframe, I was also worked on our

community policing team.  We were Mountain View

Community Policing Team.  I did that for a couple of

years in there also.

        After about six years on the department, I

applied for detectives and became a detective.  I worked

in initially our south district.  We were in districts

at the time.  I -- once we became specialized again, I

did a small stint in our theft unit and then I joined

our sexual assault unit or special victims unit.  I did

that for a number of years prior to getting promoted to

sergeant.

        After getting promoted to sergeant, I did a small

stint back on patrol and then I returned to the

detective division where I supervised our

robbery/assault unit.  And then I went on to supervise

the special victims unit where I was a detective for

many years.

        I was eventually promoted to lieutenant.  I

served a little bit of time on patrol as a patrol

lieutenant.  I returned to the detectives and commanded

pretty much all of our sex crimes units, so special

victims unit, crimes against children unit, and our

cyber crimes unit.

        After those assignments, I did some time in

internal affairs as the commander.  And in I believe

2015, I was promoted to captain.  I served as our patrol

division commander and -- up to the point where I became

Deputy Chief.  24 years.

    Q.  And you became Deputy Chief again when?

    A.  In August of 2017.

    Q.  And you mentioned in that having had several

stints in the special victims unit; is that correct?

    A.  Yes, I did.

    Q.  And you became the supervisor of that unit in

approximately what year?

    A.  2007.

    Q.  But you had worked as an officer in that unit

prior to that?

    A.  Yes.  Correction.  I think I became the

supervisor in the unit in 2009.

    Q.  Okay.  And all told, about how long were you

working in the special victims unit with a -- I

understand a few times out of that unit?

    A.  Probably about 10 -- yeah, about 10 or 11 years

on and off.

    Q.  During the time that you supervised that unit, is

it fair to say you were generally acknowledged as the

person within the Anchorage Police Department with the

primary knowledge about the work of that unit?

1     A.   Yes.  As the supervisor of the unit and the

2   commander of the unit, all sexual assault investigations

3   were filtered to us and I reviewed all of the

4   investigations.  So all the cases of reported sexual

5   assault came to my unit.  I reviewed each of those

6   investigations, assigned them to detectives.  The

7   detectives worked the cases, investigated them.  Upon

8   completing their investigations, it came back to me for

9   review before the cases were closed.

10     Q.   And by -- is it 2013 or -- I'm sorry,

11   January 2014, you become a lieutenant?

12     A.   Yes.

13     Q.   Is that correct?  And you were the SVU

14   lieutenant, with a short stint out of that, for the next

15   year and a half?

16     A.   Yes, that's correct.

17     Q.   But you were the SVU sergeant back in the 2010

18   timeframe?

19     A.   I was.

20     Q.   Do you think it's fair to say that within APD you

21   were also acknowledged as the person, the go-to person

22   if any kind of sexual misconduct or a sexual assault

23   came to the attention of a Anchorage Police Department

24   officer?

25     A.   Yes.  I believe I was that person.  That would be

1   a fair characterization.

2     Q.  And with the amount of time you spent in that

3   unit, fair to say that's been an important part of your

4   own career?

5     A.  Yes.  Like I mentioned, I spent numerous years in

6   that unit working those cases.  I definitely have a

7   passion for it.  I -- personally, I served on the board

8   of directors for Standing Together Against Rape.

9     Q.  That's STAR?

10     A.  That's STAR, yes.  And so it was a personal

11   passion of mine.  I took a lot of pride in the work that

12   I did and the work that my unit did for the citizens of

13   Anchorage.

14     Q.  Is the work at SVU considered important work

15   within the Anchorage Police Department?

16     A.  Absolutely.  Again, I worked there for a number

17   of years as a detective.  After getting promoted I left

18   the unit, and I was our robbery/assault supervisor.  And

19   very important work there, worked lots of violent cases

20   while in that unit.

21        But prior to going back to SVU, the chief of

22   police at the time was Rob Heun, and he called me up to

23   his office one day and he wanted to talk to me about

24   going back to SVU.  And I remember this to this day.  He

25   told me, "Ken, that's our -- one of our flagship units,

1    and we need the best of the best there."  And after

2    having that conversation with him, I knew that was my

3    place to go back and lead that unit.

4        Q.  And why do you have a passion for that kind of

5    work?

6        A.  I feel like we really make a difference in that

7    unit.  You know, the cases are heartbreaking at times,

8    but you get to really work closely with the people who

9    have suffered in those types of cases.  And when you're

10   able to assist them and help them put their lives back

11   together, it's just really rewarding.  And there --

12   nothing beats that feeling of being able to help people

13   in those situations.

14       Q.  Where is the SVU housed?  Where are your offices?

15   Well, you're not there anymore, but where are those

16   offices?

17       A.  So our special victims unit is housed offsite

18   from the police department in what we call the

19   multidisciplinary center.  At that center, our special

20   victims unit is housed there as well as crimes against

21   children unit.  And they're housed in the

22   multidisciplinary center with other agencies.

23           So the forensic nursing services of Providence

24   are housed there.  The Alaska C.A.R.E.S child advocacy

25   center is housed in that building also.  And the Office

1   of Children's Services is also there.  And STAR,

2   Standing Together Against Rape, our advocacy group, they

3   have space there to work out of.  They have their own

4   office.

5        And basically, the multidisciplinary center is

6   based off the family justice center concept where you

7   bring all the services to one location and basically

8   wrap the victim in services, so a victim of sexual

9   assault doesn't have to go across town to the police

10  station to file a report and then have to go to the

11  hospital to get an exam and then maybe go to an advocacy

12  center to get additional services.

13       So everything is brought to one location so the

14  victim only has to tell his or her story one time to all

15  of the agencies that are there to assist.  And that's a

16  concept that we've had for numerous years at AP.  It's

17  pretty much the gold standard in sexual assault

18  investigations across the country.

19       And like I said, our unit is currently housed in

20  the multidisciplinary center.  This spring they'll be

21  moving to a new center that's been built for them.  So

22  it's really -- we take a lot of pride in having that for

23  the citizens of Anchorage.

24     Q.  And how long has the SVU been in its current

25  location that it's about to leave?

1    A.    Gosh.

2    Q.    I mean for a number of years?

3    A.    Yes.  For a number of years they've been there.

4    Q.    Okay.  And where is it physically located?

5    A.    Currently it's physically located on the campus

6    of the Alaska Native Medical Center.  It's actually a

7    Providence Hospital building, but it's located on the

8    campus of the ANMC.

9    Q.    Forgive me if I'm wrong, but isn't that like

10   right across the street from the Anchorage Police

11   Department?

12   A.    Yes.  It's across the street, across Tudor Road.

13   Q.    You can basically see the two buildings from each

14   other, can you not?

15   A.    Yes.

16   Q.    Pretty much?

17   A.    It's close, yes.

18   Q.    Other than maybe something is blocking it, but I

19   mean it's right there?

20   A.    Yes.

21   Q.    And am I correct in understanding, sir, that

22   another reason for having SVU in this multidisciplinary

23   center is to lessen or not add to the trauma that a

24   victim might have if that person otherwise has to go

25   into the police station?

A.   Yes.   Sometimes going to the police station can
be intimidating.   So again, the whole concept behind the
multidisciplinary center is to have a location where the
victims of these crimes can feel supported and that's
why all of the services are there.   Again, it's not
located in the police station, it's located typically in
a medical setting, and the whole building and design and
so forth is to lessen that trauma and make it a better
experience for those who have to go through that
process.

Q.   Sir, I take it you know Tony Henry?

A.   I do.

Q.   And how would you describe the working
relationship that you had with Mr. Henry?

A.   I would say Mr. Henry and I had a great working
relationship.   You know, we would work together for many
years, albeit in different areas of the police
department.   Mr. Henry was primarily in our SWAT unit
and the tactical role, and I was in detectives for a
large portion of my career.   However, our units had to
work together from time to time.

I remember several cases when I was the
supervisor of the robbery/assault unit where we were
tracking violent, dangerous suspects, and I would reach
out to Mr. Henry and coordinate with him and -- for his

```
 1   assistance with his unit to bring these violent
 2   offenders into custody.
 3         And I thought we worked very well together.  I
 4   always enjoyed working with him.  He's very
 5   professional, very proficient, and I thought we had a
 6   great working relationship.
 7         Additionally, from time to time, he and I would
 8   speak about career goals.  He was always very supportive
 9   of my career aspirations.  And again, I had a great
10   respect for him, and again, he was very proficient and
11   very good at what he did.
12      Q.  And sir, at some point did you become aware that
13   there were allegations that Mr. Henry had been present
14   at a meeting at the National Guard general office
15   wherein sexual assaults were discussed?
16      A.  Yes.  I did learn of those allegations in May --
17   or actually May 1st of 2014.
18      Q.  Was that the first time you had ever heard that?
19      A.  Of those specific allegations, yes.
20      Q.  Prior to that time, had Mr. Henry ever come to
21   you and said that he had been in a meeting where there
22   was a discussion about sexual assault victims being
23   discussed in front of General Katkus?
24      A.  No.
25      Q.  And so what was your reaction when you first
```

1    heard that?

2       A.   Well, when I first heard that, I was shocked.

3    Prior to hearing that information, there was a lot of

4    maybe rumors and discussion in the public about possible

5    coverups between the National Guard and the Anchorage

6    Police Department regarding sexual assault

7    investigations.  And again, I had worked in those units

8    for a number of years and dedicated myself to those

9    cases.

10          So just hearing that information, you know,

11   really -- I was really confused and frustrated because I

12   knew what cases we were investigating.  All sexual

13   assault cases came to my unit, and I reviewed all of

14   them.  So hearing those types of accusations in the

15   community, you know, it just didn't make sense to me.

16          But then on May 1st, when I learned of the

17   specific allegations, you know, I was floored.  I was

18   shocked and I -- at that point I saw where -- what was

19   fueling a lot of these rumors.  And there were

20   allegations at that time and allegations that I felt

21   needed to be looked into and if true, dealt with, and,

22   if not true, exonerate our department of that type of

23   information being spread around.

24       Q.   So was that the same day that there was a meeting

25   in the chief's office and then ultimately a meeting --

1    were you part of a meeting downtown after that?

2        A.   I was.

3        Q.   I want to -- first of all, how did it come about

4    that you first heard about this?   I mean, set the stage

5    here.   What happened?

6        A.   So again, there was all this information kind of

7    circulating in the media about the National Guard and

8    Anchorage Police Department covering up sexual assaults.

9    So on May 1st, the chief of police at the time, Mark

10   Mew, wanted to have a meeting to discuss the status of

11   sexual assault cases that we were investigating

12   involving the National Guard.

13            So my supervisor, or I was the lieutenant, the

14   commander of unit and the supervisor of the unit at the

15   time was Sergeant John McKinnon.   He and I gathered up

16   our case files of the cases that we were aware of that

17   involved the National Guard.   We had compiled that list.

18   We knew, hey, these are the cases, we knew they were

19   investigated by our unit, and so we collected those and

20   we headed over to the meeting with the chief to show him

21   what we had been working on.

22       Q.   Can I stop you right there?

23       A.   Yes.

24       Q.   So at that point you had been hearing rumors, and

25   you had looked in to see what you might have missed?   I

1    mean --

2       A.  Yes, exactly.  So we're hearing these rumors

3    about cover-ups between the police and the National

4    Guard, so --

5       Q.  Can I stop you again?  So you had collected

6    information then at some time prior to this May 1st

7    meeting; am I correct?

8       A.  Yes.

9       Q.  What had you done to collect information about

10   any possible Guard-connected sexual assaults?

11      A.  We reviewed all of the cases that had come into

12   our unit.  I was speaking to all of my detectives trying

13   to find out if any of them had any knowledge of any

14   cases at all involving the National Guard that we

15   weren't aware of.  And we went through that process and

16   identified the cases we were able to that we knew we had

17   investigated.

18      Q.  Had you put those in a notebook?

19      A.  Yes, we put them in a notebook.

20          MR. PARKER:  Your Honor, I would seek to mark

21   for identification and seek admission of A13, which has

22   been stipulated to.

23          THE COURT:  Very well.  It will be admitted

24   without objection.

25          (Exhibit No. A13 admitted.)

BY MR. PARKER:

    Q.  I would like to show you what's been marked as A13. Can you just -- first of all, I would like to ask you, is this a table of contents for that notebook?

    A.  It is.

    Q.  That's the notebook as you had it as of May 1?

    A.  Yes.

    Q.  And there's a -- just to explain, there are a lot of blackouts here with initials, correct?

    A.  That's correct.

    Q.  That's -- Alaska state law requires that we use initials for victims' names. Are you aware of that?

    A.  Yes, I'm aware of that.

    Q.  So you had this and went into the meeting. Did you encounter Jack Carson as you were going to go into that meeting?

    A.  Yes. So again, our offices are offsite in the multidisciplinary center. So myself and Sergeant McKinnon went to the main police station. When we arrived, I ran into Jack Carson heading upstairs to the same meeting.

    Q.  Did you, Mr. McKinnon or Sergeant McKinnon at that point --

    A.  Yes.

    Q.  -- and Jack Carson have a conversation?

 1     A.  We did.

 2          MR. PARKER:  And Your Honor, I can quickly lead

 3     him through this if that's okay.

 4     Q.  Did Jack Carson describe for you what the

 5     allegations were concerning Lieutenant Henry?

 6     A.  He did.

 7     Q.  That's the first time you had heard?

 8     A.  Yes, that's the first time I had heard those

 9     allegations.

10     Q.  That in fact -- tieing Lieutenant Henry to these

11     rumors that were out there?

12     A.  Yes, that's the first time I heard those specific

13     allegations tied to him.

14     Q.  Now, there had been something on the internet

15     that had been written by a gentleman named Ken Blaylock.

16     Had you been aware of that?

17     A.  Yes, I believe I was aware of that document.

18     Q.  First of all, did you know who Ken Blaylock was?

19     A.  I did.

20     Q.  Who was Ken Blaylock?

21     A.  Well, again, I started my professional career as

22     an officer in the National Guard.  And so that was in

23     1990 -- or around 1990.  And Ken Blaylock was in the

24     National Guard also, so we were both junior officers at

25     about the same time.  I was a second lieutenant.  He may

1    have been a first lieutenant or a captain.  But I knew

2    him from that assignment.

3        Q.  Had you ever been friends?

4        A.  No.

5        Q.  But you were associates in the Guard?

6        A.  Yes.

7        Q.  Did you ever deploy together?

8        A.  We did not.

9        Q.  So you knew who he was?

10       A.  Yes.

11       Q.  Had you ever had any reason to question him as to

12   anything he would say?

13       A.  No.

14       Q.  And so you knew that.  But then you run into Jack

15   Carson and he kind of tells you that -- I mean he starts

16   describing for you facts that now put it into pretty

17   crystal-clear vision for you; am I correct?

18       A.  Yes.

19       Q.  And then you go into -- so who do you then talk

20   to next?

21       A.  So after learning of those allegations, Sergeant

22   McKinnon and myself went to my boss, Captain Bill

23   Miller.

24       Q.  And described for him what you had heard?

25       A.  Yes.

1    Q.  What was his reaction?

2    A.  He seemed surprised and unaware of those specific

3  allegations.

4    Q.  What happened next?

5    A.  So after explaining to him what was going on, you

6  know, I recommended that we need to inform the deputy

7  chief and chief of these allegations.  And so Captain

8  Miller arranged for us to meet with both deputy chiefs

9  and Chief Mew.

10    Q.  But you were already going into a meeting with

11  him anyway as I understand?

12    A.  That's correct.

13    Q.  So at the meeting, did anyone express any thought

14  about whether or not these allegations should be

15  investigated?

16    A.  Yes.

17    Q.  And were you among those that thought they should

18  be investigated?

19    A.  Yes, I was.

20    Q.  And why?

21    A.  Again, these were very serious allegations that

22  were being thrown around, and I felt that we needed to

23  investigate it to get to the bottom of it.  And if they

24  were true, people needed to be held accountable for

25  that, and if it wasn't true, we needed to exonerate the

individuals who were being alleged to have conducted
that behavior and basically clear the name of the
department.

Our department was really being blemished by this
in the public. So yes, we need to investigate, and, if
true, deal with it, and, if not true, you know, clear
our name.

Q. And it sounds like you were of the mind that if
Tony Henry did not do anything wrong we also needed to
figure that out?

A. Absolutely.

Q. You were among those that expressed that to the
chief?

A. Yes.

Q. Yet it didn't happen, did it?

A. No, it didn't.

Q. Did it then happen that you left SVU for a time?

A. Yes.

Q. And what happened?

A. So I'm sorry.

Q. Did you then get transferred out of SVU for a
time?

A. Yes, I did.

Q. When did that happen? Was it the June rotation?

A. Yes, in June of 2014.

1    Q.   Where did you go?

2    A.   I went back to patrol, took over patrol command.

3    Q.   At that point, did you have any remaining

4    involvement with SVU for the time being?

5    A.   Not when I went back to patrol, I didn't.

6    Q.   Did you personally have feelings about that?

7    A.   I did.

8    Q.   And seemed a little odd?

9    A.   Yeah, it seemed odd.  I was frustrated, really

10   didn't understand why I was removed from the special

11   victims unit, the command of those units where I had

12   been for a number of years and really had a passion for

13   it, thought I did an excellent job there.

14        So yeah, it was -- I really didn't understand,

15   and it was frustrating.

16   Q.   Actually, I missed over -- or not intentionally,

17   but forgot a fact.  And that is that isn't it true that

18   in the summer of 2013, you also got moved out of SVU for

19   a time?

20   A.   Yes, I did.

21   Q.   What happened?

22   A.   Well, during that timeframe there was some

23   decisions made, and one of the detective units was

24   eliminated.  I believe it was the intelligence unit was

25   eliminated.

So the detective division, each unit has a
sergeant in charge of those units.  So I was in charge
of special victims.  So they eliminated the intelligence
unit, and so we had an additional sergeant in the
division all of a sudden.

So that additional sergeant was sent I believe to
the vice unit, and so vice now had two sergeants since
we had an extra in the division.  So at some point we
were informed that the patrol division was running low
on sergeants and they needed another sergeant to go back
to patrol to help out, to backfill the sergeant ranks on
patrol.

So basically, by seniority, the most junior
sergeant had to go back.  And although I had been a
detective longer than most of the other sergeants, my
overall time on the department at that time made me
junior.  So I had to leave the special victims unit and
go back to patrol and fill that position.

Q.  So you were out of it for about six months; is
that correct?

A.  Yes.  So that was then -- I don't remember the
exact month.

Q.  But it was summer and fall of --

A.  Summer through the fall of 2013.

Q.  Okay.  And the person that took your place in SVU

1    was Paul Padgett?

2       A.   That's correct.

3       Q.   And it's just one of these ways that sometimes

4    the system works I gather?

5       A.   Sometimes.

6       Q.   You had all the experience and knowledge.  Did

7    Mr. Padgett have any experience and knowledge?

8       A.   Not in sexual assault investigations.

9       Q.   And then we get to the summer of 2014 and it's

10   happened again?

11      A.   Yes.

12      Q.   So I want to go back to the May meeting again and

13   you finding out what these allegations were.  How did

14   you feel in terms of what impact there might be of an

15   Anchorage Police Department lieutenant sitting in a

16   meeting at the National Guard hearing about sexual

17   assaults and you not knowing about it?

18          MS. SIMONIAN:  Judge, I'm going to object;

19   speculation.

20      Q.   Did you have a reaction to that?

21      A.   Well, all of the rumors that had been

22   circulating, you know, I was frustrated by that to begin

23   with, not knowing why there was this feeling in the

24   public that our department was covering up sexual

25   assaults.

1          And so when I learned of the allegations, it made

2     sense to me all of a sudden, okay, this is where this is

3     coming from.  These allegations are what's fueling this

4     perception in the community that we were covering up

5     sexual assault cases with the National Guard.

6          So my first reaction to that was, hey, we need to

7     get to the bottom of this right now, this is a major

8     deal.  The whole department is being beat up in the

9     public over this, and we need to launch a full

10    investigation, get to the bottom of it and move on from

11    there.

12         And so when that didn't happen, based on our

13    recommendations, the frustration grew even more.  And I

14    would say I was just extremely disappointed in the

15    leadership of our -- the senior leadership of our

16    department for not making that happen and allowing this

17    dark cloud to remain over our department.

18    Q.  Well, not only that, let's -- what is the

19    expectation within the Anchorage Police Department for

20    officers who come into -- who become knowledgeable about

21    possible sexual assaults or sexual misconduct being or

22    happening in the community?  What is their obligation?

23    A.  So any officer that takes a report or receives

24    information of a sexual assault is required to document

25    that and notify the special victims unit.  That can

happen in several different ways.  If an officer gets
information on a sexual assault has just occurred or has
occurred recently, typically, they would call my office
directly to inform me of the sexual assault at which
point I would activate our sexual assault response team
and everyone responds to the multidisciplinary center to
start that investigation.

If an officer learned of a sexual assault that
had elapsed in time, for instance, maybe it was months
ago or years ago, the officer would write a report and
then forward that to my unit for further investigation.

Q.   Is it important that this information be learned
by your unit quickly?

A.   Absolutely.

Q.   And why?

A.   These types of cases often can hinge on physical
evidence, so the sooner we get involved, the better our
opportunities are to collect evidence and to be able to
build a case to hold the offenders accountable.

Q.   And do these kinds of cases, sexual assault cases
become much weaker with the passage of time?

A.   Yes.  Sexual assault cases to begin with are some
of the most difficult cases that we have to investigate.
They're very challenging investigations, and they only
get more challenging as time elapses and physical

1    evidence dissipates.

2        Q.   And especially if no evidence has been collected

3    in the form of a rape kit or something like that?

4        A.   Exactly.  Without physical evidence, these are

5    very challenging cases.

6        Q.   Have you -- let's talk for a minute about the

7    procedure.  When your unit -- and again, I'm referring

8    back to the time you were in SVU, you had an obligation

9    to investigate, correct?

10       A.   Yes.

11       Q.   And that would include interviews and making sure

12   you have the evidence and so on?

13       A.   That's correct.

14       Q.   That gets turned over to who?

15       A.   So evidence we collect gets sent to the state

16   crime lab to be processed, but ultimately, the

17   conclusion of the investigation, if we have enough

18   information or evidence to pursue charges, that's

19   forwarded to the district attorney's office.

20       Q.   And the district attorney's office then evaluates

21   whether it thinks it can proceed with the case against

22   the alleged perpetrator of the crime; is that true?

23       A.   That's true.

24       Q.   Does the -- in your experience, does the district

25   attorney turn down cases if they have become too stale?

1      A.   Yes.

2      Q.   And has that happened more than just a little

3  bit?

4      A.   Yes, that's happened quite often.

5      Q.   And so this is all part of why this kind of

6  information needs to get quickly to your unit and

7  ultimately quickly to the DA; is that correct?

8      A.   Yes, that's correct.

9      Q.   Did you ultimately return to the SVU?

10     A.   I did.

11     Q.   And when did that happen?

12     A.   October of 2014.

13     Q.   October 23, 2014, to be precise?

14     A.   Yes, that sounds right.

15     Q.   And is it true that you were replacing Mr. Henry

16  who had been in the lieutenant's position in the SVU?

17     A.   That's correct.

18     Q.   And once you got back to the SVU, what, if

19  anything, did your unit begin doing with respect to

20  investigating Guard, you know, allegations of Guard

21  sexual assaults?

22     A.   So when I returned to the special victims unit in

23  October of '14, we launched a full scale investigation

24  into any and all allegations of sexual assault or

25  misconduct within the National Guard.

1    Q.  Did that include obtaining from the Guard certain

2    information?

3    A.  Yes.  The National Guard turned over what they

4    call 15-6 investigations to us.

5    Q.  Okay.  Who obtained that from the Guard?

6    A.  Sergeant McKinnon physically obtained those.

7    Q.  So did he obtain that from somebody at the Guard?

8    A.  Yes.

9    Q.  And so at this point, who is in the SVU, by the

10   way, at this point?

11   A.  So special victims unit, I was the commander.

12   Sergeant John McKinnon was the sergeant, the supervisor

13   of the unit.  And we had I believe seven or eight

14   detectives assigned to the unit at that time.

15   Q.  Did that include Detective Von Dolteren?

16   A.  Yes.

17   Q.  And that's Foy Von Dolteren?

18   A.  Yes.

19   Q.  And fair to say that upon obtaining the

20   information from the Guard, your unit began analyzing

21   it?

22   A.  We did.

23   Q.  Were you part of that review?

24   A.  I was.

25        MR. PARKER:  Your Honor, I would move at this

1    time for admission of Exhibit A97 which has been

2    stipulated to.

3            THE COURT:  It will be received without

4    objection.

5            (Exhibit No. A97 admitted.)

6    BY MR. PARKER:

7        Q.  I would like to show you, sir, Exhibit A97.  And

8    is this in fact a table of contents based upon the

9    review that was conducted by the SVU of the information

10   obtained from the National Guard?

11       A.  Yes, it is.

12       Q.  And again, we have a lot of names blocked out

13   here with initials, do we not?

14       A.  Yes.

15       Q.  And we have a column here that says "Case

16   Number."  Do you see that?

17       A.  I do.

18       Q.  And the case numbers begin -- at least in this

19   first group of 15, and these are all 15 either victims

20   or incidents that were investigated by the Guard that

21   you then -- your unit then reviewed?

22       A.  Yes.  So the National Guard had turned over all

23   the 15-6 investigations, and that was about 1200 to 1500

24   pages of documents.  So we went through all of those

25   reports, and where we found incidents of sexual assault

1  or any type of criminal conduct, we extracted that
2  information out and opened the individual investigation
3  into it.  And those case numbers are reflective of each
4  of those investigations we found in those reports.
5     Q.  And the very top one is number 14-45078?
6     A.  Yes.
7     Q.  Does the first number, 14, reflect the year?
8     A.  It does.
9     Q.  Now, this would indicate that that case file was
10 opened in 2014?
11    A.  Yes.
12    Q.  And have you checked to determine the date that
13 that case file was opened?
14    A.  Yes, I have.
15    Q.  What was that date?
16    A.  Forgive me.  I don't recall the exact date, but
17 it was a week after I returned to the special victims
18 unit, so I believe it was October 30th of 2014.
19    Q.  Okay.  And that's the first of the cases that
20 were opened?
21    A.  Yes.
22    Q.  And the next column says "Crime"?
23    A.  Yes.
24    Q.  And for the first four and then for 12 and 13,
25 the crime that's listed there is rape?

1    A.  That's correct.

2    Q.  Sir, why was that written on this document?

3    A.  Because those were the allegations that were

4 contained within the 15-6 report.  That was the crime

5 being reported.

6    Q.  That was the crime that had been investigated by

7 the National Guard and turned over to your unit in

8 October 2014?

9    A.  That's correct.

10    Q.  Now, I want to go back to the earlier list that

11 we looked at, Exhibit A13.  Again, these were the names

12 of victims and we have the initials, but these were

13 cases that had been investigated previously that your

14 unit knew about; is that correct?

15    A.  That's correct.

16    Q.  That your unit had investigated?

17    A.  Yes.

18    Q.  And I see for instance the first one says

19 0960051.  Is that 2009?

20    A.  Yes.

21    Q.  And then we have one from 2010?

22    A.  Correct.

23    Q.  And several from -- well, what, six or seven from

24 2011?

25    A.  Yes.

1     Q.   And a few from 2012?

2     A.   Yes.

3     Q.   One from 2013?

4     A.   Correct.

5     Q.   And one from 2014?

6     A.   Yes.

7     Q.   But this new list, were these cases known by APD

8    prior to getting the information from the National

9    Guard?

10    A.   The first 15 were not, but 16 through 21 were

11   cases that the Anchorage Police Department had

12   investigated.

13    Q.   You can tell that because they say 2013, they are

14   all 2013 cases?

15    A.   Yes.

16    Q.   Was this shocking?

17    A.   Yes, it was.  There is a lot of cases there and

18   going through the 15-6 investigations and seeing that

19   many allegations of criminal conduct that had not been

20   investigated was quite shocking.

21    Q.   Do you remember who some of the individuals were

22   that were in these 15-6 reports?

23         Actually, let me ask it on a leading, Your Honor.

24         Were there National Guard recruiters that were in

25   these 15-6 reports?

1    A.   Yes.

2    Q.   Were there National Guard recruiters who were

3    accused of these crimes that we see listed on this

4    document?

5    A.   Yes.

6    Q.   And was one of those recruiters John Nieves?

7    A.   Yes.

8    Q.   And was one of those recruiters Shannon Tallant?

9    A.   Yes.

10   Q.   Was one of those recruiters Jarrett Carson?

11   A.   Yes.

12   Q.   Were you able to determine from the 15-6 reports

13   if these individuals had been allowed to remain in the

14   Guard after these investigations were completed by the

15   Guard?

16   A.   Yes, they were still active in the National Guard

17   at the time we received the 15-6 investigations.

18   Q.   Are you sure of that?  Weren't they discharged or

19   at least recommended discharge on an other than

20   honorable basis?

21   A.   I guess I don't know.

22   Q.   Or do you know?

23   A.   I guess I don't know the answer to that.  My

24   understanding was they were still in the Guard when we

25   started our investigation.

1      Q.   On this document, we see some different things

2   here in the next column that's "Disposition," correct?

3      A.   Yes.

4      Q.   And so number one, it says, "Agency assist AST."

5   What does that mean?

6      A.   That means that particular allegation occurred or

7   occurred outside of our jurisdiction, so we forwarded

8   that information to the Alaska State Troopers.

9      Q.   And the same with the second one?

10     A.   Yes.

11     Q.   And the next one says, "Agency assist CID."  What

12  does that mean?

13     A.   Again, that's outside of our jurisdiction, and

14  that occurred in the jurisdiction of the U.S. Army, so

15  we contacted the criminal investigation division of the

16  United States Army and forwarded that investigation to

17  them.

18     Q.   And would that be because this involved either an

19  active soldier or occurred on a military base?

20     A.   Yes, occurring during a military deployment.

21     Q.   What jurisdiction does the Anchorage Police

22  Department have over these kinds of crimes committed by

23  National Guard recruiters who have not been federalized?

24     A.   We have full jurisdiction over them if the crime

25  occurred within Anchorage, in the City of Anchorage.

1     Q.   Now, would you lose jurisdiction if they had

2   committed the crime on a military base?

3     A.   We have concurrent jurisdiction with the military

4   bases, so that's something that we can coordinate with

5   the military on.  As long as they haven't been

6   federalized, they're still technically a civilian.  And

7   we often coordinate with the military authorities on

8   investigating or prosecuting civilians that commit

9   crimes on bases.

10    Q.   So the next -- beginning with four, I see number

11  four and number six through number 11, it says, "APD

12  SVU."  What does that mean?

13    A.   That means those cases were assigned to the

14  special victims unit at the Anchorage Police Department

15  for further investigation.

16    Q.   And are your investigators' names in red in the

17  far right column?

18    A.   Yes.  That's the investigator who those cases

19  were assigned to.

20    Q.   So two, is that Detective Sarber?

21    A.   Yes.

22    Q.   And three is Detective Von Dolteren?

23    A.   Correct.

24    Q.   Did you then prepare or did your unit prepare a

25  matrix of these -- of what had been revealed in the 15-6

1  reports?

2     A.  We did.

3        MR. PARKER:  Your Honor, I would move for

4  admission of Exhibit A98, which is stipulated to.

5        THE COURT:  Very well.  It can be admitted.

6        (Exhibit A98 admitted.)

7  BY MR. PARKER:

8     Q.  Is this part of that matrix?

9     A.  It is.

10    Q.  Did your unit prepare the synopsis, which appears

11 to be a lengthy statement, about what was in the 15-6

12 report?

13    A.  Yes.

14    Q.  Now, the very first item which is referred to the

15 troopers -- well, first of all, under "Case Disposition"

16 we see "Under investigation."  Correct?

17    A.  Yes.

18    Q.  And this indicates that something happened in

19 2008.

20    A.  That's correct.

21    Q.  And it indicates that, quote, "The victim engaged

22 in underage drinking to the point where she was passing

23 in and out of consciousness"?

24    A.  Yes.

25    Q.  "And while she was lapsing in and out, she found

herself engaged in various sexual activities with the two suspects"?

    A.   That's correct.

    Q.   I would like to show you --

        MR. PARKER:  Or actually, Your Honor, I would move for identification and then for admission of Exhibit C5, which I believe has also been stipulated to.

        THE COURT:  Very well.  It will be admitted.

        (Exhibit C5 admitted.)

BY MR. PARKER:

    Q.   Now, is this the same page we were just looking at?

    A.   Yes.

    Q.   Do you see under "Suspect's Name" -- and we have some initials there, do we not?

    A.   Yes.

    Q.   Okay.  And for this first item is S2 Shannon Tallant?

    A.   Yes, it is.

        THE COURT:  Is that the biggest you can make that?  It's almost illegible.

    Q.   Is it your recollection that Mr. Tallant was accused and found in this 15-6 investigation to have -- there to be evidence that he had committed the acts that are discussed there?

1    A.   Yes.

2    Q.   I would like to move to the next page of C5.

3    Sir, C5, page two, top item is number four, involves an

4    individual named John Nieves, does it not?

5    A.   That's correct.

6         MS. SIMONIAN:  Judge, can we just approach for

7    a second?

8         (Begin bench conference.)

9         MS. SIMONIAN:  The exhibit he's using is not

10   the exhibit they gave us.  They gave us redacted out all

11   suspects' names, so what he's using right now has never

12   been produced to us.

13        MR. PARKER:  It's an exhibit you stipulated to.

14        MS. SIMONIAN:  You redacted our version.

15        THE COURT:  Is there any reason why you can't

16   use what she has?  Is that critical?

17        MR. PARKER:  Your Honor, actually, in

18   Counsel --

19        MS. SIMONIAN:  Shannon Tallant -- mean this is

20   not what they produced to us.

21        MR. PARKER:  If Counsel were to look at Exhibit

22   No. 182 has a completely unredacted version.  I would

23   recommend you do that.  It's attachment 98 to the Brown

24   report unredacted in your exhibits.

25        MS. SIMONIAN:  What is going -- I'm looking at

what you said was the exhibit.  Is it your exhibit going
with unredacted or is this --

         MR. PARKER:  Yours is unredacted.

         MS. SIMONIAN:  That's not the one you're using.

         MR. PARKER:  I know, but if you want to bring
yours in --

         THE COURT:  You're saying she has it.  She
doesn't have it in her hand.

         MS. SIMONIAN:  That wasn't what he said he's
using.

         MR. PARKER:  It's in her Exhibit 182.

         MS. SIMONIAN:  I'll go pull out my exhibit.

         THE COURT:  What is the issue?  The issue you
need time?

         MS. SIMONIAN:  Yeah, because I don't have what
he's using.

         THE COURT:  You're asking for some time to pull
out the exhibits?

         MS. SIMONIAN:  I didn't know which of the
exhibits this may have been.  The one he's using right
now, he listed it, but he gave us a redacted version of
it.

         THE COURT:  I understand.  I'm just trying to
figure out what you're requesting me to do.

         MS. SIMONIAN:  I can look for it, but I want to

1   make sure.

2           MR. PARKER:  I'll be happy to take a quick

3   break so you can do that.

4           THE COURT:  Do you have one you can give her?

5           MR. PARKER:  No, because it's in her exhibits.

6   Maybe we do over here.  I don't know.

7           THE COURT:  What do you want me to do?

8           MR. PARKER:  Let's take a quick break so she

9   can look for it.

10          (End bench conference.)

11          THE COURT:  Okay.  We'll take a quick break

12  here.  It's a little early for the afternoon recess, but

13  it's Friday afternoon.  We might as well enjoy it.  Take

14  a few minutes.

15          JUROR:  I have a question.

16          THE COURT:  Yes, sir.

17          JUROR:  I am having an airplane waiting for me

18  this afternoon, so I just wondered if --

19          THE COURT:  What time?  You need to break by

20  4:00, right?

21          JUROR:  Not necessarily.  4:00 or 4:30.

22          THE COURT:  You just tell us what you want.

23          JUROR:  I just wanted an estimate.

24          THE COURT:  You tell us what you need, and

25  we'll try to accommodate you.

```
1              JUROR:  I think 4:00 or 4:30 is fine.
2              THE COURT:  Okay.  We can do that.  Not many of
3    us have airplanes waiting for us, so we'll try to stop
4    at 4:00 or 4:30.
5              JUROR:  It's at Merrill Field, so it's close.
6              THE COURT:  You need to leave your notes here.
7    All right.  Thanks.
8              (Jury absent)
9              THE COURT:  Please be seated.  Counsel, that
10   might work out if we stop at 4:00 today.  Any objection
11   to that?
12             MS. SIMONIAN:  No.
13             MR. PARKER:  No.  That's fine.
14             THE COURT:  Everyone should be happy.  We'll
15   take 15 minutes.
16             DEPUTY CLERK:  All rise.  This matter is in
17   recess for 15 minutes.
18             (Recessed from 2:29 p.m. to 2:46 p.m.)
19             (Jury absent)
20             DEPUTY CLERK:  All rise.  His Honor, the Court,
21   the United States District Court is again in session.
22             Please be seated.
23             THE COURT:  So are we all squared away?
24             MS. SIMONIAN:  We are.
25             THE COURT:  Is it realistic to be done with
```

```
 1    this witness by 4:00 p.m.?
 2            MS. SIMONIAN:  I don't know how much longer
 3    Mr. Parker has.
 4            MR. PARKER:  A bit, but not -- what time is it?
 5            THE COURT:  Let me ask you, sir.  Would it just
 6    kill you to come back on Monday morning if we had to?
 7            THE WITNESS:  I can do that.
 8            MS. SIMONIAN:  You're saying you're going for
 9    another hour?
10            MR. PARKER:  No, I didn't say that at all.
11            MS. SIMONIAN:  I'm going to need to use these
12    15-6 documents.  I'm not going to admit them, but I'm
13    going to probably have to read from them at some point.
14            THE COURT:  Well, they can't be admitted, but
15    you can I guess use them to the extent we discussed
16    before.  Do you understand what we're talking about,
17    Mr. Parker?
18            MS. SIMONIAN:  I think he knows what we're
19    talking about.
20            MR. PARKER:  Yeah, I just need to get our copy
21    of them.
22            THE COURT:  Okay.  We'll bring the jury in.
23            (Pause)
24            (Jury present)
25            THE COURT:  Please be seated.  We'll continue
```

1    forth.

2            MR. PARKER:  Thank you, Your Honor.

3    BY MR. PARKER:

4        Q.  So Chief McCoy, we were on Exhibit C5, page two,

5    and item four.  And I think we established that JN is

6    John Nieves.  Is that true?

7        A.  Yes.

8        Q.  And this indicates that Nieves had had a long

9    relationship with the victim and then ultimately had sex

10   with her without her consent, does it not?

11       A.  That's correct.

12       Q.  And at the end, it said, "She felt like she had

13   been raped"?

14       A.  That's correct.

15       Q.  "The relationship ended afterwards, and she

16   sought mental health counseling for depression and

17   anxiety"?

18       A.  Yes.

19       Q.  And that's what your unit had pulled out of the

20   15-6 reports?

21       A.  That's correct.

22       Q.  The next item I wanted to have you look at is

23   exhibit -- is item six.  And S2 again is Tallant?

24       A.  Yes.

25       Q.  "Contributing to the delinquency of a minor."  Do

1    you see that?

2        A.   Yes.

3        Q.   This says that "Three 15-6 investigation

4    statements divulged that underage girls were invited to

5    parties or get-togethers where alcohol would be served"?

6        A.   Yes.

7        Q.   Another 15-6 statement contains information

8    suggesting that Tallant would take underage recruits to

9    Jewel Lake Bowl where it was easier to obtain alcohol

10   for them?

11       A.   Yes.

12       Q.   And then the name of the witness is blocked out,

13   "Reported a complaint from a high school event where

14   empty beer cans were found in the area where recruiter

15   vehicles had been parked"?

16       A.   That's correct.

17       Q.   Let me say that again.  "A high school event

18   where empty beer cans were found in the parking lot" --

19       A.   Yes.

20       Q.   -- "where they had been parked."  Now, this was

21   -- these 15-6 reports came from an investigation that

22   had been conducted by who, do you recall?

23       A.   By -- it was Jane Wawersik.

24       Q.   Wawersik?

25       A.   Yes.

1    Q.  Do you understand she had conducted her

2 investigation in 2013?

3    A.  Yes.

4         MR. PARKER:  Your Honor, I would like to

5 refresh this witness's recollection if I might from the

6 reports without showing the jury.

7         THE COURT:  That's fine.

8 BY MR. PARKER:

9    Q.  Sir, I'm showing you a document that's dated

10 December 20, 2013.

11         DEPUTY CLERK:  Your Honor, is there an exhibit

12 number associated with it?

13         MR. PARKER:  There is no exhibit number.  I

14 guess our next one would be --

15         THE COURT:  Identification.

16         MR. PARKER:  Identification.  What's our next

17 number?

18         MS. HART:  I believe it's E, JE.  No.

19         MR. PARKER:  Whatever our next number is.  We

20 had one earlier today that was J.

21         MS. HART:  I believe it's JG.

22         MR. PARKER:  JG.  Does that sound right?

23         THE COURT:  Okay.  JG.

24         MR. PARKER:  Then that would be this entire

25 notebook for identification, or do you want to do a

1   different one?

2           THE COURT:  Do you have a preference?

3           MS. SIMONIAN:  I don't care.

4           THE COURT:  That's fine.

5   BY MR. PARKER:

6       Q.  And this indicates that an investigation had been

7   done, does it not?

8       A.  It does.

9       Q.  And this first one I'm showing you relates to

10  Master Sergeant Nieves, does it not?

11      A.  That's correct.

12      Q.  And it's an investigation into, quote, "the

13  allegation of an inappropriate relationship between

14  Master Sergeant Nieves and applicants of the Alaska Army

15  National Guard"?

16      A.  Yes.

17      Q.  It goes on to say, "It is my belief based on a

18  preponderance of the evidence that Master Sergeant

19  Nieves did have several inappropriate relationships with

20  applicants"?

21      A.  Yes.

22      Q.  "As well as civilian women"?

23      A.  That's correct.

24      Q.  "Master Sergeant Nieves also sexually assaulted a

25  prospect."  Does it not say that?

1     A.  Yes, it does.

2     Q.  Let's go on to the next report.  Same exhibit

3  number, did we decide?

4          THE COURT:  Yes, at this point, it's all one.

5          MS. SIMONIAN:  I don't know where you are.

6          MR. PARKER:  It's tab two.

7          THE COURT:  Tab two of identification whatever

8  that was, JG.

9  BY MR. PARKER:

10    Q.  This investigative report concerns Mr. Tallant,

11 does it not?

12    A.  Yes.

13    Q.  And he was also investigated for having

14 inappropriate relationships with applicants of the

15 Alaska Army National Guard?

16    A.  That's correct.

17    Q.  And so on.  And it says, "It is my belief based

18 on a preponderance of evidence that FSC Tallant had

19 several inappropriate relationships and committed the

20 regulation violations as follows"?

21    A.  Yes.

22    Q.  And then it lists some 14 violations, does it

23 not?

24    A.  It does.

25    Q.  And it goes to page three?

1    A.  Yes, that's correct.

2    Q.  And the investigation, we see at number two,

3  "Recommendations"?

4    A.  Yes, I do.

5    Q.  And the investigator recommended initiation of

6  separation proceedings?

7    A.  Yes.

8    Q.  "With a characterization of service as other than

9  honorable discharge"?

10    A.  That's correct.

11    Q.  And then going to tab three, does this concern

12  Master Sergeant Jarrett Carson?

13    A.  It does.

14    Q.  And does it state that -- in the -- from the

15  investigator, "It is my belief based on a preponderance

16  of the evidence that MSG Carson did have several

17  inappropriate relationships with applicants"?

18    A.  Yes.

19    Q.  "As well as a civilian woman"?

20    A.  That's correct.

21    Q.  Going to page two at tab three, you see the

22  "Recommendations," number two?

23    A.  I do.

24    Q.  Does it state a recommendation of "initiation of

25  separation proceedings with a characterization of

1   service as other than honorable discharge"?

2       A.  It does.

3       Q.  Did some of the allegations against these

4   recruiters occur before June of 2010?

5       A.  Yes.

6       Q.  Some go back to 2008, 2009, do they not?

7       A.  Yes, they do.

8       Q.  And did some of the other incidents in the --

9   that -- talked about in these reports occur after June

10  of 2010?

11      A.  Yes.

12      Q.  Some in 2011 and 2012 and so on?

13      A.  Correct.

14      Q.  Did you discuss these allegations ever with an

15  investigator named Rick Brown?

16      A.  I did.

17      Q.  Do you recall being interviewed by Rick Brown on

18  or about the 18th of December 2014?

19      A.  Yes, I do.

20      Q.  And had you prior to that meeting gone through

21  your worksheets with him?

22      A.  I had.

23          MR. PARKER:  Your Honor, I would move for

24  identification and admission of Exhibit C7, which has

25  been stipulated to.

1      THE COURT:  Okay.  C7 will be admitted without
2  objection.
3          (Exhibit C7 admitted.)
4  BY MR. PARKER:
5     Q.  Is this a document, sir, that you shared with
6  Mr. Brown?
7     A.  It is.
8     Q.  And up at the top, it's written "Work copy from
9  Lieutenant McCoy 12-18-14."  Correct?
10    A.  Yes, that's correct.
11    Q.  Down at the bottom, the notes say, number one,
12 "27 involving Alaska Army National Guard."  Correct?
13    A.  Yes.
14    Q.  Of that 27, do you recall how many were sexual
15 assaults?  It was six or seven, wasn't it?
16    A.  Yeah, I believe six or seven.
17    Q.  We saw the list.  We went over that.
18    A.  Yeah.
19    Q.  And you told that to Rick Brown, did you not?
20    A.  Yes.
21    Q.  And then after you had gone over your worksheets
22 with Rick Brown, he then interviewed you formally and
23 you formally discussed what you had seen in these 15-6
24 reports, did you not?
25    A.  Yes, we did.

1    Q.  You told all of this to Rick Brown, what your

2   unit had found?

3    A.  That's correct.

4    Q.  Pretty much what we've gone over?

5    A.  Yes.

6    Q.  I could go into a lot more detail, couldn't I,

7   about what was in those 15-6 reports?

8    A.  Yes.  There's a lot of information there.

9    Q.  And none of it was -- none of it was very good,

10  was it?

11   A.  They all were forms of sexual misconduct and

12  sexual assault and other crimes.

13   Q.  In your experience, this is the kind of

14  information that you wish you had had back in 2010?

15   A.  Absolutely.

16   Q.  Okay.  I'm going to refresh your recollection

17  again.  I couldn't find the recommendation on Sergeant

18  Nieves.  Do you now see that in front of you?

19   A.  Yes, I do.

20   Q.  And was he also being recommended for separation

21  from the National Guard?

22   A.  He was.

23   Q.  So this is all information that your unit

24  reviewed in the fall of 2014?

25   A.  That's correct.

1    Q.  And information that you then shared with Rick

2  Brown?

3    A.  Yes.

4    Q.  You remember a person named -- whose initials

5  were ST?

6    A.  I do.

7    Q.  I'm showing you Exhibit A13 again.

8         THE COURT:  Are you intending this to be

9  published or not?

10        MR. PARKER:  Oh, this one, yes.  Thank you,

11  Your Honor.

12  BY MR. PARKER:

13    Q.  So ST is number two on this list, correct?

14    A.  Yes.

15    Q.  And what do you recall of ST?

16    A.  I recall that that was an anonymous report that

17  had been made to the sexual assault response team on --

18  in 2010.

19    Q.  And was that something you were able to figure

20  out later after ST came back again?

21    A.  Yes.  It wasn't until 2013 that she unrestricted

22  that report and we reviewed it.

23    Q.  And in 2013, you actually met with ST?

24    A.  I did.

25    Q.  And was ST at some point in 2013 accompanied by

1  Ken Blaylock?

2      A.  Yes.

3      Q.  Was that unusual to have someone accompanying a

4  victim?

5      A.  No.  Oftentimes in sexual assault cases victims

6  have advocates with them for support or a family member

7  or friend, so I didn't find that odd.

8      Q.  And so Mr. Blaylock's presence when you were

9  conferring with ST was not anything that struck you as

10  unusual?

11      A.  No, not in these types of cases, no.

12      Q.  And this says -- and again, this is a 2010 case.

13  It says, "Unassigned.  Declined prosecution."  What does

14  that mean?

15      A.  That meant after I reviewed it, I did not assign

16  it to a detective for further investigation.

17      Q.  And ultimately, you concluded -- you first

18  concluded when it came to you on an anonymous basis that

19  she really didn't have a case; is that true?

20      A.  That's correct.

21      Q.  And that was because you had felt that she was

22  conscious and it appeared to be consensual?

23      A.  Well, in review of her case, it did not meet the

24  statutory elements of sexual assault in either the first

25  degree or second degree.  So based on those statutes, it

1    was my opinion that a crime was not prosecutable in this

2    particular instance.

3        Q.  But again in 2010, you didn't even know who this

4    person was because she had reported anonymously; is that

5    correct?

6        A.  That's correct.  I did not review this case until

7    2013, but the report was made in 2010.

8        Q.  But there's nothing wrong with her having made a

9    report either anonymously or later unrestricted, is

10   there?

11       A.  No.

12       Q.  And ultimately, the DA declined prosecution too,

13   correct?

14       A.  That's correct.

15       Q.  Did you ever hear that she had heard about the

16   meeting?

17            MS. SIMONIAN:  Okay, Judge, I'm going to

18   object.  Now we're into what -- total speculation and

19   hearsay.

20            THE COURT:  Why don't we come here and figure

21   it out.

22            (Begin bench conference.)

23            THE COURT:  What's going on?

24            MS. SIMONIAN:  Did you ever hear what she said

25   happened about the meeting?  She never reported the

1  meeting -- ST never spoke to him about the meeting with

2  Tony Henry and General Katkus even when she came in

3  2013.  The only way he would hear about that is if

4  somebody told him about Rick Brown's findings because

5  when Rick Brown interviewed him, he didn't ask him that

6  about that.

7          THE COURT:  So it's a foundation objection it

8  sounds like.

9          MR. PARKER:  I'll withdraw that question.

10         THE COURT:  Okay.  Good.  Wait a second.  What

11  are you going to do about these now?  Now it sounds like

12  both sides want these in.  Has this changed?

13         MS. SIMONIAN:  Yeah, apparently.

14         THE COURT:  I don't know, but --

15         MS. SIMONIAN:  I would like them in.

16         THE COURT:  Well, they've got to be redacted

17  significantly, so think about that.

18         (End bench conference.)

19  BY MR. PARKER:

20    Q.  Fair to say that regardless whether charges are

21  filed, and in this instance with ST, but in other

22  instances too, it's not uncommon for someone to come

23  forward and then ultimately not pursue charges?

24    A.  No, that's not uncommon.  Very often people in

25  these circumstances truly feel they were victimized, and

sometimes the elements of the crime are just not met and
the cases aren't prosecuted.

    Q.   But also fair to say that the damage is done
though when a victim doesn't come forward with an
allegation if they in some way feel they've been chilled
from doing so?  Would you agree with that?

    A.   Yes.  Victims of these crimes have to live with
it for the rest of their lives sometimes, and whether
they come forward or not, that is still something they
have to work their way through.

        MR. PARKER:  Thank you.  I have no further
questions.  Thank you.

        THE COURT:  Cross examination.

                    CROSS EXAMINATION
BY MS. SIMONIAN:

    Q.   Should I call you Deputy Chief, or can I call you
Ken?

    A.   Your choice.

    Q.   So you were shocked when you heard Jack Carson's
very serious allegations because you could never imagine
that Tony Henry would do anything to cover up a drug
investigation or a sexual assault investigation; isn't
that right?

    A.   That's correct.  I was shocked.  It seemed out of
character.

1    Q.  And when you heard these allegations, which you
2  say were very serious, like your case files that you and
3  Sergeant McKinnon had or Lieutenant McKinnon had, you
4  would have expected Jack Carson to have something in the
5  form of a police report or a document to support those
6  allegations, wouldn't you?
7    A.  If he was conducting an investigation I would
8  expect there would be some type of documentation.
9    Q.  So you would have expected that there was a
10  police report that supported -- and can we talk about
11  what he told you?
12    A.  Sure.
13    Q.  Because you told Rick Brown what he told you,
14  right?
15    A.  Yes.
16    Q.  And he told you that when you ran into him in the
17  hall, right?
18    A.  Yes.
19    Q.  So he was just freely talking about these
20  allegations?
21    A.  Well, actually, I ran into him in the hallway and
22  we went into a conference room, a private conference
23  room, and spoke about these allegations.
24    Q.  But he didn't know that he was going to this
25  meeting with you later at city hall, did he?

1    A.   When I ran into him in the hallway, I inquired as

2  to why was he going to the same meeting I was going to.

3  And we went into the conference room, and he explained

4  to me why he was involved in the discussion about sexual

5  assaults.

6    Q.   Because Jack Carson isn't involved in

7  investigating sexual assaults, is he?

8    A.   Right.  He's not.  And that's why I was surprised

9  to see him coming to this meeting.

10   Q.   He never had been up to that point or since,

11 right, that you know of?

12   A.   No, not to my knowledge.

13   Q.   And neither had Seth McMillan, right?

14   A.   That's correct.

15   Q.   They were -- but when he ran into you, he told

16 you -- this is what you quoted to Rick Brown.  You said,

17 "He told me he was involved in uncovering basically a

18 drug ring that was being operated out of the National

19 Guard and that they had some specific individuals who

20 they were using as informants and others who they were

21 targeting and questioning on different points.  And

22 within days or weeks after that, their informant stopped

23 talking to them.  Evidence started disappearing.  All of

24 their sources started drying up."

25        And Jack Carson told you he came to the

1    conclusion that General Katkus had shared that

2    information, right?

3        A.   Yes.

4        Q.   That's very serious?

5        A.   Yes.

6        Q.   So you would have expected there to be some

7    information that supported the drug ring, right, police

8    reports?

9        A.   Yes.  Again, if there was that type of

10   investigation going on I would have expected some type

11   of documentation of it.

12       Q.   Did he have any in that meeting?

13       A.   Well, when he told me that information, I went to

14   my supervisor, Captain Bill Miller, and informed him of

15   information I had learned.  And then we reconvened with

16   the deputy chiefs and the chief, and Officer Carson

17   wasn't at that meeting.

18       Q.   Well, he was at the meeting at city hall, though,

19   wasn't he?

20       A.   That was the second meeting.  Yes.

21       Q.   So did he have any police reports of the drug

22   ring and the informants?

23       A.   Again, at that meeting I'm not sure what he had

24   with him.  He may have had a file, but again, I don't

25   know for sure.

1      Q.   And he also told you Kenneth Blaylock was a
2   confidential informant, didn't he?
3      A.   He told me he was a source.
4      Q.   Really?  I thought -- let's look at what you said
5   to Rick Brown.  Do you have your statements to Rick
6   Brown in front of you?
7      A.   I don't.
8      Q.   I'll give them to you.
9      A.   Thank you.
10     Q.   You're welcome.  It's the first statement I think
11  on October 16th.  I think it's at page -- oh,
12  Exhibit A28, I'm sorry, for identification purposes.
13  And you said again at this -- again in this open forum
14  asked him who the informant was.  You used the word
15  "informant," right?
16     A.   Where are you referring to?
17     Q.   On page nine at line five through six.  "And who
18  was providing this information and ordering him to
19  provide the details of that?  And I believe Lieutenant
20  Henry was present at that time also and told his
21  supervisor.  So Officer McMillan revealed to the panel
22  who the informant was.
23          "And after he revealed that information, they
24  paraded the informant in, who was Kenneth Blaylock,
25  brought him again and asked Officer McMillan who the

1    informant was and then made him disclose information

2    with Kenneth Blaylock standing there, and they excused

3    the officer from the proceeding.  That's how it was

4    explained to me."  Right?

5        A.  Yes.

6        Q.  So at least before today, when you talked to Rick

7    Brown, you thought Kenneth Blaylock was an informant,

8    right?

9        A.  I used that term interchangeably, informant,

10   source.

11       Q.  Okay.  So you would agree that if someone was an

12   informant or source, there would be some document that

13   suggested that, either a police report or an informant

14   packet?

15           MR. PARKER:  Objection; lack of foundation,

16   misstates the evidence.

17       Q.  Are you -- how long have you been a police

18   officer?

19       A.  24 years.

20       Q.  Do you, in the course of your 24-year career,

21   know what is required of you for documenting an

22   informant or a source?

23       A.  Yes.

24       Q.  And is it required that you document an informant

25   or a source?

1      MR. PARKER:  May we approach, Your Honor?

2      THE COURT:  That's fine.

3      (Begin bench conference.)

4      MR. PARKER:  I object.  This is misstating the

5  evidence.  He has never said that this was a

6  confidential informant, and the papering requirements go

7  to confidential informant, as I'm sure Counsel knows.

8      MS. SIMONIAN:  I just read what he wrote, what

9  he said to Rick Brown.  If he thinks I'm misstating it

10 then he can fix it on redirect.  I'm not misstating

11 anything.

12     MR. PARKER:  But I don't remember hearing the

13 word confidential in there, so it's misstating the

14 evidence.

15     THE COURT:  I think she just read what --

16     MS. SIMONIAN:  Yes, exactly.

17     MR. PARKER:  Right.  And the word was

18 informant, not confidential informant.  There's actually

19 a pretty big distinction.

20     THE COURT:  What she read didn't have the word

21 confidential.

22     MR. PARKER:  Right, right.  But now she's

23 suggesting he should have been papered as an informant,

24 and that's not how it works.

25     THE COURT:  She can go ahead and you can clear

1  it up.

2          (End bench conference.)

3  BY MS. SIMONIAN:

4     Q.  If you have a confidential informant or a

5  confidential source you would expect there would be

6  either a police report that suggests that or some sort

7  of confidential informant packet, in your experience,

8  right?

9     A.  Sometimes.  However, officers receive information

10  from individuals all the time during the course of their

11  duties, and they may refer to that person as an

12  informant or a source because they're getting

13  information from them, but not necessarily completing an

14  informant packet on that individual.

15     Q.  Yes, but if there's no informant packet, you

16  would expect that information that's being given to be

17  documented in a police report somewhere, right?

18     A.  Yes, I would expect to see some documentation.

19     Q.  And you were shocked about this.  And you went to

20  this meeting with -- at city hall, right?

21     A.  Yes.

22     Q.  And then no investigation was done, as you say,

23  except you said that Chief Mew said he was going to go

24  to the FBI.  Remember when you told Rick Brown that?

25     A.  During the second meeting, the chief said he was

1  going to do that.

2     Q.  And you weren't aware and didn't know that the

3  FBI had conducted an investigation into Jack Carson's

4  allegations, were you?

5     A.  I was not.

6     Q.  In fact, Jack Carson, when he told you about

7  this, didn't tell you, "I've been interviewed by the FBI

8  back in November of 2013," did he?

9     A.  No, he didn't.

10    Q.  Let's talk about these lists.  It seemed a little

11 confusing to me.  I hope it wasn't intentional but --

12          MR. PARKER:  Objection.

13          THE COURT:  Sustained.

14 BY MS. SIMONIAN:

15    Q.  Let's talk about the different lists that you

16 were shown.  The first list, which was A13, can we pull

17 that up.  None of these were recruiters at all, right?

18 Recruiters or -- none of the victims were recruiters,

19 and none of the suspects were recruiters, right?

20    A.  Right.

21    Q.  Okay.  Now let's go to the second list.  That

22 is -- I have it as 182 -- A97.  Did you pull it up?  So

23 these were the recruiter lists, right, from the 15-6s

24 you talked about?

25    A.  Yes, those are the 15-6, yes.

1    Q.  Let's just make one thing clear.  You know that

2  Tony Henry was transferred to special victims unit after

3  that May meeting, right?

4    A.  Yes.

5    Q.  Did you think that was odd that the senior

6  command would put Tony Henry in special victims unit

7  after you had heard allegations that he was somehow

8  involved in the cover-up of sexual assaults?

9    A.  Yes, I thought the whole thing was odd.  I

10  thought him coming in and me going out was an odd

11  decision.

12    Q.  Well, let's be really clear about this.  Tony

13  Henry didn't know about your May meeting or the

14  allegations Jack Carson was making against him then, did

15  he?

16        MR. PARKER:  Lack of foundation.

17    Q.  Well, do you know if he knew?

18    A.  I didn't tell him.

19    Q.  Okay.  And none of these 15-6 investigations were

20  given to the Guard -- given to APD during the time Tony

21  Henry was in SVU, right?

22    A.  No.  We didn't receive those until I came back in

23  October.

24    Q.  So you weren't suggesting he had been in the

25  special victims unit and did nothing about these, right?

1    A.   I don't believe I made any suggestions.

2    Q.   Okay.  So these specific ones on this list are

3    all from the review of the 15-6s, right?

4    A.   Yes.

5    Q.   And you opened cases for them, right, so you

6    could look into it?

7    A.   That's correct.

8    Q.   And I'm sure the City's attorneys told you that

9    Foy Von Dolteren testified earlier, right?

10             MR. PARKER:  Objection; privileged.

11             MS. SIMONIAN:  Privileged?

12   BY MS. SIMONIAN:

13   Q.   Were you aware that Foy Von Dolteren testified at

14   this trial?

15   A.   Yes.

16   Q.   And were you aware he testified about receiving

17   the 15-6?

18             MR. PARKER:  May we approach, Your Honor.

19             THE COURT:  Okay.

20             (Begin bench conference.)

21             COURT REPORTER:  Your Honor, I can't hear.

22             MR. PARKER:  Where was I?

23             THE COURT:  Communications between you and the

24   attorney are privileged.

25             MR. PARKER:  Communications between me and the

1    deputy chief of police are privileged.

2              MS. SIMONIAN:  I'll move on, Judge.

3              (End bench conference.)

4    BY MS. SIMONIAN:

5        Q.  You opened these cases and you wrote crimes next

6    to them all, right?

7        A.  Correct.

8        Q.  How many were prosecuted?

9        A.  I don't know the exact number.

10       Q.  Well, give me a ballpark.  How many of these

11   crimes on this list were prosecuted?

12       A.  Not very many.

13       Q.  None, right?  Because this list is different than

14   the other list where you know they were prosecuted.

15   Which one was that?  Could you pull that one up?  That's

16   C7.  There were so many lists it's hard to keep track.

17   Can you pull them up side by side?

18           And we can tell because there's case numbers next

19   to them.  C7 are the lists of the ones that were charged

20   and/or prosecuted, right?

21       A.  No.  There were some cases prosecuted from that

22   list also, but --

23       Q.  Which ones?

24       A.  I would have to refer to those specific case

25   numbers to be able to tell you that.  I don't know off

 1    the top of my head exactly which ones were or weren't

 2    prosecuted.

 3        Q.  You came in today to tell the jury about all the

 4    bad stuff that the Guard recruiters were doing, and you

 5    didn't look to see which ones you actually charged and

 6    prosecuted?

 7        A.  No.  I did look.

 8        Q.  Okay.  So give me a ballpark.  How many on A97,

 9    which is the recruiter list, how many of those,

10    ballpark, were charged and prosecuted?

11        A.  Again, I don't have an exact number, but I know

12    very few out of either list were prosecuted.  The DA's

13    office declined prosecution on the vast majority of all

14    the cases we referred.

15        Q.  I just want one.  Can you show me one on this

16    list that was charged and prosecuted?

17        A.  Again, I can't point out which specific one here

18    today at this moment.

19        Q.  Well, let's look at the rapes.  Okay?  Which one

20    of the rapes was charged and prosecuted?  Because that

21    is an issue that's close to you, so I'm sure you looked

22    at those.

23            THE COURT:  Excuse me.  I believe he's

24    testified already he doesn't know.  Am I wrong about

25    that?

```
 1            THE WITNESS:  No, sir, you're correct.
 2   BY MS. SIMONIAN:
 3       Q.  Well, can you remember if one of the ones that
 4   was charged was a rape?
 5       A.  I don't believe so on this particular list.
 6       Q.  Okay.  Let's just make sure.  Let's go to ES.
 7   And then can you flip to that 182 exhibit.  ES.  That's
 8   written down as a rape, right?  And in some of these,
 9   did you even interview people?
10       A.  I assigned these cases to individual detectives
11   who did the investigations.  So I did not interview
12   people myself in these particular cases.
13       Q.  And was Foy Von Dolteren one of those detectives?
14       A.  He was assigned some cases, yes.
15       Q.  So you would have expected his testimony before
16   this jury to be an accurate representation of the
17   investigations and the crimes that he uncovered from
18   these, right?
19       A.  Yes.
20       Q.  So under ES, I'm reading from -- this was the
21   Ironman event.  Do you see that?
22       A.  I do.
23       Q.  Did you look in the 15-6 document -- let me just
24   show it to you.  Can you pull it up.  You don't have it
25   available, do you?  1.2 ES.  Do you see that?
```

1          THE COURT:  I'm sorry.  What page or what --

2          MS. SIMONIAN:  It's under tab two, first page.

3     BY MS. SIMONIAN:

4     Q.  It says, "SFC Tallant engaged in a sexual affair

5     with a junior ADOS soldier, ES.  The affair began when

6     Sergeant ES was an 18-year-old PFC who worked directly

7     for SFC Tallant on the mobile event team in R&R, and the

8     affair lasted approximately six months."  Right?

9     A.  Yes.

10    Q.  Okay.  And even the paragraph that's included in

11    Exhibit No. 182, that does not meet the elements of rape

12    either, does it, for ES?  The specific event at the

13    Ironman, that's not a rape, is it?

14    A.  I wouldn't be able to answer that question

15    without a full investigation into those allegations.

16    Q.  And I thought you did that.

17    A.  No.  That case was referred to the Alaska State

18    Troopers.

19    Q.  Okay.  And so do you know if it was prosecuted?

20    A.  I don't know for sure, but it was sent to the

21    Alaska State Troopers for investigation so you would

22    have to inquire with them.

23    Q.  Well, let's go to the next one.  That was also a

24    state trooper one, WA?

25    A.  That's correct.

1    Q.  But that doesn't have to do with a recruiter,

2    right?  That's not JN or ST or -- I mean John Nieves or

3    Shannon Tallant or Jarrett Carson, is it?

4    A.  I can't tell from what you're showing me here.

5    Q.  I know.  Can you pull it up?  That one says J4,

6    so that's not one of the recruiters, right?

7            MR. PARKER:  We'll stipulate.

8            MS. SIMONIAN:  All right.  Good.

9    BY MS. SIMONIAN:

10   Q.  So let's go to the next one.  That's three.  That

11   person is unknown, so we don't even know who that is,

12   but we can't assume it's a recruiter, right?

13   A.  I can't see it.  Can you make it --

14   Q.  Well, it says "Unknown," so you don't know who

15   the person is who's claimed to have done something

16   there, right?

17   A.  No, we don't know who the suspect is in that

18   case, but there are leads.

19   Q.  Let's go to the next one.  This is AL.  This is

20   four and this is Nieves.  This is the one you have

21   listed on -- as number four on this list.  Which list is

22   this?  A97.  So did you read through AL's description of

23   this alleged rape?

24   A.  Yes.

25   Q.  Okay.  You knew they had a consensual

1    relationship?

2        A.   That's correct.

3        Q.   A long-standing affair, both long distance and

4    here, right?

5        A.   That's what it says.

6        Q.   And he wouldn't leave his wife, and that made her

7    angry, right?

8        A.   I don't see that.

9        Q.   Well, we can go into more detail because that's

10   in these documents.

11            Can we move for their admission eventually when

12   they're redacted appropriately?

13            THE COURT:   It's hard for me to tell what's

14   redacted and what's not.   You can refer to them.

15            MS. SIMONIAN:   Okay.

16            THE COURT:   Just let the jury know, we -- if

17   names are mentioned that are confidential we try to

18   redact them, so that's what we're talking about.

19   BY MS. SIMONIAN:

20       Q.   How about this, I'll just show it to you and you

21   can see how many pages there are that document the

22   relationship between AL and John Nieves.   It's a long

23   story, isn't it?

24       A.   Yes.

25       Q.   Could you just flip through it to refresh your

1    recollection?

2    A.   I see where you're talking about the wife, yes.

3    Q.   And then finally the allegations over Christmas

4    break, right?

5    A.   Yes.

6    Q.   Okay.  Can I take that back?

7    A.   Uh-huh.

8    Q.   So at least with AL, the only rape that John

9    Nieves has attributed to him on your list, while this

10   may be and is definitely a violation of military code,

11   it does not describe something that could be prosecuted,

12   does it?

13   A.   That description does not.

14   Q.   Because it's not clear that there was no consent

15   and they were in bed together, right?

16   A.   Well, this description is what we were able to

17   get from the 15-6 investigation.  Once we extracted that

18   description, we opened a full investigation to get all

19   of the facts.  So this is just a snapshot of what we got

20   by reviewing the initial 15-6 report.  Then we opened a

21   full investigation and assigned an investigator to get

22   all of the facts.

23   Q.   After you did that, this wasn't charged, right?

24   A.   That's correct.

25   Q.   Because it didn't meet the elements of a rape,

1    did it?

2    A.    I can't say why the district attorney chose not

3    to charge the case, but they declined prosecution.

4    Q.    Let's keep going.    Under number five, that was

5    against Tallant and Butler for perjury, right?    And

6    that's because they were having an affair and then they

7    ended up getting married and they lied about having an

8    affair to the National Guard, right?

9    A.    That's correct.

10    Q.    No one got charged for that, did they?

11    A.    I don't believe so.

12    Q.    And then the next one was that the one that

13    Mr. Parker focused on and repeated several lines of --

14    several times, but he left out the last sentence.    What

15    does the last sentence say on that one?

16            MR. PARKER:    I'm sorry.    What page are you on?

17            MS. SIMONIAN:    Number six.

18            MR. PARKER:    Page six?

19            MS. SIMONIAN:    Number six of the chart.    It's

20    on your screen as well.

21    BY MS. SIMONIAN:

22    Q.    What does that last sentence say, Deputy Chief

23    McCoy?

24    A.    It says, "None of the witnesses say they -- say

25    that they ever went to or witnessed any of the parties,

1  however."

2       Q.   So there were no charges for that, I imagine,

3  because you kind of need witnesses, right?

4       A.   Again, this is just a snapshot of what was

5  obtained from the 15-6 investigation, and then based on

6  that, an investigation was launched.  It's just the

7  starting point.

8       Q.   You can't say -- well, it is just a starting

9  point, but you do need witnesses for a starting point,

10 don't you?

11      A.   Well, again, we reviewed these and there were

12 allegations, so we started investigations.  We weren't

13 going to ignore any allegation no matter how minor it

14 seemed or how difficult it seemed to make a case.

15           If it says there were no witnesses, well, we were

16 still going to assign that case and do our due diligence

17 and try to find witnesses and interview everyone

18 involved.  Were we successful in every instance, no, but

19 we were going to give it a shot in every case we had

20 allegations for.

21      Q.   And today you can't tell the jury or us whether

22 or not that resulted in any charges, right?  You can't

23 remember?

24      A.   Again, there were very few of these cases that

25 were prosecuted.  The majority of the cases we referred,

1    the DA's office declined to prosecute.

2        Q.  Let's keep going.  Number seven, that was

3    Tallant.  This relates to JM.  Do you see that?

4        A.  Yes.

5        Q.  And all of these correspond with what's on A97.

6    Each one of these correspond with the list that you

7    showed from A97, right?  This is the description of

8    them?

9        A.  Yes.  Those are all from the 15-6 investigations.

10       Q.  And this is rumors about Tallant impregnating

11   someone when she was in high school, right?

12       A.  That's correct.  We weren't going to ignore any

13   allegation.  If there was a rumor that he impregnated a

14   high school girl, we were going to investigate it.

15       Q.  And then when JM -- let's just look at what she

16   said in the actual 15-6 for Shannon Tallant.  This is

17   behind tab two, page two.  If the 15-6 says, "JM

18   reported that while he was a freshman through her junior

19   year in high school, SFC Tallant repeatedly tried to

20   take her on dates and eventually tried to get her to

21   come to his house.  She was in JROTC at that time."

22   Right?  And while that's pretty gross, it's not illegal,

23   is it?

24       A.  Again, if she's in high school and if she's

25   underage, it very well could be illegal.  And again, the

allegations were that the Anchorage Police Department
was covering up sexual assaults. So no matter how minor
the allegation was, we were going to look into it and
get to the bottom of it.

     And yes, very few of the cases were prosecuted,
but I can say we didn't cover anything up. We looked
into all of these cases.

     Q. In truth, even when you look at these 15-6
documents, you can't even tell sometimes when these
supposedly happened?

     A. No, you can't. Again --

     Q. So when Mr. Parker was saying these go back to
2009 and 2010 and before a June meeting in 2011, that's
a lot of guessing, isn't it?

          MR. PARKER: Objection; mischaracterizes the
evidence.

          THE COURT: Let him finish his answers.

     A. Again, these were just a snapshot of what
occurred. And the investigators were assigned these
cases, and they were to dig into it and see if they can
determine when exactly these events happened, if there
was witnesses, if there was any type of physical
evidence.

     We knew going in this was going to be a
challenge. But with the allegations that were out

1    there, we weren't going to ignore any of these

2    allegations.  No matter how small they were, we were

3    going to assign a detective and look into rumors.

4        Q.  I get that.  And I'm glad you did that.

5            Who hired Jane Wawersik to do this very thorough

6    investigation that uncovered every single thing that you

7    could possibly imagine about the recruiters in the

8    Alaska National Guard?

9            MR. PARKER:  Objection; argumentative.

10           THE COURT:  The question is who hired.

11       A.  I have no idea.

12       Q.  General Katkus?  Would that surprise you?

13           MR. PARKER:  Objection; assumes facts not in

14   evidence.

15           THE COURT:  The question was who hired.  The

16   answer was he doesn't know.

17   BY MS. SIMONIAN:

18       Q.  Would it surprise you if General Katkus testified

19   in court that he specifically found and hired Jane

20   Wawersik in order to look into the recruiting unit in

21   2013?

22       A.  It wouldn't surprise me.  I would expect him to

23   hire someone to investigate allegations.

24       Q.  And had he not done that, you wouldn't have had

25   any of this information to look into, right?

 1      A.   No, that's correct.   We received that information

 2   from the National Guard.

 3      Q.   I would like to talk to you about ST.   When you

 4   met with Rick Brown, you talked to him off the record,

 5   right, both times?

 6      A.   Off the record?

 7      Q.   Yeah.   Let's look at your statement.   The first

 8   one that's in front of you, A28, on page 23, Mr. Brown

 9   goes off the record.   You'll see it at the top.

10      A.   Right.

11      Q.   Is that right?

12      A.   Yes, that's correct.

13      Q.   And then you have a conversation off the record,

14   and then you go back on the record, right?

15      A.   Right.

16      Q.   And then your second interview on 92, at page

17   three, Mr. Brown acknowledges that "Last time we spoke

18   in October, we actually met a little -- for a little bit

19   this morning to go over some of your inventory of

20   cases."   Right?

21      A.   That's correct.

22      Q.   So that happened off the record as well, right?

23      A.   Yeah, sure.

24      Q.   When he talked to you on the first interview, he

25   did not speak to you about ST or any of the specific

1  victims, right?

2      A.  I don't believe we did.

3      Q.  And the second interview was about the specific

4  people on your list, but not the list of the recruiters,

5  it's the other list, right?

6      A.  I would have to --

7      Q.  Which list is that?

8      A.  I believe I had both lists at that time, but I'm

9  not entirely sure.

10     Q.  It was the list that had ST's name on it.  A13.

11     A.  Right.  So ST's name was on that original list

12 because that was the reports that we were aware of that

13 were reported to APD.

14     Q.  Those are the only ones that he went through with

15 you on the record, right?

16     A.  At which meeting?

17     Q.  The second meeting.  That's your second

18 statement.  You can flip through it, and you'll see --

19 you can compare their initials to what he was asking you

20 about.

21     A.  Right.  I do believe we spoke about this case

22 during that second meeting.

23     Q.  Why wouldn't he have talked to you about the

24 Guard list since he was investigating the Guard?

25          MR. PARKER:  Objection; lack of foundation.

1    Q.   The recruiter list, do you know?  Do you know why

2  he didn't talk to you about that on the record?

3         MR. PARKER:   Foundation.

4    Q.   Well, did you talk to him about that off the

5  record?

6         MR. PARKER:   Speculation.

7         THE COURT:   I think the answer is -- I mean

8  you're asking him why someone else did something.

9  BY MS. SIMONIAN:

10   Q.   I'll rephrase it.  Did you talk to him about the

11 recruiter list off the record?

12   A.   Off the record?

13   Q.   Yeah, in your meeting before you went on tape.

14   A.   What I talked to him about was the three

15 different lists of cases we had.  As you mentioned, it

16 was three different lists.  It's confusing, so I had to

17 give some clarification about each list.  So yes, we

18 talked about the lists that were created.

19   Q.   Okay.  But he talked to you about ST

20 specifically, right?

21   A.   We did talk about ST, yes.

22   Q.   And what you told him about ST -- well, what you

23 told him about ST is that it's a 2010 case, and you told

24 him it was a 2010 case because she had made a restricted

25 report.  And as soon as a person makes a restricted

report, a case is opened, even though APD doesn't
actually open an investigation, right?

    A.   Right.  Well, at APD we refer to them as
anonymous reports, not restricted reports.  So an
anonymous report was made by ST in 2010 where she met
with the forensic nurse.  The forensic nurse gets an APD
case number and assigns it to it, and it gets stored
until such a time as the victim chooses to come forward
and have us investigate.  So in this particular case,
that didn't occur until 2013.

    Q.   And Deputy Chief McCoy, you know Tara Henry,
don't you?

    A.   I do.

    Q.   Who is Tara Henry in relationship to forensic
nurses who do this type of work?

    A.   She is a forensic nurse.

    Q.   And what's her role -- I mean what's her
reputation and role in the community related to that?

    A.   She's an excellent forensic nurse, considered to
be one of the best.

    Q.   And you would -- I think she would share your
passion for sexual assault victims and reporting of
them, right?

         MR. PARKER:   Objection; relevance, lack of
foundation.

1      Q.   Do you agree?

2      A.   I'm sure she is very passionate about the work.

3      Q.   You told Mr. Brown that ST's allegations, quote,

4    "did not meet the criminal elements of sexual assault by

5    statute, so her case at that point was unassigned and

6    declined prosecution."  That's what it says on the list,

7    right?

8      A.   That's correct.

9      Q.   And then he briefly asks about the reasons that

10   she had a 2010 case number, right?

11     A.   Yes.

12     Q.   And those reasons are outlined in your report

13   that you wrote when you opened the -- when she came back

14   in and unrestricted her case in 2013; is that correct?

15     A.   Yes.

16     Q.   And she did that -- and I would like to move for

17   the admission of A103.  That's the actual report.

18               THE COURT:  Okay.  We'll just have a brief --

19               (Begin bench conference.)

20               THE COURT:  You have one minute left.  I just

21   want to know what your plans are.

22               MS. SIMONIAN:  One minute left until, what,

23   4:00?

24               THE COURT:  Until you're out of time.

25               MS. SIMONIAN:  Well, I need probably ten more

1   minutes to get through.

2           THE COURT:  You have ten more minutes, period.

3           (End bench conference.)

4           MS. SIMONIAN:  Move for the admission of A103,

5   stipulated?

6           THE COURT:  Very well.  It will be admitted.

7           (Exhibit A103 admitted.)

8   BY MS. SIMONIAN:

9      Q.  This is your police report from that meeting in

10  January?

11     A.  No.

12     Q.  Note the following page.  There you go.  Is that

13  right?

14     A.  Yes.

15     Q.  If you go to the last page on four, it shows an

16  e-file, right, and interview notes?  Is that correct?

17     A.  That is correct.

18     Q.  And the e-file includes the -- even though this

19  was 2013, it includes the SART report from 2010, right?

20     A.  That's correct.

21     Q.  And you could have looked at and probably did

22  look at the SART report from 2010 and 2013, right?

23     A.  Yes.

24     Q.  And so do you remember what -- and the jury will

25  have these, they can look at the facts of the case, but

1    you know that she reported this to the sexual assault

2    coordinator, Gretchen Nealy, as well at the Guard before

3    she went to get a SART exam, right?

4       A.   That's my understanding.

5       Q.   And the SART nurse and Ms. Nealy take kind of

6    history from the sexual assault victim, don't they?

7       A.   Yes.

8       Q.   I'm going to show you Exhibit No. 193, just for

9    identification purposes only.  And I would like to read

10   to the jury the reasons that Ms. -- ST gave for

11   restricting this report.  And this was in March of

12   2013 -- I mean 2010, right?

13      A.   Yes.  This would have been in 2010.

14      Q.   Could you read why ST restricted her report?

15      A.   "Patient reports that she is concerned about

16   going to talk to law enforcement right now because 'I

17   have so much going on.  I was just divorced.  My kids

18   and stuff.  Just need to think about it.  I'm also

19   afraid that he won't remember because he was

20   intoxicated.  It would open up so much stuff in my

21   unit.'"

22      Q.   And that -- those are fine reasons for

23   restricting a report, right?

24      A.   A victim doesn't have to have a reason.

25      Q.   And if a victim restricts a report, police

officers are not supposed to go and force them to change

their mind, right?

    A.  If the report is restricted or anonymous we don't

know.  So yeah, we're not going to change anyone's mind.

We're not aware of it.

    Q.  So if sexual assault victims don't want to report

their crimes, there's nothing to report to you or anyone

else, there's nothing actionable from that, correct?  If

a sexual assault victim does an anonymous report and

that is discussed somewhere, that is not actionable.

The people who hear about that aren't supposed to come

and report it to you, are they?

    A.  Depends on who it is.  Professionals in the

medical field who are taking these reports aren't going

to come to us with that.  That doesn't mean a family

member or a friend who knows about it, they could come

forward.

    Q.  Sure.  But those aren't things -- like that, when

you're talking about a police officer's duty to report

something to you, they are not under any sort of duty to

report to you about someone who doesn't want to report

their crime, correct?

    A.  Right.  That's correct.  If a person doesn't want

to report then an officer doesn't have to make a report.

    Q.  Let's go to defense Exhibit A101, page four.  Do

1    you remember getting a call from Ms. Nealy days after

2    this happened?

3        A.   I don't --

4        Q.   It's still anonymous.  It was still restricted.

5    Do you remember getting this call?

6        A.   Not specifically.  I received hundreds of phone

7    calls.

8        Q.   Could you read to the jury what Ms. Nealy

9    documented she did and why she did it as it relates to

10   you, just that sentence that begins with "Victim asked"?

11       A.   "Victim asked that I speak with APD Sergeant Ken

12   McCoy and give case details to see if she came forward

13   if the case would be investigated.  Sergeant McCoy

14   stated that it would most likely not be investigated and

15   would be hard to prove due to the circumstances."

16       Q.   So within days of this, if Ms. Nealy called you

17   and you gave her that information, it's the same

18   information you ended up giving in 2013, right?

19       A.   Yes.  I made the same analysis of the case then

20   as I did in 2013.

21       Q.   Did Mr. Brown tell you that ST, when he spoke to

22   her, said that she and Kenneth Blaylock came to see you

23   in March of 2011 before she unrestricted her report?

24       A.   I'm not aware of the exact date, no.

25       Q.   This is two years before she unrestricted her

1    report, March of 2011.

2        A.   I recall her or someone coming in with Blaylock.

3        Q.   Okay.

4        A.   But I can't tell you if it was before or after

5    this.  I thought it was after, but it could have been

6    before.

7        Q.   Yeah, it was.  This is March of 2010.  It's a

8    year later, March of 2011, still anonymous report.  She

9    comes to see you with Blaylock, and she says you

10   basically told her the same thing you said to the SART

11   nurse and the same thing you ended up saying in 2013.

12            MR. PARKER:  Misstates the evidence.

13       A.   My analysis remains --

14            THE COURT:  Let him answer.  Go ahead.

15       A.   My analysis of the case remained the same every

16   time I was asked about it.

17       Q.   She never told you in all the times that you

18   talked to her either in 2011 and 2013 about any meeting

19   with Tony Henry, did she?

20       A.   No.

21       Q.   And she never told you that she was afraid to

22   report her crime because she thought APD was corrupt,

23   did she?

24       A.   No, she didn't.

25       Q.   And Kenneth Blaylock didn't say that when he was

1   with her, did he?

2       A.  No.

3       Q.  And you talked briefly about -- and I would like

4   to move for the admission of it, but I'm just -- I'll

5   wait for that.  Can you -- oh, 159.

6           159.  You talked briefly to Mr. Brown about the

7   fact that you participated in an inquiry by General

8   Katkus to see if this case could get prosecuted.  Do you

9   remember that?

10      A.  I don't.

11      Q.  Do you remember helping Assistant District

12  Attorney Paul Miovas write a letter to General Katkus

13  about ST's case?

14      A.  No, I didn't assist him writing any letters.

15      Q.  Can you look at Exhibit No. 159, just for

16  identification purposes.  I'll show it to you.  What's

17  the date on that?

18      A.  March 7th of 2014.

19      Q.  Who is it addressed to?

20      A.  Major General Tom -- Thomas Katkus.

21      Q.  Does that look like a letter from -- you know

22  Paul Miovas, right?

23      A.  Yes.

24      Q.  And does that look like a letter from Paul Miovas

25  explaining why ST's case could not be criminally

1    prosecuted?

2        A.  Yes.  This appears to be that letter.

3        Q.  Is there anywhere in there that says because she

4    delayed reporting it's not prosecutable?

5        A.  No.

6        Q.  And is there anywhere in your police report where

7    you said because she delayed report -- unrestricting her

8    case it was not prosecutable?

9        A.  No, I didn't say that.

10       Q.  And you didn't say that because your analysis was

11   the same days after the assault, a year after the

12   assault, two years after the assault, and then you

13   concur with Paul Miovas in 2014 that the delay in

14   reporting or unrestricting had nothing to do with it?

15       A.  The analysis of her case was that it did not meet

16   the elements of sexual assault.  And that's what I made

17   my analysis on, and the Department of Law made the same

18   analysis.

19       Q.  If you thought that, if you thought there was

20   something like that, like some problem or some concern

21   she had or some reason she didn't report it that was

22   related to Tony Henry, I'm sure you would have

23   documented that and done something about it right away?

24       A.  The first time I heard any allegations related to

25   Tony Henry was March 1st of 2014.

 1    Q.   And those were from Jack Carson, right?

 2    A.   That's correct.

 3    Q.   And those were not supported by any evidence that

 4  you had that day, correct?

 5    A.   That I had, no.

 6         MS. SIMONIAN:  Thank you.

 7         THE WITNESS:  You're welcome.

 8         THE COURT:  Redirect?

 9                   REDIRECT EXAMINATION

10  BY MR. PARKER:

11    Q.   So Chief, you were asked questions about

12  confidential informants and whether or not Ken Blaylock

13  was a confidential informant.  No one ever said he was a

14  confidential informant, did they?

15    A.   No.

16    Q.   That means somebody who actually signs

17  documentation, signs basically a contract and is

18  providing information on a confidential basis, right?

19    A.   That's correct.

20    Q.   Pursuant to that contract?

21    A.   Correct.

22    Q.   And you said Blaylock was a source or an

23  informant, but that was not a papered confidential

24  informant, correct?

25    A.   Right.  That was my understanding.  It was just

1    someone giving information to them.

2       Q.   Okay.   Let me show you -- again, this is

3    Exhibit A97.   And again, we have some of these that are

4    being referred to APD.   You see the three cases assigned

5    to Von Dolteren?

6       A.   Yes.

7       Q.   And he's tasked with going through those 15-6s

8    and coming up with an assessment, correct?

9       A.   Yes.   He was assigned to look at those

10   allegations specifically.

11      Q.   Okay.   He's looking at harassment claims,

12   correct?

13      A.   Yes, he was assigned harassment claims.

14      Q.   And so he testified here a few days ago that when

15   he looked at the -- when he looked at the 15-6, that he

16   didn't see anything that approached a crime, but what he

17   saw was pretty disgusting.   But that would be consistent

18   with him reviewing harassment claims, would it not?

19      A.   That's correct.   I assigned him harassment cases,

20   not sexual assaults.

21      Q.   But Detective Sarber looked at at least one rape,

22   correct?

23      A.   That's correct.

24      Q.   And that's a crime in anybody's book, isn't it?

25      A.   If the elements are met, yes.

1    Q.   Yes.  Serious crime.  But there are very few

2  crimes that are more serious than that, are there, if at

3  all?

4    A.   No.  Sexual assault is an unclassified felony.

5  And we only have two others, homicide and kidnapping.

6    Q.   So you were asked questions about whether or not

7  any of these were prosecuted.  But first of all, when

8  you were talking to Rick Brown in December 2014 about

9  these, these were all under active investigation,

10  correct?

11   A.   That's correct.

12   Q.   None had yet been referred to the DA; am I right?

13   A.   You're correct.  We were still investigating.

14   Q.   So this is the information that you give to Rick

15  Brown at that time?

16   A.   Yes.

17   Q.   But with respect to what went to the DA, how many

18  times did you hear if -- I mean, if you could even

19  enumerate it, that a lot of these just couldn't be

20  prosecuted because they were just too old?

21   A.   That was a factor in some of them.  And they were

22  old, which equates to no physical evidence, lack of

23  witnesses, lack of being able to determine exact time,

24  locations that these things occurred.

25   Q.   No evidence that these had ever been promptly

     reported to either your multidisciplinary center and/or

     to a National Guard SART?

          A.   So from the 15-6 investigations, 1 through 15 we

     determined were never reported to us or another agency.

     However, numbers 16 through 21, we were -- those had

     been reported to us at some time, mostly 2013.

          Q.   But the ones on top, if they're not reported to

     the proper agency then really no evidence is collected.

     Would that be fair to say?

          A.   That's correct.

          Q.   No SART nurse is involved, no rape kit is done, I

     mean all sorts of stuff doesn't get preserved as

     evidence, correct?

          A.   Right.  If it's not reported to us we have no

     opportunity to collect evidence and gather witness

     statements.

          Q.   So by the time you all find out about this, some

     of these are six-plus years old, correct?

          A.   Yes.

          Q.   Let's go to C5 again.  Believe it or not, Your

     Honor, I'm getting pretty close to being done, so nobody

     needs to be nervous about airplanes and so on.

               So I'm showing you what's the fourth page of C5.

     And the first item concerns Tallant, does it not,

     item 12?

1    A.   Yes.

2    Q.   And then this says in February 2009?

3    A.   Correct.

4    Q.   And this is concerning something that happened at

5    a dog race?

6    A.   Yes.

7    Q.   The Tustamena 200 Sled Dog Race.  And this

8    describes a female who was made to drink a large amount

9    of alcohol and the soldier then hid her keys.  The

10   soldier went to go to sleep, again, referring to the

11   victim, that night to see Tallant having sex with the

12   female -- I'm sorry, a soldier, a witness, then saw

13   Tallant having sex with the female, correct?

14   A.   Yes.  That particular witness indicates that

15   Tallant instructed him to hide her keys and flatten her

16   tires, and he later observed Tallant having sex with

17   her.

18   Q.   To begin with, hiding keys, flattening tires, she

19   can't escape.  What's that called?  What crime is that?

20   A.   Could be kidnapping.

21        MS. SIMONIAN:  Excuse me.  I missed that.  What

22   did you say?

23        THE COURT:  He said could be kidnapping.

24   BY MR. PARKER:

25   Q.   This is 2009 and likely the DA did not prosecute

1  this?

2          MS. SIMONIAN:  Object; speculation.  Deputy

3  Chief McCoy said he doesn't remember whether any of

4  these were prosecuted or why.

5          THE COURT:  Okay.  Okay.  Do you remember or

6  not?

7          THE WITNESS:  This particular case, Your Honor,

8  is referred to I believe the Alaska State Troopers.

9  BY MR. PARKER:

10     Q.  But regardless, assuming prosecution was denied,

11  do you think that the fact that this was a February 2009

12  event finally disclosed in late 2014 would play a role

13  in that not being prosecuted?

14     A.  It would make it very difficult to have a

15  successful investigation of that event.

16     Q.  And the next item, January 2008, you see that?

17     A.  Yes.

18     Q.  The National Guard recruiting team were attending

19  a recruiting event in Paxson in connection with the

20  Iditarod race?

21     A.  Yes.

22     Q.  "During one of the evenings at the event, two

23  soldiers had stated that they witnessed an encounter

24  between the victim and Tallant.  One soldier stated he

25  saw Tallant give the victim more alcohol than she wanted

to consume, and then while the victim seemed drugged, lost, not responsive, incoherent and clumsy, Tallant led her to his room in the back of an RV and had sex with her. The victim stated that she barely remembered the event but felt horrible and very vulnerable afterwards."

A. Yes.

Q. And assuming that one didn't get prosecuted, in your experience, sir, to what extent would the age of this allegation and if no evidence was collected play in a decision not to prosecute?

A. It would be a huge factor. The description here is of possibly second degree sexual assaults. Those are very challenging cases to investigate and prosecute even when we investigate them immediately. This many years later, very, very challenging.

Q. And if we take a close look at the matrix that was done and we take an even closer look at the 15-6 reports, we'll see the dates that all these kinds of things happened, won't we?

A. Yes.

Q. And again, some pre June 2010?

A. That's correct.

Q. And if those had come to light in June 2010, does that increase the chances, in your experience, that they would have been prosecuted?

1     A.   We would have had a much better chance at

2  conducting a successful investigation.

3          MR. PARKER:  Your Honor, I think those are all

4  the questions I have for Chief McCoy.

5          THE COURT:  Brief recross?

6                     RECROSS EXAMINATION

7  BY MS. SIMONIAN:

8     Q.   Do you have any information that any of these

9  cases had anything to do with Lieutenant Tony Henry?

10    A.   My investigation was into the allegations of

11 these specific incidents.  I did not investigate Tony

12 Henry.

13    Q.   And Tony Henry's name never came up in any of

14 these investigations, correct?

15    A.   In the investigations my unit conducted, we were

16 investigating specific crimes that were committed by

17 members of the National Guard.  We were not

18 investigating Tony Henry.

19          MS. SIMONIAN:  Thank you.

20          THE WITNESS:  You're welcome.

21          THE COURT:  Okay.  Thank you, sir.  You're

22 done.  You're free to go.

23          (Witness excused)

24          (Requested excerpt concluded, proceedings

25 continued.)

CERTIFICATE

   I, Sonja L. Reeves, Federal Official Court Reporter
in and for the United States District Court of the
District of Alaska, do hereby certify that the foregoing
transcript is a true and accurate transcript from the
original stenographic record in the above-entitled
matter and that the transcript page format is in the
conformance with the regulations of the Judicial
Conference of the United States.

   Dated this 5th day of November, 2018.


                         /s/ Sonja L. Reeves
                         SONJA L. REEVES, RMR-CRR
                         FEDERAL OFFICIAL COURT REPORTER